# 24-2856-cv

## United States Court of Appeals

*for the*

## Second Circuit

DANIEL N. ARBEENY, As the Administrator for the Estate of NORMAN
ARBEENY (Deceased) individually and on behalf of all others similarly situated,
SEAN S NEWMAN,

*Plaintiffs-Appellants,*

— v. —

ANDREW M. CUOMO, MELISSA DELROSA, HOWARD A. ZUCKER, M.D.,
NORTHWELL HEALTH, INC., MICHAEL DOWLING,

*Defendants-Appellees,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

MICHAEL S. KASANOFF
MICHAEL S. KASANOFF, LLC
*Attorneys for Plaintiffs-Appellants*
Nine Stillwell Street
Matawan, New Jersey 07747
(908) 902-5900

CP COUNSEL PRESS    (800) 4-APPEAL • (380112)

GREATER NEW YORK HOSPITAL ASSOCIATION, KENNETH RASKE,

*Consolidated-Defendants-Appellees,*

STATE OF NEW YORK, JOHN DOES A-Z,

*Defendants.*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

STATEMENT OF JURISDICTION............................................................1

ISSUES PRESENTED FOR REVIEW ....................................................1

STATEMENT OF THE CASE....................................................................2

    A.    Factual Overview .................................................................2

    B.    Relevant Procedural History ...............................................4

STANDARD OF REVIEW .........................................................................6

    A.    The Motion to Dismiss Standard...........................................6

    B.    Qualified Immunity .............................................................8

    C.    Plaintiffs are Entitled to Discovery, as Facts and Evidence are Uniquely within the Possession of Defendants at this State of the Proceeding ...........................................................9

    D.    Because the Directives Deprived Plaintiffs of Fundamental Rights, Strict Scrutiny should be Applied...........................................14

SUMMARY OF ARGUMENT ..............................................................16

ARGUMENT ...........................................................................................21

    POINT I

    DEFENDANTS ARE ALL INDIVIDUALLY LIABLE FOR 42 U.S.C. § 1983 SUBSTANTIVE DUE PROCESS VIOLATIONS AS THE DIRECTIVES VIOLATED MULTIPLE CLEARLY ESTABLISHED RIGHTS ...........................................................21

    A.    Introduction ......................................................................21

    B.    Defendants Violated Substantive Due Process .................22

        1.    Statutory Rights under the Federal Nursing Home Reform Act of 1987 ("FNHRA") ...........................24

        2.    The Right to be Free from Cruel, Unhuman, or Degrading Treatment ................................................26

i

3. The Right to Safe Conditions ......................................................28

4. The Right to Life .......................................................................30

5. The Right to Bodily Integrity ....................................................32

6. The Right to be Free from State-Created Danger ....................33

7. Defendants' Violations of these Rights Shocks the Conscience ................................................................................36

C. Because the Directives Violated Multiple Clearly Established Rights, Defendants are not Entitled to Qualified Immunity ...............42

POINT II

DEFENDANTS ARE LIABLE FOR CONSPIRACY UNDER 42 U.S.C. § 1983.....................................................................................44

POINT III

THE DISTRICT COURT ERRED IN NOT FINDING THE HOSPITAL DEFENDANTS TO BE "STATE ACTORS" .........................45

A. Public Corruption Lies at the Heart of this Case ................................45

B. The District Court Gave Factual Deference to the Wrong Party.....................................................................................................49

C. The Court Allowed the State Defendants to Disown Their Own Acts .............................................................................................54

POINT IV

THE WRONGFUL DEATH CLAIM .........................................................58

CONCLUSION ................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abebe–Jira v. Negewo*,
  72 F.3d 844 (11th Cir.1996),
  *cert. denied*, 519 U.S. 830, 117 S. Ct. 96, 136 L. Ed. 2d 51 (1996) ...................27

*Agudath Israel of America v. Cuomo*,
  983 F.3d 620 (2d Cir. 2020) ........................................................................ *passim*

*Arbeeny v. Cuomo*,
  2025 WL 71729 (E.D.N.Y. 2025) ............................................................... *passim*

*Ashcroft v. Iqbal*,
  556 U.S. 662,129 S. Ct. 1937, 173 L. Ed. 2d 662 (2009) ....................................8

*Banks ex rel. Banks v. Yokemick*,
  177 F. Supp. 2d 239 (S.D.N.Y. 2001) ...............................................................31

*Bass v. Wallenstein*,
  769 F.2d 1173 (7th Cir. 1985) ...........................................................................31

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544,127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ....................................7

*Bell v. City of Milwaukee*,
  746 F.2d 1205 (7th Cir. 1984) ...........................................................................31

*Berry v. City of Muskogee*,
  900 F.2d 1489 (10th Cir. 1990) .........................................................................31

*BlackRock Allocation Target Shares: Series S. Portfolio v.*
  *Wells Fargo Bank, Nat'l Ass'n*,
  247 F. Supp. 3d 377 (S.D.N.Y. 2017) ..................................................................9

*Bradshaw v. Twp. of Middletown*,
  296 F. Supp. 2d 526, 550 (D.N.J. 2003),
  *aff'd sub nom, Bradshaw v. Twp. of Middleton*,
  145 F. App'x 763 (3d Cir. 2005).....................................................................8-9

*Bush v. City of Utica*,
  948 F. Supp. 2d 246, 259 (N.D.N.Y. 2013),
  *aff'd sub nom. Bush v. City of Utica, N.Y.*,
  558 F. App'x 131 (2d Cir. 2014).......................................................................13

*City of Monterey v. Del Monte Dunes at Monterey, LTD*,
526 U.S. 687, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999) ............................ 21, 22

*City of St. Louis v. Praprotnik*,
485 U.S. 112, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) ........................................22

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) .................................30

*Cosmas v. Hassett*,
886 F.2d 8 (2d Cir. 1989) ....................................................................................50

*Cruzan by Cruzan v. Direct, Missouri Dept. of Health*,
497 U.S. 261, 110 S. Ct. 2841, 111 L. Ed. 224 (1990) ........................................30

*D.C.J.V. v. United States*,
605 F. Supp. 3d 571 (S.D.N.Y. 2022) ..................................................................42

*D.J.C.V v. United States*,
605 F. Supp. 3d 571 (S.D.N.Y. 2022) ..................................................................23

*Davis v. New York City Housing Auth.*,
379 F. Supp. 3d 237 (S.D.N.Y. 2019) ..................................................................32

*DeRosa v. Murphy*,
2025 WL 249169 (D.N.J. January 21, 2025) .................................................... 6, 16

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022) ..........................................................14

*Everest Foods, Inc. v. Cuomo*,
585 F. Supp. 3d 425 (S.D.N.Y. 2022) ..................................................................14

*Ferrari v. Cuomo*,
2025 WL 965131 (S.D.N.Y. March 31, 2025)................................... 6, 16, 52, 54

*Fitzgerald v. Barnstable School Comm.*,
555 U.S. 246, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009) ....................................26

*Foman v. Davis*,
371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) ..........................................59

*Goe v. Zucker*,
43 F.4th 19 (2d Cir. 2022), *cert. denied sub nom.*
*Goe v. McDonald*, 143 S. Ct. 1020, 215 L. Ed. 2d 188 (2023)................. 2, 15, 23

iv

*Gonzaga Univ. v. Doe*,
  536 U.S. 273122, S. Ct. 2268, 153 L. Ed. 2d 309 (2002) ....................................26

*Guertin v. State*,
  912 F.3d 907 (6th Cir. 2019) ...............................................................................42

*Harris v. City of New York*,
  222 F. Supp. 3d 341 (S.D.N.Y. 2016) ...................................................................8

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
  599 U.S. 166, 143 S. Ct. 1444, 216 L. Ed. 2d 183 (2023) ...................... 24, 25, 26

*Hope v. Pelzer*,
  536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) .......................... *passim*

*In re Flint Water Cases*,
  960 F.3d 303 (6th Cir. 2020) ............................................................................ 8, 13

*Jaco v. Bloechle*,
  739 F.2d 239 (6th Cir.1984) .................................................................................31

*Jacobson v. Commonwealth of Massachusetts*,
  197 U.S. 11, 25 S. Ct. 358, 49 L. Ed 643 (1905) .................................................20

*Jama v. U.S. I.N.S.*,
  22 F. Supp. 2d 353 (D.N.J. 1998)................................................................ 9, 16, 27

*Johnson v. Newburgh Enlarged School Dist.*,
  239 F.3d 246 (2d Cir. 2001) .............................................................................. 7, 23

*Kelo v. New London*,
  545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005) ...................................13

*Lombardi v. Whitman*,
  485 F.3d 73 (2d Cir. 2007) ......................................................................... *passim*

*Marbury v. Madison*,
  5 U.S. 137, 1 Cranch 137, 2 L. Ed. 60 (1803).....................................................57

*Matzell v. Annucci*,
  64 F.4th 425 (2d Cir. 2023) .............................................................................. 8, 24

*Mauro v. Cuomo*,
  2023 WL 2403482 (E.D.N.Y. 2023) .......................................................... 29, 36, 43

*McFadden v. Sanchez*,
  710 F.2d 907 (2d Cir. 1983) .................................................................................31

*Montgomery v. Simone*,
    159 F.3d 120 (3d Cir. 1998) ..................................................21

*Najarro de Sanchez v. Banco Central de Nicaragua*,
    770 F.2d 1385 (5th Cir. 1985) ...............................................27

*NRA v. Vullo*,
    602 U.S. 175, 144 S. Ct. 1316, 218 L. Ed. 2d 642 (2024) ......................... *passim*

*Okin v. Vill. of Cornwall-On-Hudson Police Dep't*,
    577 F.3d 415 (2d Cir. 2009) ........................................... 33-34

*Oklahoma City v. Tuttle*,
    471 U.S. 808, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1988) ....................................21

*Owen v. City of Independence*,
    445 U.S. 622, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980) ....................................22

*Pac. Life Ins. Co. v. US Bank Nat'l Ass'n*,
    636 F. Supp. 3d 366 (S.D.N.Y. 2022) .........................................9

*Pangburn v. Culbertson*,
    200 F.3d 65 (2d Cir. 1999) .....................................................9

*Paul v. Avril*,
    901 F. Supp. 330 (S.D. Fla.1994) .........................................27

*Peroza-Benitez v. Smith*,
    994 F.3d 157 (3d Cir. 2021) ..................................................42

*Phillips v. Cty. of Allegeheny*,
    515 F.3d 224 (3d Cir. 2008) ...................................................8

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*,
    172 F. Supp. 3d 700 (S.D.N.Y. 2016) .........................................9

*Plaza Motors of Brooklyn, Inc. v. Cuomo*,
    2021 WL 222121 (E.D.N.Y. 2021) ..........................................35

*Rodriguez v. City of New York*,
    590 F. Supp. 3d 518 (E.D.N.Y. 2022) ........................................45

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63, 208 L. Ed. 2d 206 (2020) ..................................... *passim*

*Royal Assoc. v. Concannon*,
    200 N.J. Super. 84, 490 A.2d 357 (App. Div. 1985).............................6

*Safford Unified Sch. Dist. No. 1 v. Redding,*
  557 U.S. 364, 129 S. Ct. 2633, 174 L. Ed. 2d 354 (2009) ...................................43

*Scheuer v. Rhodes,*
  416 U.S. 232 (1974) ..................................................................................56

*South Bay United Pentecostal Church v. Newsom,*
  140 S. Ct. 1613 (2020) .............................................................................44

*Southerland v. City of New York,*
  680 F.3d 127(2d Cir. 2012) .................................................................. 22-23

*Stephenson v. Doe,*
  332 F.3d 68 (2d Cir. 2003) ................................................................... 8, 17

*Stewart v. Metro. eTransportation Auth.,*
  566 F. Supp. 3d 197 (E.D.N.Y. 2019)....................................................32

*Tolan v. Cotton,*
  572 U.S. 650, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014) ....................................43

*United States v. Lanier,*
  520 U.S. 259, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) ...................................42

*Vega v. Semple,*
  963 F.3d 259 (2d Cir. 2020) ...................................................... *passim*

*Victory v. Pataki,*
  814 F.3d 47 (2d Cir. 2016) .................................................................. 9, 12

*Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.,*
  517 F.3d 104 (2d Cir. 2008) ...............................................................1, 7

*Washington v. Glucksburg,*
  521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 772 (1997) .......................................30

*West v. Atkins,*
  487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988) .....................................21

*West Virginia Bd. of Educ. v. Barnette,*
  319 U.S. 624, 63 S. Ct. 1178, 87 L. Ed. (1943) ...................................................30

*Wolff v. McDonnell,*
  418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974) .......................................24

*Xuncax v. Gramajo,*
  886 F. Supp. 162 (D. Mass. 1995)..........................................................27

vii

*Youngberg v. Romeo*,
   457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982) ................................ 28, 29

**Statutes & Other Authorities:**

U.S. Const. Amend. 14 ................................................................... 14, 57

U.S. Const. Amend. V ................................................................... 15, 57

10 NYCRR 415.26(i)(1)(ii) ....................................................................40

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

28 U.S.C. § 1343(a)(4) ................................................................................1

28 U.S.C. § 1367 .........................................................................................58

28 U.S.C. § 1367(c)(3) ...............................................................................58

42 U.S.C. § 1396a(a)28 ..............................................................................25

42 U.S.C. § 1396r ..........................................................................................1

42 U.S.C. § 1396r(e) ...................................................................................25

42 U.S.C. § 1396r(g) ...................................................................................25

42 U.S.C. § 1396r(h) ...................................................................................25

42 U.S.C. § 1983 ................................................................................ *passim*

138 Harv. L. Rev. 305 (Nov. 2024) ........................................................52

CARES Act (P. L. 116–136) .....................................................................49

Fed. R. Civ. P. 1 ...........................................................................................7

Fed. R. Civ. P. 8(a) ......................................................................................7

Fed. R. Civ. P. 12(b)(6) ..........................................................................5, 7

Hammond, Empire Center: *Cuomo's Schedules for the Peak of New York's Pandemic Show Limited Contact with Outside Experts* ......................................47

N.Y. E.P.T.L. § 5-4.1 ...................................................................................1

N.Y. Penal L. § 200.27 (2024) .................................................................57

New York Daily News (Feb. 24, 2020) ...................................................46

New York Times Article...............................................................39, 46, 52

STAT News Articles.......................................................................46

Wall Street Journal Article.............................................................12

## STATEMENT OF JURISDICTION

This case arises under the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Federal Nursing Home Reform Act of 1987 (42 U.S.C. § 1396r) ("FNHRA"), and New York's Wrongful Death statute, N.Y. E.P.T.L. § 5-4.1. The District Court had jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 42 U.S.C. § 1983.

This is an appeal from the District Court's January 14, 2025 Judgment ("Judgment") granting Defendants' Motion to Dismiss with Prejudice as well as the Orders on September 30, 2024 and January 10, 2024 leading to that Judgment. Plaintiffs filed their Notice of Appeal on October 24, 2024. (JA87). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.      Did the District Court overindulgently misapply the standard governing motions to dismiss, by failing to accept as true all allegations in the complaint and draw all reasonable inferences in favor of Plaintiffs as the non-moving parties? *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).

2.      Is the applicable legal standard rational basis review, or "strict scrutiny" which means that the Directives were required to be "narrowly tailored" to serve a "compelling" state interest? *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct.

1

63, 67, 208 L. Ed. 2d 206 (2020); *Goe v. Zucker*, 43 F.4th 19, 30 (2d Cir. 2022), *cert. denied sub nom. Goe v. McDonald*, 143 S. Ct. 1020, 215 L. Ed. 2d 188 (2023).

3. Do the Directives survive strict scrutiny?

4. Do the Directives survive rational basis review?

5. Are Defendants entitled to dismissal based upon qualified immunity at this stage of the proceeding before Plaintiffs have had the opportunity to engage in discovery?

6. Did Defendants violate clearly established rights?

7. Did Defendants engage in a conspiracy?

## STATEMENT OF THE CASE

### A. Factual Overview

On March 25, 2020, Defendants Andrew M. Cuomo, the Governor of the State of New York, in his individual capacity, Melissa DeRosa, Secretary to the Governor of the State of New York, in her individual capacity, and Howard A. Zucker, Commissioner of the New York Department of Health, in his individual capacity (collectively "the New York Defendants"), at the behest of and with the direct assistance of Defendants Greater New York Hospital Association, Kenneth Raske ("GNYHA") Northwell Health, Inc., Michael Dowling ("Northwell") (GNYHA and Northwell referred to as "the Hospital Defendants"), administratively issued the following Directive (JA242) ordering all nursing homes in the State as follows: **"No**

**resident shall be denied re-admission to a [nursing home] solely based on a confirmed or suspected diagnosis of COVID-19. [Nursing homes] are prohibited from requiring a hospitalized resident who is determined medically stable to be tested for COVID-19 prior to admission or readmission.**" (Emphasis added.) On April 7, 2020, the New York Defendants, again at the behest of, and with the direct assistance of GNYHA and Northwell, issued an identical Directive applicable to assisted living facilities. (JA244) (the March 25, 2020 and April 7, 2020 Directives referred to collectively as the "Directives").

The New York Defendants as well as the purported experts in the field, Defendants GNYHA and Northwell, knew or should have known that the Directives would be a deadly disaster for elderly nursing home residents, the most vulnerable Covid demographic, but exhibited deliberate indifference by aggressively pushing for the Directives anyway as a means of increasing their profits. (JA265).

The New York Defendants, GNYHA, and Northwell all knew that the Directives would be a deadly disaster, as exemplified by Governor Cuomo's public acknowledgment, "For nursing homes, this could be like fire through grass." (JA 260). The New York Defendants knew all of this, yet at the behest of and with the direct assistance of Defendants GNYHA and Northwell, they maliciously, illegally, and in an act of coordinated and deliberate indifference, promoted, promulgated and enforced the Directives anyway as a means of enhancing the flow of COVID-related,

government-funded compensation to the health care industry, while also serving up the State's elderly as collateral damage central to their cynical, devious effort to placate the hospital lobby. (JA266).

As a result of the Directives, over 9,000 (nine-thousand) COVID-positive patients who otherwise would not have been admitted to the State's nursing homes and assisted living facilities, were admitted, causing as many as 15,000 (fifteen-thousand) wholly avoidable COVID or COVID-related deaths. (JA34). The Directives amounted to mass State-sanctioned euthanasia of its elderly victims. (*Id.*). Plaintiffs, the Estates of Norman Arbeeny, Michael J. Newman, and Dolores 1Newman, are the Estates of three such elderly victims who suffered horrific and wholly avoidable COVID-related deaths as a direct and proximate result of the Directives. (JA101).

## B. Relevant Procedural History

On April 26, 2022, Daniel Arbeeny initiated this case in the Eastern District of New York, Civil Action No.: 1:22-CV-2336 *pro se* against the New York Defendants on behalf of his deceased father's Estate. (JA21-29). After retaining counsel, an Amended Complaint was filed against the New York Defendants on October 6, 2022. (JA31-60).

While the Arbeeny case was pending, Arbeeny's counsel filed an identical case in the Eastern District of New York on behalf of Sean S. Newman and his

deceased parents' Estates under Civil Action No.: 2:23-CV-02391 on March 28, 2023 against the New York Defendants and the Hospital Defendants. (JA181-240).

On April 17, 2023, the Honorable LaShann DeArcy Hall, U.S.D.J. issued an Order *sua sponte* consolidating the Arbeeny and Newman cases under the Arbeeny Civil Action Number. (JA8). After a round of pre-Motion letters, Judge Hall granted Plaintiffs' request to file a Second Amended Complaint ("SAC"), adding additional claims and ensuring that all Plaintiffs were suing all Defendants. (JA9). The SAC was filed on August 24, 2023. (JA9).

Another round of pre-motion letters followed, which resulted in Judge Hall ordering the parties on October 25, 2023 to file and brief Defendants' Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (JA10). The Motion briefing was completed and filed on January 23, 2024. (JA11-12).

Eight months later, the District Court issued a Docket Order granting Defendants' Motions to Dismiss with prejudice. (JA12). The District Court did not issue a formal captioned Order or an Opinion at the time. Plaintiffs filed their Notice of Appeal on October 24, 2024. (JA12). The District Court finally issued its Memorandum and Order on January 10, 2025, and Judgment was entered on January 14, 2025. (JA12).

Additionally, the Court should be aware that this Appeal presents hot-button issues as there two other District Courts likewise ruled incorrectly in cases that are

5

almost identical to this one. Specifically, *DeRosa v. Murphy*, 2025 WL 249169 (D.N.J. January 21, 2025) (Plaintiffs are represented by Michael S. Kasanoff, and currently on appeal to the Third Circuit), and *Ferrari v. Cuomo*, 2025 WL 965131 (S.D.N.Y. March 31, 2025) (Presumably being appealed to this Court within the next three weeks).

The Covid-19 pandemic has been supplanted by a pandemic of judicial myopia when it comes to the correct disposition of the issues germane to this case. But the very reason this Court exists is to provide clarity, because as noted by Blackstone, "it is the business of the judges so to construe such statutes as to suppress the mischief, and advance the remedy." *Royal Assoc. v. Concannon*, 200 N.J. Super. 84, 93, 490 A.2d 357 (App. Div. 1985). There is currently mischief afoot at the District Court level wherein the Motion to Dismiss standard has been misconstrued in favor of the moving parties, and qualified immunity has run amok contrary to law, thus requiring this Court to once and for all, suppress such mischief and advance the appropriate remedy.

## **STANDARD OF REVIEW**

### A.    The Motion to Dismiss Standard

Dismissals for qualified immunity are reviewed *de novo*. *Lombardi v. Whitman*, 485 F.3d 73, 78 (2d Cir. 2007). All material facts alleged in the SAC must be accepted as true, and all inferences are drawn in Plaintiffs' favor. *Id*. (*citing*

*Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246, 250 (2d Cir. 2001). This includes those facts which support the qualified immunity claim and those that defeat the qualified immunity defense. *Vega v. Semple*, 963 F.3d 259, 272 (2d Cir. 2020).

Not only must all reasonable inferences be drawn in Plaintiffs' favor, but the allegations in the SAC must be considered as a "whole". *NRA v. Vullo*, 602 U.S. 175, 195, 144 S.Ct. 1316, 1330, 218 L.Ed.2d 642 (2024). This Court in engaging in *de novo* review on appeal, cannot simply credit Defendants' assertions as the District Court incorrectly did when it granted Defendants' Motions to Dismiss. *Id.*

The overriding requirement of the Federal Rules of Civil Procedure is that they shall be construed to secure just, speedy, and inexpensive determination of every action. Fed. R. Civ. P.1. A complaint need only contain a short and plain statement of claim showing that the party is entitled to relief, and a demand for judgment for relief to which the party deems itself entitled. Fed. R. Civ. P.8(a).

In deciding a Fed. R. Civ. P. 12(b)(6) motion, the court "must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). Detailed factual allegations are not required, as a complaint need only state enough facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570,127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A claim is factually plausible where it allows the court to draw a

reasonable inference that the defendants are liable for the conduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678,129 S. Ct. 1937, 173 L.Ed.2d 662 (2009).

## B.    Qualified Immunity

When seeking to dismiss a case at the pleading stage based upon qualified immunity, the motion to dismiss standard constitutes a "formidable hurdle." *Vega*, *supra*. So formidable, that the motion "is usually not successful." *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023). Defendants' version of the facts is immaterial and irrelevant on the issue of qualified immunity. *Harris v. City of New York*, 222 F.Supp.3d 341, 348 (S.D.N.Y. 2016).

Rather than this premature stage of the case, Defendants should have been required to postpone pursuit of their qualified immunity defense until the completion of pretrial proceedings, so that the claim can either be disposed of later on summary judgment, or material factual disputes can be identified and presented to the jury. *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003). It was thus premature for the District Court to make a decision on qualified immunity at the motion to dismiss stage. *Phillips v. Cty. of Allegeheny*, 515 F.3d 224, 242 n.7 (3d Cir. 2008); *In re Flint Water Cases*, 960 F.3d 303, 331 (6th Cir. 2020)(Facts regarding the Governor's request for qualified immunity are "to be fleshed out during discovery and are not appropriate to resolve at the motion to dismiss posture); *Bradshaw v. Twp. of Middletown*, 296 F. Supp. 2d 526, 550 (D.N.J. 2003), *aff'd sub nom*, *Bradshaw v.*

*Twp. of Middleton*, 145 F. App'x 763 (3d Cir. 2005)(Qualified immunity determination cannot be made without factual determinations as to the officials' subjective beliefs and motivations); *Jama v. U.S. I.N.S.*, 22 F. Supp. 2d 353, 363 (D.N.J. 1998).

### C. Plaintiffs are Entitled to Discovery, as Facts and Evidence are Uniquely within the Possession of Defendants at this State of the Proceeding

The Second Circuit instructs that "conspiracies are by their very nature secretive operations" which may have to be proven through circumstantial, rather than direct evidence. *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). It is a rare case where the entire "conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *Victory v. Pataki*, 814 F.3d 47, 68 (2d Cir. 2016).

At the pleading stage where key information "is uniquely in the possession of defendants", Plaintiffs satisfy their pleading burden where their allegations raise a reasonable expectation that discovery will reveal evidence proving their claim. *Pac. Life Ins. Co. v. US Bank Nat'l Ass'n*, 636 F. Supp. 3d 366, 417 (S.D.N.Y. 2022); *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank*, *Nat'l Ass'n*, 247 F. Supp. 3d 377, 390 (S.D.N.Y. 2017); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 713 (S.D.N.Y. 2016). The SAC easily satisfies this standard:

➢ One health-related group who Governor Cuomo consulted regularly in the early months of the pandemic was hospital officials. The words "hospital," "medical center" and "health system" appear 288 (JV. 466) times in his schedules for March and April – reflecting a series of large-group conference calls and smaller meetings. (JA274).

➢ Several meetings involved leaders of the GNYHA, which is one of Albany's largest and most powerful lobbying forces and a major donor and political ally of the Governor Cuomo. By way of contrast, the numerous state-situated nursing homes were not consulted about the March 25, 2020 Directive before it was issued. (JA274).

➢ Defendant Kenneth Raske, the president of the GNYHA, participated in seven meetings with Governor Cuomo between March 2 and March 30, 2020. Northwell Health chief, Defendant Michael Dowling, a GNYHA board member and longtime Cuomo associate, was listed at six meetings in March and three in April, 2020. (JA274).

➢ At the urging of GNYHA and Northwell citing the "urgent need to expand hospital capacity," Governor Cuomo, on the advice, cooperation, and endorsement of the other New York Defendants, Secretary DeRosa and Commissioner Zucker, issued Directives to the State's nursing homes on March 25, 2020, and to the State's assisted living facilities on April 7, 2020

(the "Directives") ordering that no person could be **"denied re-admission or admission to the [nursing home/assisted living facility] solely based on a confirmed or suspected diagnosis of COVID-19" and that "[nursing homes/assisted living facilities] are prohibited from requiring a hospitalized resident who is determined medically stable to be tested for COVID-19 prior to admission or readmission."** (emphasis added). (JA274).

➢ The Directives were the product of a conspiracy of corruption and undue influence from inception, as the New York Defendants were overly reliant on New York's powerful and influential hospital lobby operating by and through the GNYHA and Northwell. The Directives were inordinately "hospital-centric" because the "experts" called upon to shape the policy were primarily in the hospital sector, who were seeking to maximize their profits stemming from Governor Cuomo's previous order directing hospitals to immediately increase their bed capacity by at least 50%. (JA275).

➢ Numerous newspaper articles published at that time attribute the actual origination of the Cuomo Directive to Defendant GNYHA. The Feb. 26, 2021 edition of *STAT News*, an authoritative journal about health, medicine, and the life sciences, reported that "New York's influential hospital lobby was pleading with Cuomo to issue policy on transfers to nursing homes." In this

article, GNYHA spokesperson Brian Conway, said "hospitals made the request because Cuomo had ordered hospitals to immediately increase bed capacity by at least 50%." (JA275).

➢ The *Wall Street Journal* likewise reported that Defendant Kenneth Raske "president of the Greater New York Hospital Association, said he contacted Mr. Cuomo's team for help with nursing homes. Hospitals couldn't afford to house recovered nursing-home residents long-term, with models showing they soon could be swamped." And further that "Within days, Mr. Cuomo's team approved an order from the state's health department that said nursing homes couldn't refuse to admit patients simply because they had tested positive. The order would become one of the most controversial decisions" of the entire COVID treatment crisis. (JA275).

The District Court and Defendants essentially claim that there is nothing to see here and that we should all just move along, but Plaintiffs, the facts, and the law, all beg to differ. What exactly happened during that month of meetings leading up to the carnage caused through the issuance of the Directives? Plaintiffs need to review things like emails, phone records, and take testimony from all involved parties. *Victory*, *supra*, at 67–68.

Even the District Court's and Defendants' favorite justifications that the Directives "arose from legitimate disagreements over the nature and extent of the

problems and the appropriate solution" while "acting quickly in response to evolving and dynamic circumstances during the COVID-19 pandemic", are misplaced at this stage as those are fact-sensitive inquiries requiring discovery. *In re Flint Water Cases*, *supra*. A court confronted with a plausible accusation of impermissible favoritism to private parties should treat the objection as a serious one and review the record to see if it has merit. *Kelo v. New London*, 545 U.S. 469, 491, 125 S. Ct. 2655, 2669, 162 L. Ed. 2d 439 (2005) (Kennedy, J. concurring).

This can only be fully hashed out through discovery as the information is uniquely in the possession of Defendants. Even if discovery may ultimately undermine Plaintiffs' allegations and prove true Defendants' assertion that their conduct was not malicious but instead related to legitimate government objectives, such a legal finding is premature at the dismissal stage of the litigation. *Bush v. City of Utica*, 948 F. Supp. 2d 246, 259 (N.D.N.Y. 2013), *aff'd sub nom. Bush v. City of Utica, N.Y.*, 558 F. App'x 131 (2d Cir. 2014). *See Vullo*, *supra.* (Even if discovery might show that the allegations are false or that certain actions should be understood differently in light of newly disclosed evidence, the Court at the dismissal stage must still presume that the well-pleaded factual allegations in the complaint are true).

### D. Because the Directives Deprived Plaintiffs of Fundamental Rights, Strict Scrutiny should be Applied

Constitutional analysis must begin with "the language of the instrument" which offers a "fixed standard" for ascertaining what our founding document means. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2244–45, 213 L. Ed. 2d 545 (2022). Under the Fourteenth Amendment, no State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const., Amend. 14. Fundamental rights are defined as rights "implicit in the concept of ordered liberty or deeply rooted in this Nation's history and tradition" so as to trigger strict scrutiny. *Everest Foods, Inc. v. Cuomo*, 585 F.Supp.3d 425, 439-40 (S.D.N.Y. 2022).

The Fourteenth Amendment's Due Process Clause protects substantive rights guaranteed by the first eight Amendments. *Dobbs*, *supra*, at 2246. The Due Process Clause of the Fourteenth Amendment "incorporates" the great majority of those rights and thus makes them equally applicable to the States. *Id*.

No special deference is granted to the Defendants when the exercise of emergency powers infringes on constitutional rights. *Agadath Israel of America v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020). Courts may not defer to Defendants simply because they are addressing a matter involving public health. *Id*.

The Directives in this case infringed upon six clearly established rights: (1) Statutory Rights under the Federal Nursing Home Reform Act of 1987 ("FNHRA");

(2) The Right to be Free from Cruel, Unhuman, or Degrading Treatment; (3) The Right to Safe Conditions; (4) The Right to Life; (5) The Right to Bodily Integrity; and (6) The Right to be Free from State-Created Danger. Those six clearly established rights encompass one overall clearly established right, namely that in a constitutional republic, the government cannot constitutionally kill, injure, maim, or otherwise violate the individual sovereignty of persons within its borders without due process of law. *See* U.S. Const. Amend. V. This critically distinguishes this case from the laundry list of Covid cases cited by the District Court where fundamental rights were not at stake.

Even in a pandemic, the Constitution "cannot be put away or forgotten." *Id*. Courts "have a duty to conduct a serious examination into the necessity of public health measures that infringe upon constitutionally protected rights." *Id.* When evaluating the Directives, Defendants must satisfy "strict scrutiny" which means that the Directives were required to be "narrowly tailored" to serve a "compelling" state interest. *Roman Cath. Diocese*, *supra.*; *Goe*, *supra*.

Undoubtedly, stemming the spread of Covid-19 is a compelling interest. *Agudath Israel*, *supra*. But the focus turns on whether the Directives at issues were narrowly tailored and used the least restrictive means available to achieve that interest. *Id*. As discussed throughout this Brief, the Directives fail this test.

*Roman Cath. Diocese* and *Agudath Israel* are the controlling decisive precedents in this case, yet they are nowhere to be found and not even mentioned, much less distinguished in the District Court's decision, or any of the other myopic denials of justice in *DeRosa* and *Ferrari*. They are curiously neither mentioned nor distinguished because they conveniently fly in the face of those courts' desired ideological narrative of blind deference to the government irrespective of who gets hurt or what fundamental rights are infringed.

History is replete "with unfortunate examples of overly broad judicial deference to the government when the government has invoked emergency powers and asserted crisis circumstances to override" fundamental rights. *Agudath Israel*, *supra*, at 635-36. Where, as here, fundamental rights have been violated, strict scrutiny applies.

## **SUMMARY OF ARGUMENT**

American Courts have recognized that the right to be free from cruel, unhuman or degrading treatment is a universally accepted customary human rights norm. *Jama*, *supra*, at 370-71. There are few things more cruel, more unhuman, or more degrading than subjecting as many as 15,000 helpless, vulnerable elderly New Yorkers to suffer miserable torturous but wholly avoidable COVID deaths that were substantially caused by the intentional misconduct and/or deliberate indifference

exhibited by the New York Defendants and the Hospital Defendants in promulgating the Directives.

It has been said that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Stephenson*, *supra*, at 77–78. Well in the words of esteemed Professor David C. Grabowksi of Harvard Medical School's Department of Healthcare Policy, the level of grotesque incompetence and/or knowing violations of law required to defeat qualified immunity, is precisely what we are dealing with in this case:

The first COVID-19 case in New York occurred on March 1, 2020. It cannot be seriously proposed that just 24 days later any medical facility, let alone those focused on older populations living in congregate settings, would already have in place all the requisite staffing, personal protective equipment, surveillance means, separation of living space, and other mitigation tools necessary to contain what, by then, was fully appreciated to be a highly contagious disease. Indeed, under the terms of the Directive, the nursing homes were even prohibited from taking the most obvious safety precaution, namely determining which incoming patients may already be Covid-infected, symptomatic, or otherwise a danger to current occupants and staff. (JA319-329).

We begin by chronicling what the Defendants knew:

a.    Defendants *knew* from the outset that the Directives were completely unworkable as they *knew* that most nursing homes and assisted living facilities are small, older buildings without upgraded ventilation. (JA284).

b.    Defendants *knew* that there were no nursing homes or assisted living facilities in New York State that were equipped to handle an airborne, highly contagious and deadly virus. (JA284).

c.    Defendants *knew* that the Directives did not conform with the State Administrative Procedure Act and were without any factual, medical or other scientific evidence. (JA284).

d.    Defendants *knew* that the lack of compliance with infection protocols put residents at increased risk. (JA284).

e.    Defendants *knew* that insufficient PPE (personal protective equipment) for nursing staff put residents at increased risk of harm. (JA284).

f.    Defendants *knew* that insufficient COVID testing for residents and staff put residents at increased risk of harm. (JA284).

g.    Defendants *knew* that staffing was too lean to accept any stress to the system. (JA284).

h.   Defendants *knew* that nursing homes and assisted living facilities throughout New York had not done the necessary additional hiring in anticipation of COVID's arrival. (JA284).

i.   Defendants *knew* that nursing homes and assisted living facilities throughout New York had not undertaken the necessary levels of staff training. (JA284).

j.   Defendants also *knew* that the nursing homes and assisted living facilities, which in many instances depended upon nearby hospitals for referrals and were eager for new revenue that came with hospital patients, would gladly accept these patients, yet Defendants did nothing substantive to prevent the deadly combination of inadequate facilities with an overflow of COVID patients. In fact, through the Directives, this deadly combination was encouraged by Defendants, as confirmed by the New York Attorney General's (NYAG) subsequent investigation which concluded that facility decisions relating to or affecting resident care were financially motivated rather than clinically motivated, an eminently foreseeable real-world outcome that was willfully disregarded by the New York Defendants. (JA285).

k.   The NYAG's finding should not come as a surprise as Defendants *knew* that the current state and federal reimbursement model provided a

substantial financial incentive for health care facilities to use their existing beds for COVID patients rather than non-COVID patients occupying hospital beds for other medical needs. (JA285).

Defendants knew all of this, yet they implemented the Directives anyway. Rather than constituting "bold action to save lives", as dogmatically proclaimed by Defendants, the implementation of the Directives is a textbook example of willful misconduct and/or deliberate indifference sufficient to state a 42 U.S.C. § 1983 claim.

If a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no substantial relation to those objects, *or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution*. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 31, 25 S.Ct. 358, 49 L.Ed 643 (1905). (emphasis added). For the reasons that follow, the District Court's Judgment granting Defendants' Motions to Dismiss should be reversed.

## ARGUMENT

## POINT I

## DEFENDANTS ARE ALL INDIVIDUALLY LIABLE FOR 42 U.S.C. § 1983 SUBSTANTIVE DUE PROCESS VIOLATIONS AS THE DIRECTIVES VIOLATED MULTIPLE CLEARLY ESTABLISHED RIGHTS

### A.     Introduction

Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 which "creates a duty to refrain from interference with the federal rights of others and provides money damages and injunctive relief for violation of that duty." *City of Monterey v. Del Monte Dunes at Monterey, LTD*, 526 U.S. 687, 723, 119 S.Ct. 1624, 1643, 143 L.Ed.2d 882 (1999). (Scalia, J., concurring). A claim is stated under §1983 where: (1) the conduct complained of was committed by a person acting under the color of state law; and (2) the conduct deprived the aggrieved party of rights, privileges, or immunities secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 48-49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

Rather than providing substantive rights, §1983 provides a remedy for the deprivation of federal rights protected by law. *Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1988). It is designed to protect those aggrieved from the abuse of power by officials cloaked with governmental authority. *Montgomery v. Simone*, 159 F.3d 120, 125 (3d Cir. 1998). Even "a single decision of a properly constituted legislative body is an act of official policy that may subject

21

the municipality to §1983 liability. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S. Ct. 915, 924, 99 L. Ed. 2d 107 (1988) (We have assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business).

Moreover, it is certainly not unjust to hold the violators of Plaintiffs' rights liable for the injuries sustained. *Owen v. City of Independence*, 445 U.S. 622, 654, 100 S.Ct. 1398, 1417, 63 L.Ed.2d 673 (1980). Indeed,

> the central purpose of the Civil Rights Act was to provide citizens with a remedy against those who had abused state power. It hardly seems unjust to require a municipal defendant which has violated a citizen's constitutional rights to compensate him for the injury suffered thereby. Indeed Congress enacted §1983 precisely to provide a remedy for such abuses of official power···· The knowledge that a municipality will be liable for all of its injurious conduct ··· should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights.

*Id*. Under §1983, the issue is whether Defendants denied Plaintiffs' constitutional rights, and if so, what are the damages. *City of Monterey*, 526 U.S. at 722, 119 S.Ct.. at 1645. These are issues for a jury. *Id.*

## B.    Defendants Violated Substantive Due Process

Substantive due process rights safeguard persons "against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Southerland v. City of New York*, 680 F.3d 127, 151(2d

Cir. 2012). A violation of substantive due process rights occurs where "the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.*

Conscience-shocking conduct has "no calibrated yard stick." *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 593 (S.D.N.Y. 2022). But "malicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience" because such "acts by their very nature offend our fundamental democratic notions of fair play, ordered liberty and human decency." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001).

The first step is to identify the constitutional rights at stake. *Goe*, 43 F.4th at 30. The Directives violated six clearly established rights, all of which are integrated: (1) statutory rights under the Federal Nursing Home Reform Act of 1987 ("FNHRA"); (2) the right to be free from cruel, unhuman, or degrading treatment; (3) the right to safe conditions (4) the right to life; (5) the right to bodily integrity; and (6) the right to be free from state-created danger. (JA Spilbor Dec., Exh. "A", ¶181).

23

### 1. Statutory Rights under the Federal Nursing Home Reform Act of 1987 ("FNHRA")

Passed in 1987, the FNHRA represents a longstanding national commitment to provide safe and dignified care for the elderly. *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 180–81, 143 S. Ct. 1444, 1455, 216 L. Ed. 2d 183 (2023). The FNHRA caused a seismic shift in nursing home standards. *Id.*

The FNHRA unambiguously confers a multitude of rights upon Plaintiffs. *Id.*, 599 U.S. at 188, 143 S. Ct. at 1460. Those rights are detailed in the SAC. (JA306-308). Those rights are enforceable pursuant to § 1983. *Id.*, 599 U.S. at 192, 143 S. Ct. at 1462. The plain statutory language of the FNHRA renders those rights as clearly established for purposes of defeating qualified immunity. *See Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S. Ct. 2963, 2976, 41 L. Ed. 2d 935 (1974) ("We think a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of government."); *Matzell*, 64 F.4th at 438 (In addition to precedent, we consider the statute's plain language).

In reliance upon *dicta* in *Talevski* stating, "To be sure, these two provisions also establish who it is that must respect and honor these statutory rights; namely, the Medicaid-participant nursing homes in which these residents reside", Defendants claimed below that the § 1983 remedy is only enforceable against the nursing homes,

not them. *Tavelski*, 599 U.S. at 185, 143 S. Ct. at 1458. The statement is *dicta* because it identifies the nursing homes as entities who must respect those rights, but that language does not foreclose the liability of Defendants.

Rather, the FNHRA establishes a comprehensive statutory scheme where the State and all of its political subdivisions are likewise responsible for respecting and enforcing the rights guaranteed by the FNHRA. *Id.*, 599 U.S. at 181-82, 143 S. Ct. at 1456-57; 42 U.S.C. § 1396r(e), (g), (h); 42 U.S.C. § 1396a(a)28. Accordingly, Defendants as state actors are subject to § 1983 liability for the violation of Plaintiffs' FNHRA rights.

The District Court held that Plaintiffs' rights under the FNHRA were not clearly established because, prior "to the Supreme Court's ruling in *Talevski*, courts around the country, and within the Second Circuit, were split as to whether the FNHRA conferred a private right of action enforceable under Section 1983." *Arbeeny v. Cuomo*, 2025 WL 71729, at *8 (E.D.N.Y. 2025). While the District Court might be right about the split of authority as to whether FNHRA rights were enforceable in a private right of action, the District Court is wrong as to the availability of that private right of action as being dispositive of whether Plaintiffs' FNHRA rights were clearly established for purposes of defeating qualified immunity.

The Supreme Court notes that "***as we have previously held***, § 1983 can presumptively be used to enforce ***unambiguously conferred federal individual rights***, unless a private right of action under § 1983 would thwart any enforcement mechanism that the rights-creating statute contains for protection of the rights it has created." *Tavelski*, 599 U.S. at 172, 143 S. Ct. at 1450 (emphasis added) (*citing Fitzgerald v. Barnstable School Comm.*, 555 U.S. 246, 253–255, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, and n. 4, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002)).

In concluding that the FNHRA unambiguously created § 1983-enforceable rights, the *Tavelski* court went on to hold that, "we discern no incompatibility between private enforcement under § 1983 and ***the statutory scheme that Congress has devised for the protection of those rights.***" *Tavelski*, *supra*. (emphasis added). Thus as a matter of law, it is irrelevant whether the FNHRA conferred a private right of action at the time the Directives were promulgated, because the statutory scheme clearly established those rights and placed public officials nationwide on fair notice of those rights ever since passage of the FNHRA in 1987.

### 2. The Right to be Free from Cruel, Unhuman, or Degrading Treatment

American Courts have recognized that the right to be free from cruel, unhuman or degrading treatment is a universally accepted customary human rights

norm. *Abebe–Jira v. Negewo*, 72 F.3d 844 (11th Cir.1996), *cert. denied*, 519 U.S. 830, 117 S.Ct. 96, 136 L.Ed.2d 51 (1996); *Najarro de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385 (5th Cir.1985); *Jama*, *supra*.; *Xuncax v. Gramajo*, 886 F.Supp. 162 (D.Mass.1995); *Paul v. Avril*, 901 F.Supp. 330 (S.D.Fla.1994). If this right is to mean anything, then it must be applicable to state actors such as Defendants.

The District Court held that because all of these cases are "readily distinguishable", they "cannot serve as a basis to find that such a right was clearly established as it relates to the conduct alleged here." *Arbeeny*, *supra*, at *9. The District Court is incorrect, as "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002).

Officials can still be on notice that their conduct violates established law even in novel factual circumstances. *Id.* The concept that previous cases must be "fundamentally similar" has been expressly rejected. *Id.*

Earlier cases involving "fundamentally similar" facts are not required to conclude that the law is clearly established. *Id.* Rather, the salient question is whether

the state of the law in 2020 gave Defendants fair warning that their alleged treatment of Plaintiffs was unconstitutional. *Id.*

Once again, there are few things more cruel, more unhuman, or more degrading than subjecting as many as 15,000 helpless, vulnerable elderly New Yorkers to suffer miserable torturous but wholly avoidable COVID deaths that were substantially caused by the intentional misconduct and/or deliberate indifference exhibited by the New York Defendants and the Hospital Defendants in promulgating the Directives. The cases establishing the right to be free from cruel, unhuman or degrading treatment provided fair warning to Defendants that their treatment of Plaintiffs was unconstitutional, at least at this stage where all reasonable inferences must be drawn in Plaintiffs' favor, and the allegations in the SAC must be considered as a "whole". *Vullo*, *supra*.

### 3. The Right to Safe Conditions

Plaintiffs, as patients confined to nursing homes and/or assisted living facilities, have the clearly established right to safe conditions, defined as "the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." *Youngberg v. Romeo*, 457 U.S. 307, 315, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982). If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions. *Id.*

*See also Mauro v. Cuomo*, 2023 WL 2403482 at *7 (E.D.N.Y. 2023) (Public officials are obligated to protect nursing home residents from the COVID pandemic).

The District Court held that Plaintiffs failed to cite any case similar in fact demonstrating beyond debate that the right to safe conditions was clearly established in the context of public health policy decisions at the time the Directives were issued. *Arbeeny*, *supra*, at *10. As discussed above, however, Plaintiffs are not required to do so. *Hope*, *supra.*

*Youngberg* clearly established the right to safe conditions and placed Defendants on fair notice that the Directives violated that right. *Id.* Factually, on March 13, 2020, the New York Defendants, fully acknowledging that nursing home residents "are at especially high risk of severe morbidity and mortality", issued a Directive suspending all visitation and ordering that all nursing residents are to be confined to their rooms. (JA366-368). Thus in the aftermath of the March 13, 2020 isolation and confinement Directive, nursing home residents became the equivalent of incarcerated prisoners, triggering a special duty on the part of Defendants to keep them safe in accordance with *Youngberg*.

By promulgating the Directives, Defendants exercised deliberate indifference in that they created conditions that posed an unreasonable risk of serious damage to Plaintiffs' health, while acting intentionally to impose unsafe conditions upon Plaintiffs. *Vega*, 963 F.3d at 273-74. Defendants further recklessly failed to act with

29

reasonable care to mitigate the risk that the Directives posed to Plaintiffs, even though Defendants knew or should have known that the conditions posed an excessive risk to Plaintiffs' health and safety. *Id.* at 274.

### 4.    The Right to Life

The right to life is unquestionably established, as the Fifth and Fourteenth Amendments both prohibit the deprivation of the fundamental right to life without due process of law. The Fourteenth Amendment's substantive due process analysis is fully preserved for those instances in which a free citizen is denied his or her constitutional right to life through means other than a law enforcement official's arrest, investigatory stop or other seizure. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844–45, 118 S. Ct. 1708, 1716, 140 L. Ed. 2d 1043 (1998).

The States are committed "to the protection and preservation of all human life." *Washington v. Glucksberg*, 521 U.S. 702, 710, 117 S.Ct. 2258, 2263, 138 L.Ed. 772 (1997). It is undisputed that the Due Process Clause protects an interest in life. *Cruzan by Cruzan v. Direct, Missouri Dept. of Health*, 497 U.S. 261, 281, 110 S.Ct. 2841, 2853, 111 L.Ed. 224 (1990). One's right to life is a fundamental right that cannot be submitted to a vote, and is not dependent upon the outcome of elections. *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185-86, 87 L.Ed. 674 (1943).

When a violation of federal rights protected by § 1983 causes the decedent's death, the decedent's estate is entitled to recovery for loss of life. *Banks ex rel. Banks v. Yokemick*, 177 F. Supp. 2d 239, 250 (S.D.N.Y. 2001). *See Berry v. City of Muskogee*, 900 F.2d 1489, 1501 (10th Cir. 1990) ("We are satisfied that Congress intended significant recompense when a constitutional violation caused the death of a victim. The general legislative history of the 1871 act makes clear that death was among the civil rights violations that Congress intended to remedy."); *Bass v. Wallenstein*, 769 F.2d 1173, 1189–90 (7th Cir.1985) (holding that where the constitutional violation has caused death, "state law that precludes recovery on behalf of the victim's estate for loss of life is inconsistent with the deterrent policy of section 1983.") (*citing Bell v. City of Milwaukee*, 746 F.2d 1205, 1234 (7th Cir.1984)); *Jaco v. Bloechle*, 739 F.2d 239 (6th Cir.1984); *McFadden v. Sanchez*, 710 F.2d 907, 911 (2d Cir.1983).

The District Court held that Plaintiffs failed to cite any case similar in fact demonstrating beyond debate that the right to life was clearly established in the context of public health policy decisions at the time the Directives were issued. *Arbeeny*, *supra*, at *10. As discussed above, however, Plaintiffs are not required to do so. *Hope*, *supra.* The aforementioned caselaw clearly established the right to life and placed Defendants on fair notice that the Directives violated that right. *Id.*

31

### 5.     The Right to Bodily Integrity

The interests protected by substantive due process include, "among other things, an individual's right to bodily integrity free from unjustifiable governmental interference." *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007). The right to bodily integrity was violated when the Directives dramatically increased the risk of helpless nursing home/assisted living facility patients' exposure and death from COVID. *Davis v. New York City Housing Auth.*, 379 F.Supp.3d 237, 255 (S.D.N.Y. 2019).

Involuntarily subjecting non-consenting individuals to foreign substances (COVID) is a classic example of invading the core of the bodily integrity protection. *Id*. Furthermore, deliberately exposing people to toxic substances has been found to "shock the conscience". *Stewart v. Metro. eTransportation Auth.*, 566 F. Supp. 3d 197, 210 (E.D.N.Y. 2019).

Choosing to implement the Directives while knowing that the Directives contributed to the continuation of conditions that would constitute cruel and unusual punishment if imposed on incarcerated persons, evinces the kind of deliberate indifference that shocks the conscience establishing a substantive due process claim based upon the interference with Plaintiffs' clearly established right to bodily integrity. *Davis*, *supra*.

The District Court held that Plaintiffs failed to cite any case similar in fact demonstrating beyond debate that the right to bodily integrity was clearly established in the context of public health policy decisions at the time the Directives were issued. *Arbeeny*, *supra*, at \*10. As discussed above, however, Plaintiffs are not required to do so. *Hope*, *supra.* The aforementioned caselaw clearly established the right to bodily integrity and placed Defendants on fair notice that the Directives violated that right. *Id.*

### 6.     The Right to be Free from State-Created Danger

Under the State Created Danger doctrine, when "a government official takes an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm), the government official can potentially be liable for damages." *Lombardi*, *supra*, at 80. Here, Defendants took an affirmative act (promulgation of the Directives) that created an opportunity for a third party (Covid and/or the 9000 patients who spread Covid "like fire through dry grass") to harm a victim (Plaintiffs) or increase such harm.

Stated another way, Defendants are prohibited from affirmatively contributing to the vulnerability of a known victim (Plaintiffs) by engaging in conduct (promulgation of the Directives), whether explicit or implicit, that encourages intentional violence (the spread of Covid) against the victim (Plaintiffs). *Okin v. Vill.*

*of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 434–35 (2d Cir. 2009). This states a substantive due process claim where qualified immunity is inapplicable. *Id*.

While not mentioned in the District Court's Opinions, Defendants uniformly relied upon *Lombardi* where the court ruled against the plaintiffs because the officials were "subject to the pull of competing obligations", they had "no good choices", and did not have time to deliberate. Despite Defendants' hyperbole, that is not the situation here.

First, the New York Defendants have engaged in pandemic planning for years and years, while annually updating the State's pandemic plan. (JA336-351). Second, unlike in *Lombardi*, the New York Defendants were not in an impossible dilemma with no good options and competing choices.

Independent experts advocated for the creation of separate settings for recovering COVID patients, including large field hospitals, dormitories, hotels, and shuttered nursing homes or hospitals in order to keep the virus out of facilities by isolating COVID positive patients from the extremely vulnerable elderly. (JA279). On March 27, 2020, the Javits Convention Center became a provisional hospital, offering **2,500 (twenty-five hundred) beds**. (JA279).

On March 28, 2020, Governor Cuomo announced that the federal government approved four additional hospital sites, which would have added **4,000 (four-thousand) beds**: (1) Brooklyn Cruise Terminal; (2) Aqueduct Racetrack facility in

Queens; (3) CUNY Staten Island; (4) New York Expo Center in the Bronx. (JA279). On March 30, 2020, the USNS Comfort arrived in New York City as a provisionary medical facility, offering **1,000 (one-thousand) beds**. (JA279).

This is not Monday Morning Quarterbacking or litigation by hindsight. Based upon the widespread availability of alternative sites throughout the State, Defendants did not have to send a single Covid hazard patient to the nursing homes, yet they did so anyway. The availability of this easily workable alternative, renders this case fully distinguishable from *Lombardi* and its progeny.

Moreover it is open question whether *Lombardi* still even good law, at least with respect to fundamental rights in light of *Roman Catholic Diocese* and *Agudath Israel of America* requiring the application of strict scrutiny to pandemic regulations which infringe upon fundamental rights. While halting the spread of Covid is "unquestionably a compelling interest", it is hard to see how the Directives can be regarded as narrowly tailored, given the availability of an easily workable alternative. *Roman Catholic Diocese*, 141 S.Ct. at 67. In fact, given the availability of the easily workable alternative, the Directives are even invalid under rational basis review as there is no relationship between the promulgation of the Directives, and some legitimate governmental purpose. *Plaza Motors of Brooklyn, Inc. v. Cuomo*, 2021 WL 222121at *5 (E.D.N.Y. 2021).

The District Court held that Plaintiffs failed to cite any case similar in fact demonstrating beyond debate that the right to be free from state-created danger was clearly established in the context of public health policy decisions at the time the Directives were issued. *Arbeeny*, *supra*, at \*10. As discussed above, however, Plaintiffs are not required to do so. *Hope*, *supra.* The aforementioned caselaw clearly established the right to be free from state-created danger and placed Defendants on fair notice that the Directives violated that right. *Id.*

### 7. Defendants' Violations of these Rights Shocks the Conscience

We have already documented that the implementation of the Directives is a textbook example of willful misconduct and/or deliberate indifference sufficient to state a 42 U.S.C. § 1983 claim. The New York Defendants fully acknowledged on March 13, 2020, that nursing home residents "are at especially high risk of severe morbidity and mortality." (JA366-368). This was confirmed at the earliest stages of the pandemic when it was widely reported "how a case of COVID-19 identified in a nursing home on February 28, 2020, in Washington state led to 37 deaths and the critical need for rapid and sustained public health intervention." *Mauro*, *supra*, at \*7.

This comports with the known science at the time advising "that the virus is transmitted from person to person through respiratory droplets produced when a person or group of people talk, sing, cough, or breathe near each other." *Roman*

*Catholic Diocese*, 141 S. Ct. at 78 (Breyer, J. dissenting). The science further confirmed that "the risk of transmission is higher when people are in close contact with one another for prolonged periods of time, particularly indoors or in other enclosed spaces." *Id.*

Just a day after Defendants issued the March 25, 2020 Directive, three organizations, to wit, the Society for Post-Acute and Long-Term Care Medicine ("AMDA"), the National Center for Assisted Living ("NACL"), and American College of Health Care Administrators ("CHCA"), all describing themselves as dedicated to preserving the safety of patients, residents, and other long-term care facilities, issued a dire warning about the March 25, 2020 Directive. (JA556). They noted that the Directives were "a short-term and short-sighted solution that will only add to the surge in COVID-19 patients that require hospital care." (JA556).

They explained that based on what they "currently know about how this virus can spread in institutional settings, the hospitalizations and case fatality rate, this action by a state will put the many frail and older adults who reside in nursing homes at risk." (JA556). The preliminary results from the first nursing home to have an outbreak of COVID-19 in King County Washington show a hospitalization rate of 57% for residents. (JA556).

The case fatality rate (CFR) for residents was 36% and 7% for staff. (JA556). Subsequent published scientific studies from multiple countries, including recent

U.S. data released by the Centers for Disease Control and Prevention (CDC), report the CFR to be in the 15-30% range for geriatric nursing home residents. (JA556). Alternative settings for patients recovering from COVID-19 must be considered and implemented now, including large field hospitals, dormitories, hotels, and shuttered nursing homes or hospitals. (JA556).

Unfortunately, a decision to attempt to create more hospital bed capacity by sending patients to nursing homes indiscriminately may have the unintended effect of making the problem this is trying to solve worse. (JA556). In New York, requiring all New York nursing homes state-wide to accept all patients regardless of their COVID-19 status, even from hospitals that are not at capacity, will likely cause many more hospitalizations, since elderly people over the age of 80 with chronic diseases are most at risk of hospitalizations – and they constitute the majority of nursing home residents today. (JA557).

The nursing homes had inadequate supplies, inadequate staffing, inadequate infection control capabilities, and inadequate physical structure. (JA557). In sum, a blanket, one-size-fits-all approach statewide, which will include areas of the state that are not as severely impacted as others, will result in more people going to the hospital and more deaths than using a more strategic and collaborative approach that takes all of the above elements into consideration. (JA557). Defendants knew all of this, yet they implemented the Directives anyway.

Not only that, but on January 28, 2021, New York State Attorney General Letitia James issued a report concluding that there had been a significant undercount by as much as ***fifty-percent (50%)*** of the number of COVID deaths in New York nursing homes. (JA291). On April 28, 2021, the *New York Times* reported, as patient advocates had maintained all along, that the State of New York had engaged in "a sustained effort" to hide the true nursing home death toll from the public and further that this cover up "was something Mr. Cuomo's aides had known since the previous spring." (JA292).

On March 15, 2022, the NYS Comptroller Auditors found in their audit and report, that the NYS DOH officials, under direction of Defendant Cuomo, purposefully undercounted the death toll by at least 4,100 residents and at times by more than fifty percent, allowing Governor Cuomo to repeatedly and falsely claim that New York was doing a better job than other states in protecting highly vulnerable seniors. (JA292). Controller Tom DiNapoli concluded, "The public was misled by the highest level of state government and given a distorted version of reality that suppressed facts when they deserved the truth." (JA293).

Secretary DeRosa continued to obstruct the truth while promoting her book, stating that the March 25 directive was "based on" guidance from the Centers for Medicare & Medicaid Services. (JA373-379). In fact, the two policies differed in crucial ways, as the CMS guidance was clearly non-mandatory and came with

caveats – that nursing homes should accept Covid-positive patients only if they could do so safely and were prepared to take special precautions. (JA373-379).

The Directive used prescriptive language and did not cite the CMS guidelines, mention the need to exercise discretion, or identify any special precautions. (JA373-379). She continues to pursue the false narrative that nursing homes were required to turn away patients they could not properly handle under a long-standing state regulation. (JA373-379). But that regulation – 10 NYCRR 415.26(i)(1)(ii) – was one of many that Governor Cuomo had suspended a week earlier, as part of Executive Order 202.5. (JA373-379).

Lastly, Donny Tuchman, the CEO of Cobble Hill LifeCare, confirms Defendants' heavy-handed approach and the difficulties nursing homes faced when attempting to comply with the Directives:

(a) From the outset, we tried hard to prevent potentially infected patients from entering our building.

(b) When the order came out, we and others were very confused as to why the State was ordering us to take covid patients who could be contagious even if they were otherwise medically stable. At that time, little was known about Covid and there was great fear of bringing infected patients into the building to cause further spread. This seemingly ran counter to prior statements from the Governor and DOH about protecting nursing home residents at all costs.

(c) When the order came out, we and others including hospitals did not perceive it as mere suggestion, but rather

40

as a clear directive with potential consequences for not following it.

(d)    The result of the order was pressure from hospitals to admit/readmit covid positive patients despite the obvious concerns.

(e)    We nevertheless tried hard to resist the pressure where we could to prevent potentially contagious patients from coming/returning.

(f)    We even requested permission to potentially send infected patients to the temporary Covid hospitals (Mercy ship and Javits Center) in order to protect other patients from the virus but the request was denied.

(JA382-385).

Yet despite all of this, the District Court seeks to give Defendants full immunity because "State officials were tasked with acting quickly in response to evolving and dynamic circumstances during the COVID-19 pandemic." *Arbeeny*, *supra*, at *10. The actual facts as chronicled above are quite to the contrary especially at this stage where all reasonable inferences must be be drawn in Plaintiffs' favor, and the allegations in the SAC must be considered as a "whole". *Vullo*, *supra*.

Taken in totality, Defendants' promulgation of the Directives constitutes a substantive due process violation that shocks the conscience. At bare minimum, "the merits of plaintiffs' claim cannot be resolved without full discovery", necessitating

the reversal of the District Court's granting of Defendants' Motions to Dismiss. *D.C.J.V.*, 605 F. Supp.3d at 593.

###   C.   Because the Directives Violated Multiple Clearly Established Rights, Defendants are not Entitled to Qualified Immunity

Qualified immunity shields federal and state officials from money damages unless it is shown that: (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct. *Vega*, 963 F.3d at 273. Misconduct violates clearly established law when at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right. *Id*. at 275. Qualified immunity is "no license to lawless conduct." *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021).

The lack of a comparable government-created public health disaster precedent does not grant defendants a qualified immunity shield. *Guertin v. State*, 912 F.3d 907, 933 (6th Cir. 2019). Rather, it showcases the grievousness of their alleged conduct, as the "easiest cases don't even arise." *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). There is no need that the very action in question has previously been held unlawful" because "the unconstitutionality of outrageous conduct obviously will be unconstitutional."

*Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009).

General statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful. *Hope*, 536 U.S. at 741, 122 S. Ct. at 2516. Officials can still be on notice that their conduct violates established law even in novel factual circumstances, as the requirement that previous cases be "fundamentally similar" has been expressly rejected. *Id.*

Plaintiffs are entitled to have all inferences drawn in their favor. *Tolan v. Cotton*, 572 U.S. 650, 657, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014). Based upon the discussion in the substantive due process section above, Plaintiffs have shown that Defendants have violated multiple clearly established rights, necessitating the denial of Defendants' motions to dismiss on grounds of qualified immunity.

Lastly, the District Court proclaimed that "courts in this circuit and across the country have routinely granted state officials qualified immunity for policies implemented in response to the ongoing public health crisis."*Arbeeny*, *supra*, at *10 (*citing Mauro*, *supra*, at *6)(collecting cases). The District Court's proclamation is

a wholly irrelevant false narrative, as those cases all involved either commercial interests or non-lethal interests, as compared to the lethal infringement upon the fundamental rights of Covid-19's most vulnerable victims that we have in this case.

The District Court, cites with approval Chief Justice Roberts concurrence opining that state officials must be given especially broad latitude to act "in areas fraught with medical and scientific uncertainties," and generally "should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Arbeeny*, *supra*, at \*10 (*citing South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring in the judgment). But this Court has subsequently noted that "Whatever persuasive value that opinion [Justice Roberts' concurrence] may have had in the early months of the COVID-19 pandemic, the Supreme Court's decision in *Roman Catholic Diocese* has supplanted *South Bay*. *Agudath Israel*, *supra*, at 635 (*citing Roman Cath. Diocese*, 141 S. Ct. at 70) (Gorsuch, J., concurring).

## POINT II

## DEFENDANTS ARE LIABLE FOR CONSPIRACY UNDER 42 U.S.C. § 1983

A § 1983 conspiracy claim for deprivation of civil rights has three elements: (1) an agreement between two or more state actors, or a state actor and a private entity, (2) to act in concert to inflict constitutional injury; and (3) an overt act done

in furtherance of the goal of causing damages. *Rodriguez v. City of New York*, 590 F. Supp. 3d 518, 547 (E.D.N.Y. 2022). In order to survive a motion to dismiss, Plaintiffs must provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end, augmented by some details of time and place and the alleged effects of the conspiracy. *Id*. at 548.

While conclusory allegations of a § 1983 conspiracy are insufficient, it must again be emphasized that such conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence. *Id.* These allegations that Defendants worked in tandem to promulgate the Directives in an illicit manner that went far beyond simple lobbying, permits a plausible inference that Defendants formed an implicit agreement to engage in a conspiracy. (JA274-275).

## POINT III

### THE DISTRICT COURT ERRED IN NOT FINDING
### THE HOSPITAL DEFENDANTS TO BE "STATE ACTORS"

#### A.    Public Corruption Lies at the Heart of this Case

As already referenced, the essence of this conspiratorial act was the following

On March 25, 2020, the New York Defendants, at the behest of and with the direct assistance of GNYHA and Northwell, administratively issued the following directive to all nursing homes in the State, "No

45

resident shall be denied re-admission to a [nursing home] solely based on a confirmed or suspected diagnosis of COVID-19.

The parties may differ as to whether the number of COVID-positive patients transferred from New York hospitals to nursing homes located in New York State was 6,000 or 9,000, but that differential is irrelevant as to who is responsible for the deaths of over ten thousand elderly nursing home residents as a consequence of that Directive. (fn. 1).

The Complaint next pointed to independent corroboration that the Directive behind these thousands of deaths was promulgated by the Public Defendants at the behest of the Hospital Defendants:

> Numerous newspaper articles published at that time attribute the actual origination of the Cuomo Directive to the GNYHA, e.g., the Feb. 26, 2021 edition of *STAT News*, an authoritative journal about health, medicine, and the life sciences, reported that "New York's influential hospital lobby was pleading with Cuomo to issue policy on transfers to nursing homes. (JA80).

The Complaint next indicated from independent sources that the Hospital Defendants provided massive campaign contributors to Public Defendant Cuomo, e.g., "Health Care Groups, Lobbyists Padded Cuomo Campaign Coffers amid COVID Crisis, Immunity Push" *New York Daily News* (Feb. 24, 2020); *also New York Times* article reporting that "the hospital lobby, at the request of the Cuomo campaign made a $1 million donation to the State Democratic Party, which Governor Cuomo controlled. (Oct. 3, 2019). (JA96).

The Complaint also pointed out that Hospital Defendants Raske, in a memorandum dated April 2, 2020 to the GNYHA membership, bragged that they had "**drafted** and aggressively advocated for" the adoption of related New York legislation granting any health care facility and health care staff immunity from civil or criminal liability for any harm or damages alleged to have been sustained providing health care services to COVID-19 patients. (JA96) (Emphasis added).

In response to a public records search of Defendant Cuomo's schedule, Appellant cited independent party documentation that during the critical COVID-outbreak months in early 2020 and in the midst of the issuance of the Mar. 25, 2020 Directive, Defendant Cuomo's schedule showed over 288 meetings and/or calls with the hospital lobby. (fn. 1) The Defendant Drucker testified before the U.S. Congress that the March 25 Directive was prompted by a direct request to Mr. Cuomo from the Greater New York Hospital Association. (fn. 2)

---

1 *See also*, Hammond, Empire Center: *Cuomo's Schedules for the Peak of New York's Pandemic Show Limited Contact with Outside Experts:* One call involving [Defendant] Raske took place on March 17, eight days before the Health Department issued its controversial order requiring nursing homes to accept COVID-positive patients being discharged from hospitals … Raske has acknowledged proposing that policy to the governor's office.

2 https://oversight.house.gov/release/new-covid-select-memo-exposes-former-new-york-governor-andrew-cuomo-reveals-interim-findings-of-covid-19-nursing-home-investigation/

Not on this list was any of the following patient-oriented organizations such as the American Medical Directors Association (AMDA)-The Society for Post-Acute Care and Long-Term Care (PALTC) Medicine warned against it on the day after its issuance stating that it was: "over-reaching, not consistent with science…and beyond all, not in the least consistent with patient safety principles."

Three days later, on March 29, AMDA-PALTC was joined in another statement by the American Health Care Association (AHCA) and the National Center for Assisted Living (NCAL) stating:

> "As organizations dedicated to preserving the safety of patients and residents in post-acute and long-term care settings including assisted living, we strongly object to this policy **directive** and approach…This is a short-term and short-sighted solution that will only add to the surge in COVID-19 patients… a blanket order for every nursing home in the state to accept all admissions from hospitals is not sound policy." (fn .3) (Emphasis added on these prominent medical organizations using of the word "directive.")
>
> Based upon what we currently know about how this virus can spread in institutional settings, the hospitalizations and case fatality rate, this action by a state will put the many frail and older adults who reside in nursing homes at risk." (fn. 4)

---

3        https://paltmed.org/newsroom/amda-urges-cooperation-between-paltc-hospitals-and-public-health-agencies-responding-covid

4 https://www.insidernj.com/ny-and-nj-enduring-covid-19-questions-around-nursing-homes/

Instead, the Public Defendants, acting in concert with the Hospital Defendants who Defendants Cuomo's largest campaign contributors would first have to clear out the hospitals for new patients coming in under the 20% COVID bonus which had just been authorized under the CARES Act (P. L. 116–136). In total, as the Hospital Defendants were aware and likewise helped shape,[5] the CARES Act additionally permitted hospital payments for COVID patients under full Medicare certified bed occupancy, including a ventilator, up to $40,000 a day. (JA90).

## B.      The District Court Gave Factual Deference to the Wrong Party

In the face of the foregoing: (1) contemporaneous news reports that the Hospital Lobby promoting the Mar. 25, 2020 Directive; (2) Defendant Raske's own admission to drafting the related COVID legislation adopted by New York State legislative and signed by Defendant Cuomo; (3) millions of dollars in campaign contributions going from the Hospital Defendants to Defendant Cuomo; (4) an independent research report that there were over 288 formally scheduled meetings and telephone conferences between the Public Defendants and the Hospital Defendants lobby within the 60 days prior to or just after the issuance of the Mar. 25 Directive; and, (5) another published reports that Defendant Raske admitted to recommending the March 25, 2020 Directive to Defendant Cuomo, the District

---

5 GNYHA Federal Lobbying Report: Senate ID #16839; House ID #324950000 for the 2nd Qtr. 4., 2020 ($570,000.00) (filed July 15, 2000).

Court deemed these allegations "insufficient" as to a valid claim and likewise not amounting to "concerted action" as between and among the Public and the Hospital Defendants. *Arbeeny*, *supra*, at *3-*4.

On a Motion to Dismiss, as here, the controlling caselaw in the Second Circuit remains *Cosmas v Hassett* 886 F.2d 8, 11 (2nd Cir. 1989), which states that a court "must read the complaint generously, and draw all inferences in favor of the pleader." The District Court's decision not only ignores this bedrock principle, but it does the opposite by adopting the Defendants' interpretations in each and every instance.

By way of example, in response to the above noted report that there were over 200 meetings and telephones calls on the Governor's schedule with the Hospital Defendants at the precise time the March 25 Directive was issued, the District Court dismisses that as follows: "Notably, Plaintiffs do not allege that any of the 228 (fn.6) meetings and calls between Cuomo and the Hospital Defendants were related to the issuance of the Advisories." Note also here the Court is adopting the Defendant/Appellees' transfiguration of a New York State document at the core of this dispute which actually uses the words "this directive" into some form of an "advisory" function.

---

6 Erratum, should be 288.

50

In addition to its self-description as a "Directive," the March 25 document which went to all New York nursing homes with the names of Defendant Cuomo and Defendant Zucker at the very top (JA242, *infra*) employs the phrase "**must comply**" and that pre-testing hospital transferees for COVID admission or re-admission is "**prohibited**," and that "**No resident shall be denied.**" Commonplace usage and certainly no dictionary would comport the words "directive," "must comply," "prohibited," or "shall be denied" as denoting optionality.

Next, the District Court resorts to the rhetorical tactic of taking up and then denigrates the Complaint's numerous and independently corroborated allegations on a one-off basis as distinct from assessing the pleadings "as a whole." This approach likewise defies common sense and is in direct contradiction to the Supreme Court's recent remand to this Circuit in a very apposite decision holding that a high-level official appointed by Defendant Cuomo was <u>not</u> entitled to qualified immunity at the motion-to-dismiss stage:

> For example, the Second Circuit failed to analyze the Guidance Letters and press release against the backdrop of other allegations in the complaint …. Given the obligation to draw reasonable inferences in the [Plaintiff's] favor and consider the allegations **as a whole**, the Second Circuit erred in reading the complaint as involving only individual instances of "permissible government speech" and the execution of Vullo's "regulatory responsibilities". *Vullo*, 602 U.S. at 195, 144 S. Ct. at 1330.

It is no coincidence that the above cited language also stressed the importance that at the Motion to Dismiss stage in a judicial proceeding there exists "the obligation to draw reasonable inferences in the Plaintiff's favor." In fact, Justice Sotomayor emphasized that because the case was still at the motion to dismiss stage, the Court "must assume the well-pleaded factual allegations in the complaint are true. *Id*., 602 U.S. at 180, 144 S.Ct. at 1322.

Of equal significance is the less than subtle admonition that the "Second Circuit is free to revisit the qualified immunity question in light of this Court's opinion" which it appears from current press reports that the Circuit is now undertaking (fn. 7).

As an aside, it is surprising that this widely publicized immunity case (fn. 8). decided unanimously and written by Justice Sotomayor who served on the Second Circuit for ten years, was not explored in the decision below, nor in a case just decided on March 31, 2025 by another New York District Court decision dismissing a comparable nursing home case. *Ferrari, et al. v. Cuomo et al*. (SPA38-58.)

Lastly with respect to the District Court's abiding adherence to deference only for the Defendants in this case, is must be noted that no responsible person or party

---

7 https://www.nytimes.com/2024/12/09/us/nra-supreme-court.html

8 E. g., 138 Harv. L. Rev. 305 (Nov., 2024).

disputes that the Public Defendants, with full cooperation by the Hospital Defendant lied to the public during the entirety of the nursing home scandal. Foremost among these lies was the deliberate hiding of the rising death toll by only counting deaths in nursing homes themselves to the exclusion of five to seven thousand deaths that occurred after nursing home patients had to be been transported to a hospital for the last few days of their lives. The latter, conveniently, were counted as hospital deaths rather than nursing home fatalities.

These are staggering numbers involved in this case where all the Defendants lied and covered up their conduct until it could longer be contained due to a state court ordering a Freedom of Information Law (FOIL) release by separate from this lawsuit and the State Attorney General about to issue a full expose pointing out that New York underreported COVID-19 nursing home deaths by as much as 50 percent. (JA213). And yet the Court's Order below awards deference to the lying side rather than the dying side, and does so in the face of pleadings based entirely, as noted, on independently-premised pleadings including this *Pro Publica* article: "In the weeks that followed the March 25 order, COVID-19 tore through New York state's nursing facilities, killing more than 6,000 people — about 6% of its more than 100,000 nursing home residents."

According to its website, *ProPublica* is an independent, non-profit newsroom based in New York that produces investigative journalism in the public interest

which, since it began publishing in 2008, has received six Pulitzer Prizes, five Peabody Awards, five Emily Awards and twelve George Polk Awards. And yet the Court below refers to the Appellants' citations such as this report from *Pro Publica* as "conclusory allegations." (SPA8)

### C. The Court Allowed the State Defendants to Disown Their Own Acts

Five years after 15,000 elderly and in almost all cases disabled New Yorkers died of COVID and three years since this litigation commenced, not a single one of the New York public or private policymakers has had to answer a single question under oath in this proceeding or in any of the numerous state-conducted investigations related to this matter. This has allowed Defendant Cuomo, the Governor of the state, and Defendant Zucker, the Director of the state's Department of Health to take a public stance that they had no idea how the March 25, 2020 Directive came into existence or even who might have written the final or earlier draft versions of this death sentence document.

At one point during a public forum held on April 20, 202, a reporter asked Defendants Cuomo about the safety of the "state 'directive'(fn.9) that people cannot

---

9 Emphasis again on every party but the Defendants and the opinion below using the word "Directive." The *Ferrari* opinion includes the incredulous statement the difference between "Directive" and "Advisory" is only "semantics." (SPA52)

be denied admission or readmission" to a nursing home. This dialogue follows and is included as Exhibit 1 to this brief:

> Governor Cuomo: If you are tested positive for the virus, are you allowed to be admitted to a nursing home, is the question.
> Reporter: Or readmitted.
> Governor Cuomo: It's a good question. **I don't know**.

Up to 15,000 people die under a State Directive with Defendant Cuomo name the top of it and admits no knowledge of its most essential and most fatal content.

Perhaps even more astounding Defendant Zucker, the Director of Health for the State of New York, stated in transcribed interview before the U. S. Congress that "he was not involved with the drafting, review, or issuance of the March 25 Directive" (fn. 10) Likewise at a transcribed interview, Ms. DeRosa testified that she played no role in the development of the March 25 Directive and only learned about it at the press conference on April 20, 2020. (fn. 11)

The decision below allows this travesty to continue by depriving the Appellants of even the simplest form of discovery. It was a long process, but it took only a single FOIL request to expose the Defendants' pattern of lying regarding the number of nursing home deaths. Discovery in this case is the only avenue to what is

---

10      https://oversight.house.gov/wp-content/uploads/2024/12/12.04.2024-SSCP-FINAL-REPORT.pdf, p. 223.

11 (*Id*., at 224).

almost certainly the actual facts, namely the Hospital Defendants drafted the March 25 Directive just as they have already admitted to drafting the New York State COVID legislation granting immunity the hospitals they manage and represent.

The essence of the decision below rests on the doctrine of qualified immunity which as a general rule shields government officials performing official actions from judicial actions (SPA12-17), just as, in most instances, private parties are not be deemed state actors. But there are exceptions to these general rules and, most importantly, no legal doctrine can be fairly enforced in the absence of all the relevant facts being before the court.

The District Court opinion appropriately acknowledges there are exceptions to the limited liability doctrine (SPA14-16), but then goes on to state that "it is only for exceptional cases." (SPA15) Up to 15,000 New York nursing home residents died under the prescriptions set forth on March 25, 2020 pursuant to the power, purview, and public corruption of the Defendants in this case, and that is not even sufficiently exceptional to warrant discovery within the scope of the limited immunity doctrine?

It is likewise important to note the limited liability doctrine is only available to state officials for any "acts performed in the course of official conduct." *Scheuer v. Rhodes*, 416 U.S. 232, 247–48 (1974). *Quid pro Quo* actions such as issuing government proclamations in exchange for political contributions do not fall with

the gambit of official actions and is, in fact, a violation of New York law for any persons to confer any benefit upon a public servant upon an agreement or understanding that such public exercise of discretion as a public servant will thereby be influenced and vice versa. (NY Penal L § 200.27 (2024)). Discovery is also necessary in further proof of these potential actions in concert.

Lastly, we respectfully suggest that there exists an overriding legal doctrine at issue in this case with a 232-year history in American jurisprudence. It was first enunciated by Chief Justice Marshall in *Marbury v. Madison* 5 U.S. 137, 163, 1 Cranch 137, 2 L.Ed. 60 (1803), when he said the "very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." He further warned that a government cannot be called a "government of laws, and not of men ... if the laws furnish no remedy for the violation of a vested legal right." What "vested legal right" can there be that the right to life guaranteed through the due process of law in the Fifth and Fourteenth Amendments to the U.S. Constitution?

No justice for the death, pain and suffering of these individuals involuntarily removed by state action and into an environment which could only produce the very result which these same Defendants then lied about and otherwise acted to hide. Not restitution for the hundreds of thousands of their family members is possible unless

this Honorable Court steps in to vacate the District Cour Order and remand this case with direction for discovery to proceed prior to any disposition on the merits.

## POINT IV

## THE WRONGFUL DEATH CLAIM

This portion of the appeal challenges the Southern District of New York's (SDNY) decision to dismiss Plaintiffs' wrongful death claim for lack of subject matter jurisdiction after declining to exercise supplemental jurisdiction under 28 U.S.C. §1367(c)(3).

Plaintiffs request, quite simply, that should this Court reverse the dismissal and remand the case for further proceedings that it also order the supplemental state claim alleging wrongful death to be included pursuant to §1367.

## CONCLUSION

If the underlying facts and circumstances *may* be the proper subject of relief, Plaintiffs ought to be afforded an opportunity to test their claims on the merits, as "the purpose of pleading is to facilitate a proper decision on the merits." *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L.Ed.2d 222 (1962). Accordingly, the District Court's decision granting Defendants' Motion to Dismiss should be reversed and remanded.

Dated: April 10, 2025

/s/Michael S. Kasanoff
MICHAEL S. KASANOFF
MICHAEL S. KASANOFF, LLC
Nine Stillwell Street
Matawan, New Jersey 07747
(908) 902-5900

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 12,966 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
    April 10, 2025

                                        */s/Michael S. Kasanoff*
                                        MICHAEL S. KASANOFF
                                        MICHAEL S. KASANOFF, LLC
                                        Nine Stillwell Street
                                        Matawan, New Jersey 07747
                                        (908) 902-5900

**SPECIAL APPENDIX**

i

## TABLE OF CONTENTS

**Page**

Text Order, dated September 30, 2024 ...................... SPA-1

Memorandum and Order, dated January 10, 2025..... SPA-2

Judgment, dated January 10, 2025........................... SPA-26

Unpublished Memorandum and Order in *Arbeeny v. Cuomo*, United States District Court for the Eastern District of New York, Docket No.: 22-CV-02336(LDH)(LB), dated January 10, 2025 ..... SPA-27

Unpublished Opinion and Order in *Ferrari v. Cuomo*, United States District Court for the Eastern District of New York, Docket No.: 23-CV-7715(KPF), dated March 31, 2025................. SPA-38

SPA-1

| | |
|---|---|
| 09/30/2024 | ORDER: Defendants' motions 64 , 66 , 69 , 72 , 73 to dismiss are GRANTED. Memorandum and Order to follow. Ordered by Judge LaShann DeArcy Hall on 9/30/2024.(CG) (Entered: 09/30/2024) |

SPA-2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

DANIEL N. ARBEENY, as the Administrator of the Estate of NORMAN ARBEENY (deceased) individually, Plaintiff SEAN S. NEWMAN, as the Administrator of the Estates of MICHAEL J. NEWMAN (deceased) and DOLORES D. NEWMAN (deceased) individually, and on behalf of others

Plaintiffs,

v.

ANDREW M. CUOMO, MELISSA DEROSA, HOWARD A. ZUCKER, M.D., GREATER NEW YORK HOSPITAL ASSOCIATION, KENNETH RASKE, NORTHWELL HEALTH, INC., MICHAEL DOWLING, AND JOHN DOES A-Z,

Defendants.

---

**MEMORANDUM AND ORDER**

22-cv-02336 (LDH) (LB)

LASHANN DEARCY HALL, United States District Judge:

Daniel Arbeeny, as the Administrator of the Estate of Norman Arbeeny and Sean S. Newman, as the Administrator of the Estates of Michael J. Newman and Dolores D. Newman individually, and on behalf of others ("Plaintiffs"), bring the instant action against Andrew M. Cuomo, former Governor of New York, Melissa DeRosa, former Chief of Staff to Governor Cuomo, Dr. Howard A. Zucker, former Commissioner of the New York State Department of Health ("NYSDOH") (collectively, the "State Defendants"), Greater New York Hospital Association ("GNYHA"), Kenneth Raske, President and Chief Executive Officer of GNYHA (together, "GNYHA Defendants"), Northwell Health, Inc. ("Northwell"), Michael Dowling, President and Chief Executive Officer of Northwell (together, "Northwell Defendants") (together with GNYHA Defendants, the "Hospital Defendants"), and John Does A-Z, asserting claims pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985 for deprivation of their constitutional rights and rights under the Federal Nursing Home Reform Act ("FNHRA"). Plaintiffs also assert a

SPA-3

wrongful death claim under New York Estate Powers & Trust Law ("NYEPT") § 5-4.1. Defendants each move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint in its entirety.

## BACKGROUND

In March 2020, when a rise in COVID-19-related hospitalizations began to put a strain on New York State's healthcare infrastructure, state officials determined that there was an "urgent need" to expand hospital capacity to meet the demand for patients with COVID-19 requiring acute care. (*See* Glavin Decl. Supp. Cuomo's Mot. Dismiss ("Glavin Decl."), Ex. 1 ("NH Advisory") at 1, ECF No. 68-1.)[1]  Governor Cuomo directed hospitals to immediately increase bed capacity by at least 50%. (Second Am. Compl. ("SAC") ¶ 52.)  Kenneth Raske and Micheal Dowling, on behalf of GNYHA and Northwell respectively, spoke with Cuomo and his team on multiple occasions. (*Id*. ¶ 49.)  During those discussions, they urged Cuomo to issue policy on transfers of patients to nursing homes. (*Id*. ¶ 52.)  Among other things, Raske and Dowling indicated such policy was necessary because the hospitals couldn't afford to house recovered nursing-home residents long-term and models showed they soon "could be swamped." (*Id*. ¶ 52–53.)

On March 25, 2020, the NYSDOH issued an advisory to nursing homes (the "NH Advisory") directing that "[n]o resident shall be denied re-admission or admission to the [nursing home] solely based on a confirmed or suspected diagnosis of COVID-19" and that nursing homes were "prohibited from requiring a hospitalized resident who is determined medically stable, under the advisory, to be tested for COVID-19 prior to admission or readmission." (NH Advisory at 1.)

---

[1] In rendering its decision on the motions to dismiss, the Court has considered the NH Advisory, the ACF Advisory, and the NYSDOH Report, which were all attached to Defendant Cuomo's motion to dismiss and were incorporated by reference in the complaint.  On a motion to dismiss, the Court "may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

SPA-4

Hospital discharge planners were to confirm that a resident was determined to be "medically stable for return" by a hospital physician and provide "[c]omprehensive discharge instructions" to the nursing homes prior to the transfer. (*Id*.) Nursing homes were expected to maintain standard precautions and make "environmental cleaning" a priority. (*Id*.) On April 7, 2020, the NYSDOH issued a similar advisory to adult care facilities (the "ACF Advisory"), prohibiting such facilities from denying admission and readmission to COVID-19-recovered residents. (Glavin Decl., Ex. 2 ("ACF Advisory") at 1, ECF No. 68-2.) The ACF Advisory further directed that "[a]ny denial of admission or re-admission must be based on the ACF's inability to provide the level of care required for the prospective resident, pursuant to the hospital's discharge instructions." (*Id*.) According to the second amended complaint, as a result of the NH Advisory and the ACF Advisory (together, the "2020 Advisories"), over 9,000 COVID-19-positive residents were admitted to nursing homes and adult care facilities, and over 15,000 of their residents died from COVID-19. (SAC ¶¶ 75–76.)[2] The 2020 Advisories were withdrawn on May 10, 2020. (*Id*. ¶ 75.)

Plaintiffs are the children of decedents Norman Arbeeny, Michael J. Newman, and Dolores D. Newman (collectively, the "Decedents"). (SAC ¶¶ 1, 4, 7.) The Decedents were residents of nursing homes and adult care facilities in the State of New York who died between March and April 2020 after contracting COVID-19 and after the NYSDOH issued the 2020 Advisories. (*Id*. ¶¶ 1–2, 4–5, 7–8, 50.)

---

[2] On July 6, 2020, the NYSDOH issued a report, later revised on February 11, 2021, assessing the factors associated with COVID-19 infections and fatalities in nursing homes during the pandemic. (Glavin Decl., Ex. 3 ("NYSDOH Report") at 1, ECF No. 68-3.) The revised report concluded that approximately 6,326 COVID-19-positive residents were admitted to nursing homes and adult care facilities between March 25, 2020 and May 8, 2020, that there had been 6,432 COVID-19 fatalities in nursing homes as of June 26, 2020, and that the data did not support "[a] causal link between the admission policy and infections/fatalities." (*Id*. at 4–5, 7.) The report instead attributed these infections and fatalities to COVID-19 transmission from nursing home employees, with the rate of employee infections corresponding to the spread of COVID-19 throughout the most impacted regions in the state. (*Id*. at 3.) Some state officials and media outlets reported that Cuomo, DeRosa, and the NYSDOH made a concerted effort to downplay the number of COVID-19 deaths in nursing homes and adult care facilities and failed to report "at least 4,100" additional fatalities from April 2020 to February 2021. (SAC ¶¶ 130–39.)

Norman Arbeeny, aged 89, was admitted to Cobble Hill Health Center ("CHHC"), a nursing home in Brooklyn, New York on March 20, 2020. (*Id*. ¶¶ 20–23.) At some point before his release from CHHC on April 8, 2020, Mr. Arbeeny developed a low-grade fever. (*Id*. ¶¶ 25–26.) Upon Mr. Arbeeny's discharge from CHHC, Mr. Arbeeny was placed under 24-hour at-home nursing care. (*Id*. ¶ 27.) Mr. Arbeeny's symptoms began to worsen, and he was tested for COVID-19 on April 20, 2020. (*Id*. ¶ 29.) Mr. Arbeeny died the next day, on April 21, 2020. (*Id*. ¶ 30.) Later that day, test results indicated that Mr. Arbeeny was positive for COVID-19. (*Id*. ¶ 31.)

Michael J. Newman, aged 84, was admitted to Grandell Rehabilitation and Nursing Center ("GRNC"), a nursing home in Long Beach, New York, on February 7, 2020. (*Id*. ¶¶ 32, 35.) At the time of his admission Mr. Newman "was in declining health." (*Id*. ¶ 34.) On March 29, 2020, Mr. Newman developed a fever, and his lungs began to fill with fluid. (*Id*. ¶ 37.) Mr. Newman died that same day and was posthumously diagnosed with COVID-19. (*Id*.)

Dolores D. Newman, aged 78, was admitted to Long Island Living Center ("LILC"), an adult care facility in Long Island, New York, on December 26, 2019. (*Id*. ¶¶ 38, 41.) On April 10, 2020, Ms. Newman developed a cough and a headache, and had difficulty breathing. (*Id*. ¶ 43.) On April 11, 2020, Ms. Newman was transported to a hospital and diagnosed with COVID-19. (*Id*.) Ms. Newman died at the hospital on April 14, 2020. (*Id*. ¶ 44.)

## STANDARD OF REVIEW

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Iqbal*, 556 U.S. at 678. While this standard requires more than a "sheer possibility"

*of a defendant's liability, id.*, "[i]t is not the [c]ourt's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the [c]ourt must merely determine whether the complaint itself is legally sufficient, and in doing so, it is well settled that the [c]ourt must accept the factual allegations of the complaint as true." *Id.* (internal citation omitted).

## DISCUSSION

### I.    THE HOSPITAL DEFENDANTS

#### A. Section 1983 Claims

Plaintiffs raise Section 1983 and Section 1983 conspiracy claims against the Hospital Defendants. (SAC ¶¶ 171–235.) To state a claim under Section 1983, a plaintiff must plausibly allege that the conduct at issue was "committed by a person acting under color of state law" and that it "deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d. Cir. 2010) (citing *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). "To support a claim against a private party on a [Section] 1983 conspiracy theory, a plaintiff must show (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Lee v. L. Off. of Kim & Bae, PC*, 530 F. App'x 9, 9–10 (2d Cir. 2013) (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002)). The Hospital Defendants argue that Plaintiffs' Section 1983 and Section 1983 conspiracy claims against them must be dismissed because Plaintiffs fail to plead that the Hospital Defendants, as private parties, were acting under the color of state law or that they acted in concert with the State Defendants to inflict an unconstitutional injury. (GNYHA Defs.' Mot.

Dismiss ("GNYHA Mot.") at 10–16, 23, ECF No. 74; Northwell Defs.' Mot. Dismiss

("Northwell Mot.") at 6–15, ECF No. 65.)  The Court agrees.

Acts of a private party can only serve to sustain a Section 1983 claim if the challenged action is "fairly attributable to the state" or if the non-state actor was a "'willful participant in joint activity' with the state or its agents."  *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1027 (2d Cir. 1995) ("[A] state action occurs where the challenged action of a private party is fairly attributable to the state.") (internal citation and quotations omitted); *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) ("[A] private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents.") (internal citation and quotations omitted).  Otherwise, private conduct, no matter how wrongful, is not "under color of state law" and, as such, does not fall within the ambit of a Section 1983 claim.  *Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 50 (1999).

Plaintiffs do not dispute that the Hospital Defendants are private entities whose actions cannot be attributable to the state.  Instead, Plaintiffs argue that the Hospital Defendants acted under color of state law because they actively participated, or conspired to participate, in the issuance of the 2020 Advisories, alongside the State Defendants.  (Pl.'s Opp'n Hospital Defs.' Mot. Dismiss ("Pl.'s Hospital Defs.' Opp'n") at 4–13, ECF No. 79.)

Although a Section 1983 conspiracy claim is distinct from one of joint action, courts in this circuit typically conduct the same analysis in evaluating these claims.  *See Betts*, 751 F.3d 78, 84 n.1 (2d Cir. 2014) ("A Section 1983 conspiracy claim is distinct from one of joint action."); *Ciambriello*, 292 F.3d at 324–25 (holding that the analysis of the plaintiff's Section 1983 conspiracy claim "is very similar to the analysis performed" for the Section 1983 claim and upholding the dismissal of both claims for the same reasons); *see also Lee*, 530 F. App'x at 9–10

(applying the same analysis to evaluate whether the plaintiff sufficiently alleged joint action or conspiracy by a private party under Section 1983); *Spear v. Town of W. Hartford*, 954 F.2d 63, 68 (2d Cir. 1992) (same); *Rice v. City of New York*, 275 F. Supp. 3d 395, 403 (E.D.N.Y. 2017) ("Although a Section 1983 conspiracy claim is distinct from one of joint action the concepts of acting 'jointly' or in 'conspiracy with' state actors are intertwined.") (internal citations and quotations omitted)*; Stewart v. Victoria's Secret Stores, LLC*, 851 F. Supp. 2d 442, 445 (E.D.N.Y. 2012) (The concepts of acting "jointly" or in "conspiracy with" state actors are intertwined . . . Even if considered as conceptually separate theories, both require the pleading of facts sufficient to show something more than conclusory allegations.)  That is, to sufficiently plead either joint activity or conspiracy with state actors, a plaintiff must allege specific facts that set forth a plausible theory of agreement and concerted action between the private party and the state actor. *See Stewart*, 851 F. Supp. 2d at 445.  Thus, a complaint must allege facts demonstrating that the private party and the state actor "share[d] some common goal to violate the plaintiff's rights" and "that the private entity acted in concert with the state actor to commit an unconstitutional act." *Betts*, 751 F.3d at 84-85 (quoting *Spear*, 954 F.2d at 68) (internal quotations omitted).  To support their claims, Plaintiffs direct the Court to eleven allegations that Plaintiffs contend sufficiently plead concerted action between the Hospital Defendants and the State Defendants. (Pl.'s Hospital Defs.' Opp'n at 5–7.)  They do not.

    *First*, Plaintiffs direct the Court to the purported allegations that in "early 2020," Defendant Cuomo appointed Defendant Dowling to head the Medicaid Redesign Team and, at the same time, Defendant Raske was serving as a "member of the state commission."[3]  (*Id*. at 5.) As a threshold matter, Plaintiffs failed to raise these allegations in their Second Amended

---

[3] Plaintiffs fail to specify the "state commission" of which Raske is alleged to be a member.

Complaint and, as such, the Court need not consider them.  *Peacock v. Suffolk Bus Corp.*, 100 F. Supp. 3d 225, 231 (E.D.N.Y. 2015) ("It is well-settled that a plaintiff cannot amend his complaint by asserting new facts or theories for the first time in opposition to a motion to dismiss . . . Such claims are not properly before the Court and the Court need not consider them." (internal citations and alterations omitted)).  Nonetheless, these allegations cannot support an inference of concerted action to violate the Decedents' constitutional rights.  That is, Plaintiffs do not allege that the Medicaid Redesign Team or the "state commission" were involved in the issuance of the 2020 Advisories.  And, allegations of conduct that is unrelated to the state's alleged unlawful actions cannot support Section 1983 claims against a private party.  *See Hollman v. Cnty. of Suffolk*, No. 06-CV-3589, 2011 WL 2446428, at *6 (E.D.N.Y. June 15, 2011) ("[A]ctivities [that] are wholly unrelated to the alleged injury at issue in the instant case . . . are inapplicable to the state action analysis.")

       *Second*, Plaintiffs point to allegations that, throughout March and April 2020, Defendant Cuomo's schedule reflected 228 meetings or calls "with the hospital lobby" and that, in the month leading up to the issuance of the NH Advisory, and shortly thereafter, Defendants Raske and Dowling met with Cuomo on several occasions.  (Pls.' Hospital Defs. Opp'n at 5–6.)  Notably, Plaintiffs do not allege that any of the 228 meetings and calls between Cuomo and the Hospital Defendants were related to the issuance of the 2020 Advisories.  Of course, "[a]lleging merely that a private party regularly interacts with a state actor does not create an inference of agreement to violate a plaintiff's rights."  *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 338 (E.D.N.Y. 2010), *aff'd*, 417 F. App'x 96 (2d Cir. 2011) (internal citations and quotations omitted).  Without more, the fact that the Hospital Defendants and Cuomo communicated regularly around the time that the 2020 Advisories were issued is insufficient to

plead that they were acting in concert with the State Defendants. *See Bryant v. Steele*, 93 F. Supp. 3d 80, 91–92 (E.D.N.Y. 2015) (citing *Fisk v. Letterman*, 401 F. Supp. 2d 362, 377 (S.D.N.Y. 2005)) ("[M]ere '[c]ommunications,' even regular ones, 'between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient to make the private party a state actor.'").

*Third*, Plaintiffs highlight allegations regarding the influence of the hospital lobby on the Cuomo administration and its health policy. (Pls.' Hospital Defs. Opp'n at 5–6.) For example, Plaintiffs point to allegations that the hospital lobby donated significant sums to Cuomo's campaign and successfully advocated for legislation benefitting health care facilities. (*Id*.) Plaintiffs also direct the Court to news reports that the "hospital lobby was pleading with Cuomo to issue policy on transfers to nursing homes" and that Defendant Raske "contacted Mr. Cuomo's team for help with nursing homes" days before Cuomo's approval of the NH Advisory. (*Id*.) These allegations at most suggest that the Hospital Defendants solicited the State Defendants to issue the 2020 Advisories through lobbying efforts. However, mere solicitation of state actors without participation in state activity does not amount to concerted action. *See Sherman v. City of New York*, No. 18-CV-5359, 2019 WL 2164081, at *6 (E.D.N.Y. May 16, 2019) ("A private party does not act under color of law when he merely elicits but does not join in an exercise of official state authority.") (quoting *Serbalik v. Gray*, 27 F. Supp. 2d 127, 131–32 (N.D.N.Y. 1998)) (internal quotations and alterations omitted); *see also Missere v. Gross*, 826 F. Supp. 2d 542, 567–68 (S.D.N.Y. 2011) (holding that lobbying and pressuring officials to take action was not sufficient to establish that a private party was a state actor) Where a state actor "exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not 'jointly engaged' in the [official's] conduct." *Ginsberg v.*

*Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272–73 (2d Cir. 1999) (internal citation omitted) (holding that "Section 1983 does not impose civil liability on persons who merely stand to benefit from an assertion of authority under color of law.").

*Fourth*, Plaintiffs point to allegations that, after the 2020 Advisories were withdrawn, Cuomo enlisted Dowling, Raske, and two other individuals to provide a report on the impact of the 2020 Advisories on nursing homes, and that Cuomo endorsed a book written by Defendant Dowling about the pandemic.  (Pls.' Hospital Defs.' Opp'n at 5–6.)  However, like the allegations regarding Dowling's appointment to the Medicaid Redesign Team and Raske's involvement in the "state commission," these allegations are untethered to the wrongful conduct alleged in this case.  Indeed, Plaintiffs make no effort to tie Dowling's book, or Cuomo's endorsement of it, to the issuance of the 2020 Advisories.  Instead, Plaintiffs curiously rely on conduct that post-dates the issuance and withdrawal of the 2020 Advisories in an effort to convince the Court that the Hospital Defendants acted in concert with the State Defendants.  (*See id.*)  It does not.  It is axiomatic that conduct post-dating the alleged constitutional violation cannot support an inference that a defendant acted in concert with state officials or jointly participated in said violation.

**B.  Section 1985 Claim**

Plaintiffs' Section 1985 claim fares no better.  To support a conspiracy claim pursuant to Section 1985, Plaintiffs must allege: "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States."  *Gray v. Town of Darien,* 927 F.2d 69, 73 (2d Cir. 1991).  Importantly, to make out a

Section 1985 claim Plaintiffs must plead that the alleged conspiracy was motivated by "some racial, or perhaps otherwise class-based, invidious discriminatory animus." *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 835 (1983). Here, Plaintiffs do not make any allegations that would support an inference that any Defendant was motivated by discriminatory animus toward elderly individuals. Plaintiffs do not allege that the Defendants "selected their course of action because of" the Decedents' age. *See Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999). Nor do Plaintiffs refer to any statements made by the Defendants that would suggest that their actions were motivated by the Decedents' age. *See Khan v. City of New York*, No. 14-CV-4665, 2016 WL 1128298, at *7 (E.D.N.Y. Feb. 1, 2016), *report and recommendation adopted,* No. 14-CV-4665, 2016 WL 1192667 (E.D.N.Y. Mar. 21, 2016). In fact, Plaintiffs' allegations suggest that the whatever motivation that the Hospital Defendants had was "financial, not discriminatory," which is insufficient to support a Section 1985 conspiracy claim. *See Doe v. Fenchel*, 837 F. App'x 67, 69 n.2 (2d Cir. 2021). Indeed, Plaintiffs allege that the Defendants' actions were "financially motivated at their core" and that their "real motivation" for soliciting the issuance of the 2020 Advisories was the fact that hospitals were paid significantly more under Medicare for patients with COVID-19 than those without. (*See* SAC ¶ 97, 176; *see also* ¶¶ 95–96, 131, 225.) Accordingly, Plaintiffs' Section 1985 claims against the Defendants must be dismissed. *See Panchitkhaew v. Cuomo*, No. 19-CV-6206, 2024 WL 1347518, at *3 (E.D.N.Y. Mar. 29, 2024) (dismissing Section 1985 claim where Plaintiffs failed to assert any allegation that might support an inference that Defendants conspired to deprive a protected class of any specified constitutional rights).

## II.   THE STATE DEFENDANTS

Plaintiffs' remaining Section 1983 claims against the State Defendants are precluded by the doctrine of qualified immunity. Qualified immunity shields government officials performing discretionary functions from suits for money damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine is intended to "give[] government officials breathing room to make reasonable but mistaken judgments" and "protect[] all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citing *Malley v. Briggs*, 475 U.S. 335, 335 (1986)) (internal quotations omitted). As such, state officials are entitled to qualified immunity under Section 1983 unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards,* 566 U.S. 658, 664 (2012)). [4]

In evaluating whether to grant qualified immunity, courts have historically first assessed whether the state actor violated a federal statutory or constitutional right before determining whether that right was clearly established at the time of the official's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This protocol, known as the "*Saucier* protocol," was born out of the Supreme Court's 2001 decision in *Saucier v. Katz*, which expressly held that, for courts conducting a qualified immunity analysis, the question of whether a plaintiff alleged that an official's conduct violated a constitutional right "must be the initial inquiry." *See id*. The

---

[4] "[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability [and] it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). As such, the availability of qualified immunity should be decided by a court "[a]t the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *see also Pearson*, 555 U.S. at 231–32 ("[T]he driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." (internal citations and quotations omitted)).

SPA-14

Court in *Saucier* reasoned that "[i]n the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established." *Id*. This explication of legal principles necessarily facilitates the elaboration of the law from case to case. *Id*.

Some eight years after *Saucier*, the Supreme Court opened the door for courts to depart from its protocol. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). That is, in *Pearson v. Callahan*, the Supreme Court concluded that a court need not first determine whether an official's actions violated a statutory or constitutional right in order to find that the qualified immunity doctrine applies. *See id*. Instead, according to the Court, "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*.; *see also Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020) ("[A] court need not determine whether a defendant violated a plaintiff's rights if it decides that the right was not clearly established."). Such latitude avoids, what is in some cases, "an essentially academic exercise" where the resolution of the constitutional question is not necessary to find that qualified immunity applies. *See Pearson*, 555 U.S. at 237–38. This is particularly so when (1) "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," (2) "the constitutional question is so factbound that the decision provides little guidance for future cases," (3) "[a] decision on the underlying constitutional question in a Section 1983 damages action . . . may have scant value when it appears that the question will soon be decided by a higher court," (4) "resolution of the constitutional question requires clarification of an ambiguous state statute," (5) at the pleading stage, "the precise factual basis for the plaintiff's

claim or claims may be hard to identify" and thus "the answer to whether there was a violation may depend on a kaleidoscope of facts not yet fully developed," (6) "the briefing of constitutional questions is woefully inadequate" which creates a "risk that constitutional questions may be prematurely and incorrectly decided in cases where they are not well presented," or (7) "a court [can] rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question [of] whether the relevant facts make out a constitutional question at all." *See id*. at 237–40 (citations and quotations omitted).

Admittedly, this Court has not previously accepted the Supreme Court's invitation to bypass the inquiry into whether challenged conduct violates a federal statutory or constitutional right. The reason for this is consistent with the reasoning articulated by the Supreme Court in *Saucier*. Inquiry into whether a statutory or constitutional right has been violated is necessary to clearly establish the law that will serve to protect against potential future abuses by state actors. *Saucier*, 533 U.S. at 201 (holding that "[t]he law might be deprived of [the elaboration of a clearly established right] were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case."). As such, in this Court's opinion, it is only in the exceptional case where the *Saucier* protocol should be abandoned in favor of the one articulated in *Pearson*. This is such a case. Accordingly, the Court's inquiry here begins with whether Plaintiffs' claimed constitutional rights and statutory rights under the FNHRA were clearly established when the 2020 Advisories were issued.

"A right is 'clearly established' when 'the contours of the right are sufficiently clear that a reasonable official would understand that what they are doing violates that right.'" *Soukaneh*

*v. Andrzejewski*, 112 F.4th 107, 116 (2d Cir. 2024) (quoting *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011)) (alterations omitted).  Put another way, "'existing precedent must have placed the statutory or constitutional question *beyond debate*.'"  *Liberian Cmty.*, 970 F.3d at 186–87 (quoting *White v. Pauly*, 580 U.S. 73 (2017)) (emphasis in original).  Where "reasonable officers could disagree on the legality of the action at issue in its particular factual context," under then-existing legal precedent, qualified immunity should be granted.  *Soukaneh*, 112 F.4th at 116 (quoting *Guan v. City of New York*, 37 F.4th 797, 806 (2d Cir. 2022)); *see also Wesby*, 583 U.S. at 63 (2018) ("'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." (internal citations and quotations omitted)); *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) ("[E]ven where the law is 'clearly established' . . . the qualified immunity defense [] protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010))); *Walczyk v. Rio,* 496 F.3d 139, 166 (2d Cir. 2007) (Sotomayor, J., concurring) ("[W]hether a right is clearly established is *the same question* as whether a reasonable officer would have known that the conduct in question was unlawful." (emphasis in original)).

Of particular relevance here, the Supreme Court has repeatedly instructed courts "not to define clearly established law at a high level of generality."  *al-Kidd*, 563 U.S. at 742.  As such, to sufficiently plead that a right was clearly established, "[a] plaintiff must show with a high degree of specificity, that the rule he seeks to apply prohibited the officer's conduct."  *Liberian Cmty.*, 970 F.3d at 186–87 (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)) (internal quotations omitted); *see also Mara v. Rilling*, 921 F.3d 48, 68–69 (2d Cir. 2019) ("[T]he law must be so

clearly established with respect to the *particular* conduct and the specific context at issue that every reasonable official would have understood that his conduct was unlawful." (emphasis in original) (internal citations and quotations omitted)); *Reichle*, 566 U.S. at 665 ("[W]e have previously explained that the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." (internal citations and quotations omitted)). Although this standard does not require a plaintiff to allege that there is a case directly on point with their alleged facts, "controlling authority or a robust consensus of cases of persuasive authority" dictate whether a right is clearly established. *Liberian Cmty.*, 970 F.3d at 186 (internal citations and quotations omitted); *see also Soukaneh*, 112 F.4th at 122 ("The analysis under this element 'turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" (quoting *Colvin v. Keen*, 900 F.3d 63, 75 (2d Cir. 2018)); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 60 (2d Cir. 2014) ("The salient question [] is whether the case law at the time in question would have put reasonable officers on fair warning that their conduct violated the plaintiff's rights." (internal citation and quotations omitted)). [5]

Here, Plaintiffs allege that the State Defendants, in issuing the 2020 COVID Advisories,

---

[5] Courts routinely find that readily distinguishable cases cannot serve as a basis to find that a right was clearly established in a separate context. For example, in *Radwan v. Manuel*, a student who played soccer for the University of Connecticut brought claims against the school for violating her First Amendment rights when they terminated her scholarship in response to her raising her middle finger to a television camera after the team won a tournament. 55 F.4th 101, 118 (2d Cir. 2022). The student argued that it was clearly established that showing the middle finger, even if offensive, expresses a viewpoint and that punishing her for expressing a viewpoint violated her First Amendment rights. *Id.* To support her argument, the student relied on a case, *Papish v. Board of Curators of the Univ. of Mo.*, 410 U.S. 667 (1973), where the Supreme Court held that a university violated a student's First Amendment right to free speech when it expelled the student after she published "indecent" content in her independent newspaper. *Id.* The Second Circuit in *Radwan* rejected the plaintiff's argument, holding that "[e]xpelling a university student because of a disagreement with the content of an article in an independent student newspaper . . . is not the constitutional equivalent of disciplining a university student for displaying a vulgar or offensive gesture while playing for a university's sports team." *Id.* The court found that, because the plaintiff's situation differed from the context of the previous case, the plaintiff failed to plead that her free speech rights, in the context of her involvement in a school-sponsored event, were clearly established at the time. *Id.* at 118–20.

violated Decedents' statutory rights under the FNHRA and certain constitutional rights.  (SAC ¶ 181.)  The State Defendants argue that they are immune from Section 1983 liability because these rights were not clearly established such that reasonable officials would have found the 2020 Advisories to be unlawful at the time that they were issued.  (*See* Cuomo Mot. to Dismiss ("Cuomo MTD") at 17–22, ECF No. 67; DeRosa Mot. to Dismiss ("DeRosa MTD") at 18–20, ECF No. 72-1; Zucker Mot. to Dismiss ("Zucker MTD") at 20–23, ECF No. 70.)  The Court agrees with the State Defendants.

### A.  Rights Under the FNHRA

The FNHRA was enacted to protect the health, safety, and dignity of residents in nursing facilities that receive Medicaid funding.  *See* 42 U.S.C.A. § 1396r; 42 C.F.R. § 483.10.  Under the FNHRA, "[a] nursing facility must protect and promote the rights of each resident," which includes rights to choose their physician and to participate in planning their treatments, be free from restraints and abuse, retain privacy and confidentiality, receive reasonable accommodations, voice grievances, organize groups and participate in activities, and refuse transfers, among others.  42 U.S.C.A. § 1396r(c)(A)(i)–(xi); 42 C.F.R. § 483.10 (enumerating additional resident rights).  Therefore, according to Plaintiffs, the FNHRA "unambiguously confers a multitude of rights upon Plaintiffs" and the "plain statutory language of the FNHRA renders those rights as clearly established for the purposes of defeating qualified immunity." (Pls.' Opp'n to State Defs.' Mots. to Dismiss ("Pls.' State Defs. Opp'n") at 16–17, ECF No. 76.)[6]

---

[6] In full, Plaintiffs allege that under the FNHRA, Decedents had clearly established rights to "be cared for in such a manner and in such an environment as will promote quality of life;" "receive nursing and related services and specialized rehabilitative services so as to attain and maintain the highest practicable physical, mental, and psychosocial well-being;" "be cared for in such a manner so as to attain and maintain the highest practicable physical, mental, and psychosocial wellbeing;" " reside in a safe, sanitary, and comfortable environment designed to prevent the development of disease and infection;" "reside in a facility designed, constructed, equipped, and maintained in a manner to protect the health and safety of residents, personnel, and the general public;" "be treated

In support of their argument, Plaintiffs rely on the Supreme Court's 2023 holding in *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023). In *Talevski*, the plaintiff brought a Section 1983 claim against a county-run nursing facility on behalf of a deceased resident who had been chemically restrained with medications that exacerbated his dementia and was then transferred to another facility 90 minutes away without notification to his family and without the facility satisfying necessary preconditions. *Id*. at 171–73. The plaintiff alleged that the nursing home's treatment of the decedent violated his rights under the FNHRA to be free from unnecessary physical or chemical restraints and to be discharged or transferred only when certain preconditions are satisfied. *Id*. Ultimately, the Supreme Court held that the plaintiff was permitted to bring a Section 1983 claim against the nursing home because the FNHRA confers individually enforceable rights on nursing home residents. *Id*. at 180.

Plaintiffs' reliance on *Talevski* is misplaced. Prior to the Supreme Court's ruling in *Talevski*, courts around the country, and within the Second Circuit, were split as to whether the FNHRA conferred a private right of action enforceable under Section 1983. *See, e.g. Mauro v. Cuomo*, No. 21-CV-1165, 2023 WL 2403482, at *3 (E.D.N.Y. Mar. 8, 2023) ("Courts in [the Second] Circuit are split as to whether the FNHRA creates a private right of action.") (collecting cases); *Boykin v. 1 Prospect Park ALF, LLC*, 993 F. Supp. 2d 264, 281 (E.D.N.Y. 2014) ("The federal courts are split as to whether various provisions of FNHRA confer individual rights that are enforceable through section 1983 for Medicaid beneficiaries who reside at substandard, state-run nursing homes.") (collecting cases). This disagreement at the time of the issuance of the

---

with dignity and care in a manner and in an environment that promotes maintenance or enhancement of their quality of life, recognizing their individuality, and with their rights protected and promoted;" "be treated with respect and dignity;" "make choices about aspects of their life that are/were significant to them;" "receive the necessary care and services in such a manner so as to attain and maintain the highest practicable physical, mental, and psychosocial well-being;" and "reside in a safe, sanitary, and comfortable environment designed to prevent the development of diseases and infections." (SAC ¶ 56.)

2020 Advisories forecloses a finding that a reasonable officer would have known that the issuance of the advisories would violate residents' rights under the FNHRA. Or, as put by the Supreme Court, "[i]f judges [] disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy." *Reichle*, 566 U.S. at 670 (citing *Wilson v. Layne,* 526 U.S. 603, 618 (1999)).

Even more damning to Plaintiffs argument is the timing of the issuance of the *Talevski* opinion. That is, *Talevski* was decided in 2023—three years after the 2020 Advisories were issued in this case. It is axiomatic that for a case to provide the basis to claim that the law articulated therein was clearly established to defeat a claim of qualified immunity, the case must predate the conduct at issue. Where there are no existing court decisions that would give an official fair warning that such conduct was proscribed by law, there can be no clearly established right. *See Matusick*, 757 F.3d at 61 (holding that there was no clearly established right where, at the time of officers' alleged constitutional violation of the right to intimate association, "the nature and the extent of the right [were] hardly clear," "the source of the intimate association right ha[d] not been authoritatively determined," and there were no court decisions that would have provided fair warning to a reasonable officer at the time that the right to intimate association would extend to the plaintiff's relationship).

In any event, *Talevski* is plainly distinguishable. In *Talevski*, the Supreme Court noted that the case was about "particular provisions" of the FNHRA referring to the rights of nursing-home residents "to be free from unnecessary physical or chemical restraints and to be discharged or transferred only when certain preconditions are satisfied" and "whether nursing-home residents can seek to vindicate those FNHRA rights in court." *See Talevski*, 599 U.S. at 171; 42 U.S.C. § 1396r(a). Here, Plaintiffs bring claims against state officials for the issuance of public

19

health regulations governing the admission of residents to nursing homes and adult care facilities in the midst of an unprecedented global pandemic. *Talevski* does not contemplate the circumstances presented by the instant case. In other words, *Taleveski* did not place the statutory or constitutional questions raised in this case beyond debate. *See al-Kidd*, 563 U.S. at 741 (finding that to be deemed clearly established "existing precedent must have placed the statutory or constitutional question beyond debate.") At most, *Talevski* stands for a general proposition that the FNHRA confers a private right of action, which can be enforced against state-run nursing facilities under Section 1983. This broad proposition is insufficient to support a finding that the Decedents' rights under the FNHRA were clearly established with respect to public health regulations imposed by the state. *See Mullenix*, 577 U.S. at 12 (finding that inquiry into whether law is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition.").

### B. Constitutional Rights

Plaintiffs argue that the Decedents had clearly established rights to "[freedom] from cruel, unhuman, or degrading treatment," "safe conditions," "life," "bodily integrity," and "[freedom] from state-created danger," such that any reasonable official would have known that the issuance of the 2020 Advisories would violate these rights. (Pl.'s State Def.'s Opp'n at 17–22; SAC ¶ 181.) None of Plaintiffs arguments operate to defeat qualified immunity here.

Plaintiffs maintain that the Decedents' right to be free from cruel, unhuman, or degrading treatment, as a "universally accepted customary human rights norm" was clearly established at the time the State Defendants issued the 2020 Advisories. (Pls.' State Defs.' Opp'n at 17.) In support, Plaintiffs direct the Court to non-controlling case law pertaining to claims brought under the Foreign Sovereign Immunities Act ("FSIA"), the Torture Victim Protection Act ("TVPA"),

and the Alien Tort Claims Act ("ATCA").  (*Id.*)  Of course, none of these statutes are implicated by the claims in this case.  Plaintiffs point to *Abebe–Jira v. Negredo*, where a plaintiff brought a claim under the ATCA against her captor and torturer, who was associated with the mid-1970s military dictatorship in Ethiopia, for torture and cruel, inhuman, and degrading treatment.  72 F.3d 844 (11th Cir. 1996), *cert. denied*, 519 U.S. 830 (1996).  Plaintiffs also cite *Najarro de Sanchez v. Banco Central de Nicaragua*, where an émigré from Nicaragua who fled the country to escape the Sandinista regime, brought a claim under the FSIA against the Nicaraguan Central Bank to cash a check that was issued to her prior to the demise of the former regime.  770 F.2d 1385 (5th Cir. 1985).  Moreover, Plaintiffs cite to *Xuncax v. Gramajo*, where Guatemalan immigrants brought claims under the FSIA, TVPA, and ATCA against the former Guatemalan Minister of Defense for the execution and disappearance of plaintiffs' relatives, torture, arbitrary detention, and cruel, inhuman and degrading treatment.  886 F. Supp. 162 (D.Mass. 1995).  Lastly, Plaintiffs cite to *Paul v. Avril*, where Haitian citizens brought claims under the ATCA against the ruler of a military regime in Haiti for torture and false imprisonment.  901 F. Supp. 330 (S.D.Fla. 1994).

These cases are patently distinguishable from the instant matter.  In each case, one or more plaintiffs claimed to have been subjected to torture, murder, kidnapping and the like from Defendants.  Here, the conduct at issue, while serious, is of a different sort.  Plaintiffs in this case complain that Defendants issued public health advisories pertaining to the admission of COVID-19-recovered residents into nursing homes and adult care facilities, which, once adhered to, led to the untimely deaths of nursing home residents.  (*See generally*, SAC.)  Even if Plaintiffs were able to demonstrate a broad, general right to be free from cruel, unhuman, and degrading

treatment, such readily distinguishable cases cannot serve as a basis to find that such right was clearly established as it relates to the conduct alleged here. *See Mullenix*, 577 U.S. at 12.

Moreover, to the extent that Plaintiffs allude to the constitutional right to be free from cruel and unusual punishment conferred by the Eighth Amendment to support their argument, it is unhelpful to them. (*See* Pl.'s State Defs.' Opp'n at 17.) It is well-settled that constitutional protections under the Eighth Amendment are only applicable to individuals who have been convicted of a crime. *See Ingraham v. Wright*, 430 U.S. 651, 668–69 (1977) (holding that the Eighth Amendment's prohibition of cruel and unusual punishments is limited to "criminal punishments" and is not applicable outside of that context). As such, because the nursing home residents were not under criminal punishment, they did not have a clearly established right under the Eighth Amendment.

Plaintiffs further argue that the issuance of the 2020 Advisories violated clearly established substantive due process rights under the Fifth and Fourteenth Amendments— specifically the right to safe conditions, life, bodily integrity, and freedom from state-created danger. (Pls.' State Defs.' Opp'n at 17–22.) Here, again, Plaintiffs fail to cite to any case similar in fact to the one at hand that would demonstrate, beyond debate, that these due process rights were clearly established in the context of public health policy decisions at the time of the issuance of the 2020 Advisories. Indeed, they could not have.

The Second Circuit has explicitly noted that "the Supreme Court has not addressed the limits imposed by due process on a [s]tate's power to manage infectious diseases." *Liberian Cmty.*, 970 F.3d at 190. State officials were tasked with acting quickly in response to evolving and dynamic circumstances during the COVID-19 pandemic. As such, courts in this circuit and across the country have routinely granted state officials qualified immunity for policies

implemented in response to the ongoing public health crisis.  *See, e.g.*, *Mauro*, 2023 WL 2403482, at *6 (collecting cases); *Liner v. Hochul*, No. 21-CV-11116, 2023 WL 358826, at *5 (S.D.N.Y. Jan. 23, 2023).  And as the Second Circuit has made clear, "the very purpose of qualified immunity is to protect officials when their jobs require them to make difficult on-the-job decisions . . . [t]his is especially true when officials are forced to act quickly, such as in the context of a public health emergency."  *DiBlasio v. Novello*, 413 F. App'x 352, 356 (2d Cir. 2011) (citation and quotations omitted).  Even the Supreme Court has weighed in to conclude that state officials must be given "especially broad" latitude to act "in areas fraught with medical and scientific uncertainties," and generally "should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people."  *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring in the judgment denying temporary injunction) (internal citations and quotations omitted).  All of these considerations are at play in this case.  In fact, the Court need look no further than the Plaintiffs' own complaint.  According to the complaint, Defendants were motivated to issue the 2020 Advisories, at least in part, by the concern that New York State hospitals would become "swamped" with COVID-19 patients and could not afford to house recovered nursing-home residents long-term.  (*See* SAC ¶ 53.)

Plaintiffs' claims against the State Defendants are precluded by the doctrine of qualified immunity.  Accordingly, Plaintiffs' Section 1983 and Section 1985 claims against the State Defendants must be dismissed.

### III.    WRONGFUL DEATH CLAIM

Having concluded that Plaintiffs failed to state any federal claims, it is within the Court's discretion not to exercise pendent jurisdiction over the state law claims.  *See Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *see also Jones v. Cnty. of Suffolk*, 236 F. Supp. 3d 688, 702 (E.D.N.Y. 2017); *Eubanks v. Hansell*, No. 22-CV-6277, 2024 WL 1308672, at *12 (E.D.N.Y. Mar. 26, 2024) ("[B]ecause Plaintiffs have failed to allege a viable federal claim, it would 'exceed [the] allowable discretion' of the Court to assert supplemental jurisdiction.").  As such, the Court declines to exercise jurisdiction over Plaintiffs' wrongful death claim and it must be dismissed for lack of subject matter jurisdiction.

### CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED and Plaintiffs' complaint is DISMISSED.


        SO ORDERED.


Dated: Brooklyn, New York                    /s/ LDH
        January 10, 2025                      LaSHANN DeARCY HALL
                                              United States District Judge

24

SPA-26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DANIEL N. ARBEENY, as the Administrator of
the Estate of NORMAN ARBEENY (deceased)
individually, Plaintiff SEAN S. NEWMAN, as the
Administrator of the Estates of MICHAEL J.
NEWMAN (deceased) and DOLORES D.
NEWMAN (deceased) individually, and on
behalf of others,

|                          |                          |
|--------------------------|--------------------------|
| Plaintiffs,              | JUDGMENT                 |
| v.                       | 22-cv-02336 (LDH) (LB)   |

ANDREW M. CUOMO, MELISSA DEROSA,
HOWARD A. ZUCKER, M.D., GREATER
NEW YORK HOSPITAL ASSOCIATION,
KENNETH RASKE, NORTHWELL HEALTH, INC.,
MICHAEL DOWLING, AND JOHN DOES A-Z,

Defendants.
-------------------------------------------------------------X

A Memorandum and Order of the Honorable LaShann DeArcy Hall, United States District

Judge, having been filed on January 10, 2025, granting Defendants' motions to dismiss; and

dismissing Plaintiffs' complaint; it is

ORDERED and ADJUDGED that Defendants' motions to dismiss are granted; and that

Plaintiffs' complaint is dismissed.

Dated: Brooklyn, New York                      Brenna B. Mahoney
      January 14, 2025                          Clerk of Court

                                            By:    /s/Jalitza Poveda
                                                  Deputy Clerk

Arbeeny v. Cuomo, Slip Copy (2025)

2025 WL 71729
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Daniel N. **ARBEENY**, as the Administrator
of the Estate of Norman **Arbeeny** (deceased)
individually, Plaintiff Sean S. Newman, as the
Administrator of the Estates of Michael J. Newman
(deceased) and Dolores D. Newman (deceased)
individually, and on behalf of others, Plaintiffs,
v.
Andrew M. **CUOMO**, Melissa DeRosa, Howard
A. Zucker, M.D., Greater New York Hospital
Association, Kenneth Raske, Northwell Health, Inc.,
Michael Dowling, and John Does A-Z, Defendants.

22-cv-02336 (LDH) (LB)
|
Signed January 10, 2025

**Attorneys and Law Firms**

Michael S. Kasanoff, Michael S. Kasanoff, LLC, Matawan,
NJ, Jonna Spilbor, Jonna Spilbor Law, Poughkeepsie, NY, for
Plaintiff Daniel N. Arbeeny.

Michael S. Kasanoff, Michael S. Kasanoff, LLC, Matawan,
NJ, for Plaintiff Sean S. Newman.

Rita M. Glavin, Katherine Ellen Petrino, Leo Korman,
Glavin PLLC, New York, NY, Michaelene Kennedy Wright,
Rosenfeld & Kaplan LLP, New York, NY, for Defendant
Andrew M. Cuomo.

Gregory Morvillo, Morvillo PLLC, New York, NY, Sarah
Ann Sulkowski, Gelber & Santillo PLLC, New York, NY, for
Defendant Melissa DelRosa.

Nelson A. Boxer, Caelyn Stephens, Deepa DeVanathan,
Petrillo Klein & Boxer LLP, New York, NY, for Defendant
Howard A. Zucker M.D.

Edward A. Smith, Daniel Stuart Alter, Abrams Fensterman
LLP, White Plains, NY, Robert A. Spolzino, Wilson Elser
Moskowitz Edelman & Dicker LLP, West Harrison, NY, for
Defendants Northwell Health, Inc., Michael Dowling.

Jeremy Creelan, Elizabeth Austin Edmondson, Stephen L.
Ascher, Jenner & Block LLP, New York, NY, for Defendants
Greater New York Hospital Association, Kenneth Raske.

**MEMORANDUM AND ORDER**

LASHANN DEARCY HALL, United States District Judge:

**\*1** Daniel Arbeeny, as the Administrator of the Estate of
Norman Arbeeny and Sean S. Newman, as the Administrator
of the Estates of Michael J. Newman and Dolores D.
Newman individually, and on behalf of others ("Plaintiffs"),
bring the instant action against Andrew M. Cuomo, former
Governor of New York, Melissa DeRosa, former Chief
of Staff to Governor Cuomo, Dr. Howard A. Zucker,
former Commissioner of the New York State Department of
Health ("NYSDOH") (collectively, the "State Defendants"),
Greater New York Hospital Association ("GNYHA"),
Kenneth Raske, President and Chief Executive Officer
of GNYHA (together, "GNYHA Defendants"), Northwell
Health, Inc. ("Northwell"), Michael Dowling, President and
Chief Executive Officer of Northwell (together, "Northwell
Defendants") (together with GNYHA Defendants, the
"Hospital Defendants"), and John Does A-Z, asserting claims
pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985 for
deprivation of their constitutional rights and rights under the
Federal Nursing Home Reform Act ("FNHRA"). Plaintiffs
also assert a wrongful death claim under New York State
Powers & Trust Law ("NYEPT") § 5-4.1. Defendants each
move pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure to dismiss the complaint in its entirety.

**BACKGROUND**

In March 2020, when a rise in COVID-19-related
hospitalizations began to put a strain on New York State's
healthcare infrastructure, state officials determined that there
was an "urgent need" to expand hospital capacity to meet
the demand for patients with COVID-19 requiring acute care.
(*See* Glavin Decl. Supp. Cuomo's Mot. Dismiss ("Glavin
Decl."), Ex. 1 ("NH Advisory") at 1, ECF No. 68-1.)[1]
Governor Cuomo directed hospitals to immediately increase
bed capacity by at least 50%. (Second Am. Compl. ("SAC")
¶ 52.) Kenneth Raske and Micheal Dowling, on behalf of
GNYHA and Northwell respectively, spoke with Cuomo and
his team on multiple occasions. (*Id.* ¶ 49.) During those
discussions, they urged Cuomo to issue policy on transfers
of patients to nursing homes. (*Id.* ¶ 52.) Among other things,
Raske and Dowling indicated such policy was necessary
because the hospitals couldn't afford to house recovered

SPA-28

nursing-home residents long-term and models showed they soon "could be swamped." (*Id.* ¶ 52–53.)

On March 25, 2020, the NYSDOH issued an advisory to nursing homes (the "NH Advisory") directing that "[n]o resident shall be denied re-admission or admission to the [nursing home] solely based on a confirmed or suspected diagnosis of COVID-19" and that nursing homes were "prohibited from requiring a hospitalized resident who is determined medically stable, under the advisory, to be tested for COVID-19 prior to admission or readmission." (NH Advisory at 1.) Hospital discharge planners were to confirm that a resident was determined to be "medically stable for return" by a hospital physician and provide "[c]omprehensive discharge instructions" to the nursing homes prior to the transfer. (*Id.*) Nursing homes were expected to maintain standard precautions and make "environmental cleaning" a priority. (*Id.*) On April 7, 2020, the NYSDOH issued a similar advisory to adult care facilities (the "ACF Advisory"), prohibiting such facilities from denying admission and readmission to COVID-19-recovered residents. (Glavin Decl., Ex. 2 ("ACF Advisory") at 1, ECF No. 68-2.) The ACF Advisory further directed that "[a]ny denial of admission or re-admission must be based on the ACF's inability to provide the level of care required for the prospective resident, pursuant to the hospital's discharge instructions." (*Id.*) According to the second amended complaint, as a result of the NH Advisory and the ACF Advisory (together, the "2020 Advisories"), over 9,000 COVID-19-positive residents were admitted to nursing homes and adult care facilities, and over 15,000 of their residents died from COVID-19. (SAC ¶¶ 75–76.)[2] The 2020 Advisories were withdrawn on May 10, 2020. (*Id.* ¶ 75.)

　*2　Plaintiffs are the children of decedents Norman Arbeeny, Michael J. Newman, and Dolores D. Newman (collectively, the "Decedents"). (SAC ¶¶ 1, 4, 7.) The Decedents were residents of nursing homes and adult care facilities in the State of New York who died between March and April 2020 after contracting COVID-19 and after the NYSDOH issued the 2020 Advisories. (*Id.* ¶¶ 1–2, 4–5, 7–8, 50.)

Norman Arbeeny, aged 89, was admitted to Cobble Hill Health Center ("CHHC"), a nursing home in Brooklyn, New York on March 20, 2020. (*Id.* ¶¶ 20–23.) At some point before his release from CHHC on April 8, 2020, Mr. Arbeeny developed a low-grade fever. (*Id.* ¶¶ 25–26.) Upon Mr. Arbeeny's discharge from CHHC, Mr. Arbeeny was placed under 24-hour at-home nursing care. (*Id.* ¶ 27.) Mr. Arbeeny's

symptoms began to worsen, and he was tested for COVID-19 on April 20, 2020. (*Id.* ¶ 29.) Mr. Arbeeny died the next day, on April 21, 2020. (*Id.* ¶ 30.) Later that day, test results indicated that Mr. Arbeeny was positive for COVID-19. (*Id.* ¶ 31.)

Michael J. Newman, aged 84, was admitted to Grandell Rehabilitation and Nursing Center ("GRNC"), a nursing home in Long Beach, New York, on February 7, 2020. (*Id.* ¶¶ 32, 35.) At the time of his admission Mr. Newman "was in declining health." (*Id.* ¶ 34.) On March 29, 2020, Mr. Newman developed a fever, and his lungs began to fill with fluid. (*Id.* ¶ 37.) Mr. Newman died that same day and was posthumously diagnosed with COVID-19. (*Id.*)

Dolores D. Newman, aged 78, was admitted to Long Island Living Center ("LILC"), an adult care facility in Long Island, New York, on December 26, 2019. (*Id.* ¶¶ 38, 41.) On April 10, 2020, Ms. Newman developed a cough and a headache, and had difficulty breathing. (*Id.* ¶ 43.) On April 11, 2020, Ms. Newman was transported to a hospital and diagnosed with COVID-19. (*Id.*) Ms. Newman died at the hospital on April 14, 2020. (*Id.* ¶ 44.)

## STANDARD OF REVIEW

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Iqbal*, 556 U.S. at 678. While this standard requires more than a "sheer possibility" of a defendant's liability, *id.*, "[i]t is not the [c]ourt's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the [c]ourt must merely determine whether the complaint itself is legally sufficient, and in doing so, it is well settled that the [c]ourt must accept the factual allegations of the complaint as true." *Id.* (internal citation omitted).

## DISCUSSION

## I. THE HOSPITAL DEFENDANTS

Arbeeny v. Cuomo, Slip Copy (2025)

### A. Section 1983 Claims

Plaintiffs raise Section 1983 and Section 1983 conspiracy claims against the Hospital Defendants. (SAC ¶¶ 171–235.) To state a claim under Section 1983, a plaintiff must plausibly allege that the conduct at issue was "committed by a person acting under color of state law" and that it "deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d. Cir. 2010) (citing *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). "To support a claim against a private party on a [Section] 1983 conspiracy theory, a plaintiff must show (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Lee v. L. Off. of Kim & Bae, PC*, 530 F. App'x 9, 9–10 (2d Cir. 2013) (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002)). The Hospital Defendants argue that Plaintiffs' Section 1983 and Section 1983 conspiracy claims against them must be dismissed because Plaintiffs fail to plead that the Hospital Defendants, as private parties, were acting under the color of state law or that they acted in concert with the State Defendants to inflict an unconstitutional injury. (GNYHA Defs.' Mot. Dismiss ("GNYHA Mot.") at 10–16, 23, ECF No. 74; Northwell Defs.' Mot. Dismiss ("Northwell Mot.") at 6–15, ECF No. 65.) The Court agrees.

**\*3** Acts of a private party can only serve to sustain a Section 1983 claim if the challenged action is "fairly attributable to the state" or if the non-state actor was a " 'willful participant in joint activity' with the state or its agents." *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1027 (2d Cir. 1995) ("[A] state action occurs where the challenged action of a private party is fairly attributable to the state.") (internal citation and quotations omitted); *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) ("[A] private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents.") (internal citation and quotations omitted). Otherwise, private conduct, no matter how wrongful, is not "under color of state law" and, as such, does not fall within the ambit of a Section 1983 claim. *Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 50 (1999).

Plaintiffs do not dispute that the Hospital Defendants are private entities whose actions cannot be attributable to the state. Instead, Plaintiffs argue that the Hospital Defendants acted under color of state law because they actively participated, or conspired to participate, in the issuance of the

2020 Advisories, alongside the State Defendants. (Pl.'s Opp'n Hospital Defs.' Mot. Dismiss ("Pl.'s Hospital Defs.' Opp'n") at 4–13, ECF No. 79.)

Although a Section 1983 conspiracy claim is distinct from one of joint action, courts in this circuit typically conduct the same analysis in evaluating these claims. *See Betts*, 751 F.3d 78, 84 n.1 (2d Cir. 2014) ("A Section 1983 conspiracy claim is distinct from one of joint action."); *Ciambriello*, 292 F.3d at 324–25 (holding that the analysis of the plaintiff's Section 1983 conspiracy claim "is very similar to the analysis performed" for the Section 1983 claim and upholding the dismissal of both claims for the same reasons); *see also Lee*, 530 F. App'x at 9–10 (applying the same analysis to evaluate whether the plaintiff sufficiently alleged joint action or conspiracy by a private party under Section 1983); *Spear v. Town of W. Hartford*, 954 F.2d 63, 68 (2d Cir. 1992) (same); *Rice v. City of New York*, 275 F. Supp. 3d 395, 403 (E.D.N.Y. 2017) ("Although a Section 1983 conspiracy claim is distinct from one of joint action the concepts of acting 'jointly' or in 'conspiracy with' state actors are intertwined.") (internal citations and quotations omitted)*; Stewart v. Victoria's Secret Stores, LLC*, 851 F. Supp. 2d 442, 445 (E.D.N.Y. 2012) (The concepts of acting "jointly" or in "conspiracy with" state actors are intertwined ... Even if considered as conceptually separate theories, both require the pleading of facts sufficient to show something more than conclusory allegations.) That is, to sufficiently plead either joint activity or conspiracy with state actors, a plaintiff must allege specific facts that set forth a plausible theory of agreement and concerted action between the private party and the state actor. *See Stewart*, 851 F. Supp. 2d at 445. Thus, a complaint must allege facts demonstrating that the private party and the state actor "share[d] some common goal to violate the plaintiff's rights" and "that the private entity acted in concert with the state actor to commit an unconstitutional act." *Betts*, 751 F.3d at 84-85 (quoting *Spear*, 954 F.2d at 68) (internal quotations omitted). To support their claims, Plaintiffs direct the Court to eleven allegations that Plaintiffs contend sufficiently plead concerted action between the Hospital Defendants and the State Defendants. (Pl.'s Hospital Defs.' Opp'n at 5–7.) They do not.

*First*, Plaintiffs direct the Court to the purported allegations that in "early 2020," Defendant Cuomo appointed Defendant Dowling to head the Medicaid Redesign Team and, at the same time, Defendant Raske was serving as a "member of the state commission."[3] (*Id.* at 5.) As a threshold matter, Plaintiffs failed to raise these allegations in their Second Amended Complaint and, as such, the Court need not consider

them. *Peacock v. Suffolk Bus Corp.*, 100 F. Supp. 3d 225, 231 (E.D.N.Y. 2015) ("It is well-settled that a plaintiff cannot amend his complaint by asserting new facts or theories for the first time in opposition to a motion to dismiss ... Such claims are not properly before the Court and the Court need not consider them." (internal citations and alterations omitted)). Nonetheless, these allegations cannot support an inference of concerted action to violate the Decedents' constitutional rights. That is, Plaintiffs do not allege that the Medicaid Redesign Team or the "state commission" were involved in the issuance of the 2020 Advisories. And, allegations of conduct that is unrelated to the state's alleged unlawful actions cannot support Section 1983 claims against a private party. *See Hollman v. Cnty. of Suffolk*, No. 06-CV-3589, 2011 WL 2446428, at *6 (E.D.N.Y. June 15, 2011) ("[A]ctivities [that] are wholly unrelated to the alleged injury at issue in the instant case ... are inapplicable to the state action analysis.")

**\*4** *Second*, Plaintiffs point to allegations that, throughout March and April 2020, Defendant Cuomo's schedule reflected 228 meetings or calls "with the hospital lobby" and that, in the month leading up to the issuance of the NH Advisory, and shortly thereafter, Defendants Raske and Dowling met with Cuomo on several occasions. (Pls.' Hospital Defs. Opp'n at 5–6.) Notably, Plaintiffs do not allege that any of the 228 meetings and calls between Cuomo and the Hospital Defendants were related to the issuance of the 2020 Advisories. Of course, "[a]lleging merely that a private party regularly interacts with a state actor does not create an inference of agreement to violate a plaintiff's rights." *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 338 (E.D.N.Y. 2010), *aff'd*, 417 F. App'x 96 (2d Cir. 2011) (internal citations and quotations omitted). Without more, the fact that the Hospital Defendants and Cuomo communicated regularly around the time that the 2020 Advisories were issued is insufficient to plead that they were acting in concert with the State Defendants. *See Bryant v. Steele*, 93 F. Supp. 3d 80, 91–92 (E.D.N.Y. 2015) (citing *Fisk v. Letterman*, 401 F. Supp. 2d 362, 377 (S.D.N.Y. 2005)) ("'[M]ere '[c]ommunications,' even regular ones, 'between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient to make the private party a state actor.' ").

*Third*, Plaintiffs highlight allegations regarding the influence of the hospital lobby on the Cuomo administration and its health policy. (Pls.' Hospital Defs. Opp'n at 5–6.) For example, Plaintiffs point to allegations that the hospital lobby donated significant sums to Cuomo's campaign and

successfully advocated for legislation benefitting health care facilities. (*Id.*) Plaintiffs also direct the Court to news reports that the "hospital lobby was pleading with Cuomo to issue policy on transfers to nursing homes" and that Defendant Raske "contacted Mr. Cuomo's team for help with nursing homes" days before Cuomo's approval of the NH Advisory. (*Id.*) These allegations at most suggest that the Hospital Defendants solicited the State Defendants to issue the 2020 Advisories through lobbying efforts. However, mere solicitation of state actors without participation in state activity does not amount to concerted action. *See Sherman v. City of New York*, No. 18-CV-5359, 2019 WL 2164081, at *6 (E.D.N.Y. May 16, 2019) ("A private party does not act under color of law when he merely elicits but does not join in an exercise of official state authority.") (quoting *Serbalik v. Gray*, 27 F. Supp. 2d 127, 131–32 (N.D.N.Y. 1998)) (internal quotations and alterations omitted); *see also Missere v. Gross*, 826 F. Supp. 2d 542, 567–68 (S.D.N.Y. 2011) (holding that lobbying and pressuring officials to take action was not sufficient to establish that a private party was a state actor). Where a state actor "exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not 'jointly engaged' in the [official's] conduct." *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272–73 (2d Cir. 1999) (internal citation omitted) (holding that "Section 1983 does not impose civil liability on persons who merely stand to benefit from an assertion of authority under color of law.").

*Fourth*, Plaintiffs point to allegations that, after the 2020 Advisories were withdrawn, Cuomo enlisted Dowling, Raske, and two other individuals to provide a report on the impact of the 2020 Advisories on nursing homes, and that Cuomo endorsed a book written by Defendant Dowling about the pandemic. (Pls.' Hospital Defs.' Opp'n at 5–6.) However, like the allegations regarding Dowling's appointment to the Medicaid Redesign Team and Raske's involvement in the "state commission," these allegations are untethered to the wrongful conduct alleged in this case. Indeed, Plaintiffs make no effort to tie Dowling's book, or Cuomo's endorsement of it, to the issuance of the 2020 Advisories. Instead, Plaintiffs curiously rely on conduct that post-dates the issuance and withdrawal of the 2020 Advisories in an effort to convince the Court that the Hospital Defendants acted in concert with the State Defendants. (*See id.*) It does not. It is axiomatic that conduct post-dating the alleged constitutional violation cannot support an inference that a defendant acted in concert with state officials or jointly participated in said violation.

### B. Section 1985 Claim

**\*5** Plaintiffs' Section 1985 claim fares no better. To support a conspiracy claim pursuant to Section 1985, Plaintiffs must allege: "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Gray v. Town of Darien,* 927 F.2d 69, 73 (2d Cir. 1991). Importantly, to make out a Section 1985 claim Plaintiffs must plead that the alleged conspiracy was motivated by "some racial, or perhaps otherwise class-based, invidious discriminatory animus." *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott,* 463 U.S. 825, 835 (1983). Here, Plaintiffs do not make any allegations that would support an inference that any Defendant was motivated by discriminatory animus toward elderly individuals. Plaintiffs do not allege that the Defendants "selected their course of action because of" the Decedents' age. *See Thomas v. Roach,* 165 F.3d 137, 147 (2d Cir. 1999). Nor do Plaintiffs refer to any statements made by the Defendants that would suggest that their actions were motivated by the Decedents' age. *See Khan v. City of New York,* No. 14-CV-4665, 2016 WL 1128298, at \*7 (E.D.N.Y. Feb. 1, 2016), *report and recommendation adopted,* No. 14-CV-4665, 2016 WL 1192667 (E.D.N.Y. Mar. 21, 2016). In fact, Plaintiffs' allegations suggest that the whatever motivation that the Hospital Defendants had was "financial, not discriminatory," which is insufficient to support a Section 1985 conspiracy claim. *See Doe v. Fenchel,* 837 F. App'x 67, 69 n.2 (2d Cir. 2021). Indeed, Plaintiffs allege that the Defendants' actions were "financially motivated at their core" and that their "real motivation" for soliciting the issuance of the 2020 Advisories was the fact that hospitals were paid significantly more under Medicare for patients with COVID-19 than those without. (*See* SAC ¶ 97, 176; *see also* ¶¶ 95–96, 131, 225.) Accordingly, Plaintiffs' Section 1985 claims against the Defendants must be dismissed. *See Panchitkhaew v. Cuomo,* No. 19-CV-6206, 2024 WL 1347518, at \*3 (E.D.N.Y. Mar. 29, 2024) (dismissing Section 1985 claim where Plaintiffs failed to assert any allegation that might support an inference that Defendants conspired to deprive a protected class of any specified constitutional rights).

### II. THE STATE DEFENDANTS

Plaintiffs' remaining Section 1983 claims against the State Defendants are precluded by the doctrine of qualified immunity. Qualified immunity shields government officials performing discretionary functions from suits for money damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The doctrine is intended to "give[ ] government officials breathing room to make reasonable but mistaken judgments" and "protect[ ] all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd,* 563 U.S. 731, 743 (2011) (citing *Malley v. Briggs,* 475 U.S. 335, 335 (1986)) (internal quotations omitted). As such, state officials are entitled to qualified immunity under Section 1983 unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.' " *D.C. v. Wesby,* 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards,* 566 U.S. 658, 664 (2012)).[4]

In evaluating whether to grant qualified immunity, courts have historically first assessed whether the state actor violated a federal statutory or constitutional right before determining whether that right was clearly established at the time of the official's alleged misconduct. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). This protocol, known as the "*Saucier* protocol," was born out of the Supreme Court's 2001 decision in *Saucier v. Katz,* which expressly held that, for courts conducting a qualified immunity analysis, the question of whether a plaintiff alleged that an official's conduct violated a constitutional right "must be the initial inquiry." *See id.* The Court in *Saucier* reasoned that "[i]n the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established." *Id.* This explication of legal principles necessarily facilitates the elaboration of the law from case to case. *Id.*

**\*6** Some eight years after *Saucier,* the Supreme Court opened the door for courts to depart from its protocol. *See Pearson v. Callahan,* 555 U.S. 223, 236 (2009). That is, in *Pearson v. Callahan,* the Supreme Court concluded that a court need not first determine whether an official's actions violated a statutory or constitutional right in order to find that the qualified immunity doctrine applies. *See id.* Instead, according to the Court, "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs

of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*; *see also Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020) ("[A] court need not determine whether a defendant violated a plaintiff's rights if it decides that the right was not clearly established."). Such latitude avoids, what is in some cases, "an essentially academic exercise" where the resolution of the constitutional question is not necessary to find that qualified immunity applies. *See Pearson*, 555 U.S. at 237–38. This is particularly so when (1) "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," (2) "the constitutional question is so factbound that the decision provides little guidance for future cases," (3) "[a] decision on the underlying constitutional question in a Section 1983 damages action ... may have scant value when it appears that the question will soon be decided by a higher court," (4) "resolution of the constitutional question requires clarification of an ambiguous state statute," (5) at the pleading stage, "the precise factual basis for the plaintiff's claim or claims may be hard to identify" and thus "the answer to whether there was a violation may depend on a kaleidoscope of facts not yet fully developed," (6) "the briefing of constitutional questions is woefully inadequate" which creates a "risk that constitutional questions may be prematurely and incorrectly decided in cases where they are not well presented," or (7) "a court [can] rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question [of] whether the relevant facts make out a constitutional question at all." *See id.* at 237–40 (citations and quotations omitted).

Admittedly, this Court has not previously accepted the Supreme Court's invitation to bypass the inquiry into whether challenged conduct violates a federal statutory or constitutional right. The reason for this is consistent with the reasoning articulated by the Supreme Court in *Saucier*. Inquiry into whether a statutory or constitutional right has been violated is necessary to clearly establish the law that will serve to protect against potential future abuses by state actors. *Saucier*, 533 U.S. at 201 (holding that "[t]he law might be deprived of [the elaboration of a clearly established right] were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case."). As such, in this Court's opinion, it is only in the exceptional case where the *Saucier* protocol should be abandoned in favor of the one articulated in *Pearson*. This is such a case. Accordingly, the Court's inquiry here begins with whether Plaintiffs' claimed

constitutional rights and statutory rights under the FNHRA were clearly established when the 2020 Advisories were issued.

"A right is 'clearly established' when 'the contours of the right are sufficiently clear that a reasonable official would understand that what they are doing violates that right.' " *Soukaneh v. Andrzejewski*, 112 F.4th 107, 116 (2d Cir. 2024) (quoting *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011)) (alterations omitted). Put another way, " 'existing precedent must have placed the statutory or constitutional question *beyond debate.*' " *Liberian Cmty.*, 970 F.3d at 186–87 (quoting *White v. Pauly*, 580 U.S. 73 (2017)) (emphasis in original). Where "reasonable officers could disagree on the legality of the action at issue in its particular factual context," under then-existing legal precedent, qualified immunity should be granted. *Soukaneh*, 112 F.4th at 116 (quoting *Guan v. City of New York*, 37 F.4th 797, 806 (2d Cir. 2022)); *see also Wesby*, 583 U.S. at 63 (2018) (" 'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." (internal citations and quotations omitted)); *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) ("[E]ven where the law is 'clearly established' ... the qualified immunity defense [ ] protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010))); *Walczyk v. Rio*, 496 F.3d 139, 166 (2d Cir. 2007) (Sotomayor, J., concurring) ("[W]hether a right is clearly established is *the same question* as whether a reasonable officer would have known that the conduct in question was unlawful." (emphasis in original)).

**\*7** Of particular relevance here, the Supreme Court has repeatedly instructed courts "not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. As such, to sufficiently plead that a right was clearly established, "[a] plaintiff must show with a high degree of specificity, that the rule he seeks to apply prohibited the officer's conduct." *Liberian Cmty.*, 970 F.3d at 186–87 (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)) (internal quotations omitted); *see also Mara v. Rilling*, 921 F.3d 48, 68–69 (2d Cir. 2019) ("[T]he law must be so clearly established with respect to the *particular* conduct and the specific context at issue that every reasonable official would have understood that his conduct was unlawful." (emphasis in original) (internal citations and quotations omitted)); *Reichle*, 566 U.S. at 665 ("[W]e have previously explained that the right allegedly violated must

SPA-33

Arbeeny v. Cuomo, Slip Copy (2025)

be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." (internal citations and quotations omitted)). Although this standard does not require a plaintiff to allege that there is a case directly on point with their alleged facts, "controlling authority or a robust consensus of cases of persuasive authority" dictate whether a right is clearly established. *Liberian Cmty.*, 970 F.3d at 186 (internal citations and quotations omitted); *see also Soukaneh*, 112 F.4th at 122 ("The analysis under this element 'turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.' ") (quoting *Colvin v. Keen*, 900 F.3d 63, 75 (2d Cir. 2018)); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 60 (2d Cir. 2014) ("The salient question [ ] is whether the case law at the time in question would have put reasonable officers on fair warning that their conduct violated the plaintiff's rights." (internal citation and quotations omitted)). [5]

Here, Plaintiffs allege that the State Defendants, in issuing the 2020 COVID Advisories, violated Decedents' statutory rights under the FNHRA and certain constitutional rights. (SAC ¶ 181.) The State Defendants argue that they are immune from Section 1983 liability because these rights were not clearly established such that reasonable officials would have found the 2020 Advisories to be unlawful at the time that they were issued. (*See* Cuomo Mot. to Dismiss ("Cuomo MTD") at 17–22, ECF No. 67; DeRosa Mot. to Dismiss ("DeRosa MTD") at 18–20, ECF No. 72-1; Zucker Mot. to Dismiss ("Zucker MTD") at 20–23, ECF No. 70.) The Court agrees with the State Defendants.

### A. Rights Under the FNHRA

The FNHRA was enacted to protect the health, safety, and dignity of residents in nursing facilities that receive Medicaid funding. *See* 42 U.S.C.A. § 1396r; 42 C.F.R. § 483.10. Under the FNHRA, "[a] nursing facility must protect and promote the rights of each resident," which includes rights to choose their physician and to participate in planning their treatments, be free from restraints and abuse, retain privacy and confidentiality, receive reasonable accommodations, voice grievances, organize groups and participate in activities, and refuse transfers, among others. 42 U.S.C.A. § 1396r(c)(A) (i)–(xi); 42 C.F.R. § 483.10 (enumerating additional resident rights). Therefore, according to Plaintiffs, the FNHRA "unambiguously confers a multitude of rights upon Plaintiffs" and the "plain statutory language of the FNHRA renders those rights as clearly established for the purposes of defeating

qualified immunity." (Pls.' Opp'n to State Defs.' Mots. to Dismiss ("Pls.' State Defs. Opp'n") at 16–17, ECF No. 76.) [6]

**\*8** In support of their argument, Plaintiffs rely on the Supreme Court's 2023 holding in *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023). In *Talevski*, the plaintiff brought a Section 1983 claim against a county-run nursing facility on behalf of a deceased resident who had been chemically restrained with medications that exacerbated his dementia and was then transferred to another facility 90 minutes away without notification to his family and without the facility satisfying necessary preconditions. *Id.* at 171–73. The plaintiff alleged that the nursing home's treatment of the decedent violated his rights under the FNHRA to be free from unnecessary physical or chemical restraints and to be discharged or transferred only when certain preconditions are satisfied. *Id.* Ultimately, the Supreme Court held that the plaintiff was permitted to bring a Section 1983 claim against the nursing home because the FNHRA confers individually enforceable rights on nursing home residents. *Id.* at 180.

Plaintiffs' reliance on *Talevski* is misplaced. Prior to the Supreme Court's ruling in *Talevski*, courts around the country, and within the Second Circuit, were split as to whether the FNHRA conferred a private right of action enforceable under Section 1983. *See, e.g. Mauro v. Cuomo*, No. 21-CV-1165, 2023 WL 2403482, at *3 (E.D.N.Y. Mar. 8, 2023) ("Courts in [the Second] Circuit are split as to whether the FNHRA creates a private right of action.") (collecting cases); *Boykin v. 1 Prospect Park ALF, LLC*, 993 F. Supp. 2d 264, 281 (E.D.N.Y. 2014) ("The federal courts are split as to whether various provisions of FNHRA confer individual rights that are enforceable through section 1983 for Medicaid beneficiaries who reside at substandard, state-run nursing homes.") (collecting cases). This disagreement at the time of the issuance of the 2020 Advisories forecloses a finding that a reasonable officer would have known that the issuance of the advisories would violate residents' rights under the FNHRA. Or, as put by the Supreme Court, "[i]f judges [ ] disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy." *Reichle*, 566 U.S. at 670 (citing *Wilson v. Layne,* 526 U.S. 603, 618 (1999)).

Even more damning to Plaintiffs argument is the timing of the issuance of the *Talevski* opinion. That is, *Talevski* was decided in 2023—three years after the 2020 Advisories were issued in this case. It is axiomatic that for a case to provide the basis to claim that the law articulated therein was

Arbeeny v. Cuomo, Slip Copy (2025)

clearly established to defeat a claim of qualified immunity, the case must predate the conduct at issue. Where there are no existing court decisions that would give an official fair warning that such conduct was proscribed by law, there can be no clearly established right. *See Matusick*, 757 F.3d at 61 (holding that there was no clearly established right where, at the time of officers' alleged constitutional violation of the right to intimate association, "the nature and the extent of the right [were] hardly clear," "the source of the intimate association right ha[d] not been authoritatively determined," and there were no court decisions that would have provided fair warning to a reasonable officer at the time that the right to intimate association would extend to the plaintiff's relationship).

In any event, *Talevski* is plainly distinguishable. In *Talevski*, the Supreme Court noted that the case was about "particular provisions" of the FNHRA referring to the rights of nursing-home residents "to be free from unnecessary physical or chemical restraints and to be discharged or transferred only when certain preconditions are satisfied" and "whether nursing-home residents can seek to vindicate those FNHRA rights in court." *See Talevski*, 599 U.S. at 171; 42 U.S.C. § 1396r(a). Here, Plaintiffs bring claims against state officials for the issuance of public health regulations governing the admission of residents to nursing homes and adult care facilities in the midst of an unprecedented global pandemic. *Talevski* does not contemplate the circumstances presented by the instant case. In other words, *Taleveski* did not place the statutory or constitutional questions raised in this case beyond debate. *See al-Kidd*, 563 U.S. at 741 (finding that to be deemed clearly established "existing precedent must have placed the statutory or constitutional question beyond debate.") At most, *Talevski* stands for a general proposition that the FNHRA confers a private right of action, which can be enforced against state-run nursing facilities under Section 1983. This broad proposition is insufficient to support a finding that the Decedents' rights under the FNHRA were clearly established with respect to public health regulations imposed by the state. *See Mullenix*, 577 U.S. at 12 (finding that inquiry into whether law is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition.").

**B. Constitutional Rights**

**\*9** Plaintiffs argue that the Decedents had clearly established rights to "[freedom] from cruel, unhuman, or degrading treatment," "safe conditions," "life," "bodily integrity," and "[freedom] from state-created danger," such that any

reasonable official would have known that the issuance of the 2020 Advisories would violate these rights. (Pl.'s State Def.'s Opp'n at 17–22; SAC ¶ 181.) None of Plaintiffs arguments operate to defeat qualified immunity here.

Plaintiffs maintain that the Decedents' right to be free from cruel, unhuman, or degrading treatment, as a "universally accepted customary human rights norm" was clearly established at the time the State Defendants issued the 2020 Advisories. (Pls.' State Defs.' Opp'n at 17.) In support, Plaintiffs direct the Court to non-controlling case law pertaining to claims brought under the Foreign Sovereign Immunities Act ("FSIA"), the Torture Victim Protection Act ("TVPA"), and the Alien Tort Claims Act ("ATCA"). (*Id.*) Of course, none of these statutes are implicated by the claims in this case. Plaintiffs point to *Abebe–Jira v. Negredo*, where a plaintiff brought a claim under the ATCA against her captor and torturer, who was associated with the mid-1970s military dictatorship in Ethiopia, for torture and cruel, inhuman, and degrading treatment. 72 F.3d 844 (11th Cir. 1996), *cert. denied*, 519 U.S. 830 (1996). Plaintiffs also cite *Najarro de Sanchez v. Banco Central de Nicaragua*, where an émigré from Nicaragua who fled the country to escape the Sandinista regime, brought a claim under the FSIA against the Nicaraguan Central Bank to cash a check that was issued to her prior to the demise of the former regime. 770 F.2d 1385 (5th Cir. 1985). Moreover, Plaintiffs cite *Xuncax v. Gramajo*, where Guatemalan immigrants brought claims under the FSIA, TVPA, and ATCA against the former Guatemalan Minister of Defense for the execution and disappearance of plaintiffs' relatives, torture, arbitrary detention, and cruel, inhuman and degrading treatment. 886 F. Supp. 162 (D. Mass. 1995). Lastly, Plaintiffs cite to *Paul v. Avril*, where Haitian citizens brought claims under the ATCA against the ruler of a military regime in Haiti for torture and false imprisonment. 901 F. Supp. 330 (S.D. Fla. 1994).

These cases are patently distinguishable from the instant matter. In each case, one or more plaintiffs claimed to have been subjected to torture, murder, kidnapping and the like from Defendants. Here, the conduct at issue, while serious, is of a different sort. Plaintiffs in this case complain that Defendants issued public health advisories pertaining to the admission of COVID-19-recovered residents into nursing homes and adult care facilities, which, once adhered to, led to the untimely deaths of nursing home residents. (*See generally*, SAC.) Even if Plaintiffs were able to demonstrate a broad, general right to be free from cruel, unhuman, and degrading treatment, such readily distinguishable cases cannot serve as a

Arbeeny v. Cuomo, Slip Copy (2025)

basis to find that such right was clearly established as it relates to the conduct alleged here. *See Mullenix*, 577 U.S. at 12.

Moreover, to the extent that Plaintiffs allude to the constitutional right to be free from cruel and unusual punishment conferred by the Eighth Amendment to support their argument, it is unhelpful to them. (*See* Pl.'s State Defs.' Opp'n at 17.) It is well-settled that constitutional protections under the Eighth Amendment are only applicable to individuals who have been convicted of a crime. *See Ingraham v. Wright*, 430 U.S. 651, 668–69 (1977) (holding that the Eighth Amendment's prohibition of cruel and unusual punishments is limited to "criminal punishments" and is not applicable outside of that context). As such, because the nursing home residents were not under criminal punishment, they did not have a clearly established right under the Eighth Amendment.

**\*10** Plaintiffs further argue that the issuance of the 2020 Advisories violated clearly established substantive due process rights under the Fifth and Fourteenth Amendments—specifically the right to safe conditions, life, bodily integrity, and freedom from state-created danger. (Pls.' State Defs.' Opp'n at 17–22.) Here, again, Plaintiffs fail to cite to any case similar in fact to the one at hand that would demonstrate, beyond debate, that these due process rights were clearly established in the context of public health policy decisions at the time of the issuance of the 2020 Advisories. Indeed, they could not have.

The Second Circuit has explicitly noted that "the Supreme Court has not addressed the limits imposed by due process on a [s]tate's power to manage infectious diseases." *Liberian Cmty.*, 970 F.3d at 190. State officials were tasked with acting quickly in response to evolving and dynamic circumstances during the COVID-19 pandemic. As such, courts in this circuit and across the country have routinely granted state officials qualified immunity for policies implemented in response to the ongoing public health crisis. *See, e.g.*, *Mauro*, 2023 WL 2403482, at \*6 (collecting cases); *Liner v. Hochul*, No. 21-CV-11116, 2023 WL 358826, at \*5 (S.D.N.Y. Jan. 23, 2023). And as the Second Circuit has made clear, "the very purpose of qualified immunity is to protect officials when their jobs require them to make difficult on-the-job decisions ... [t]his is especially true when officials are forced to act quickly, such as in the context of a public health emergency." *DiBlasio v. Novello*, 413 F. App'x 352, 356 (2d Cir. 2011) (citation and quotations omitted). Even the Supreme Court has weighed in to conclude that state

officials must be given "especially broad" latitude to act "in areas fraught with medical and scientific uncertainties," and generally "should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring in the judgment denying temporary injunction) (internal citations and quotations omitted). All of these considerations are at play in this case. In fact, the Court need look no further than the Plaintiffs' own complaint. According to the complaint, Defendants were motivated to issue the 2020 Advisories, at least in part, by the concern that New York State hospitals would become "swamped" with COVID-19 patients and could not afford to house recovered nursing-home residents long-term. (*See* SAC ¶ 53.)

Plaintiffs' claims against the State Defendants are precluded by the doctrine of qualified immunity. Accordingly, Plaintiffs' Section 1983 and Section 1985 claims against the State Defendants must be dismissed.

### III. WRONGFUL DEATH CLAIM

Having concluded that Plaintiffs failed to state any federal claims, it is within the Court's discretion not to exercise pendent jurisdiction over the state law claims. *See Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *see also Jones v. Cnty. of Suffolk*, 236 F. Supp. 3d 688, 702 (E.D.N.Y. 2017); *Eubanks v. Hansell*, No. 22-CV-6277, 2024 WL 1308672, at \*12 (E.D.N.Y. Mar. 26, 2024) ("[B]ecause Plaintiffs have failed to allege a viable federal claim, it would 'exceed [the] allowable discretion' of the Court to assert supplemental jurisdiction."). As such, the Court declines to exercise jurisdiction over Plaintiffs' wrongful death claim and it must be dismissed for lack of subject matter jurisdiction.

### CONCLUSION

**\*11** For the foregoing reasons, Defendants' motions to dismiss are GRANTED and Plaintiffs' complaint is DISMISSED.

SPA-36

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 71729

---

## Footnotes

1    In rendering its decision on the motions to dismiss, the Court has considered the NH Advisory, the ACF Advisory, and the NYSDOH Report, which were all attached to Defendant Cuomo's motion to dismiss and were incorporated by reference in the complaint. On a motion to dismiss, the Court "may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

2    On July 6, 2020, the NYSDOH issued a report, later revised on February 11, 2021, assessing the factors associated with COVID-19 infections and fatalities in nursing homes during the pandemic. (Glavin Decl., Ex. 3 ("NYSDOH Report") at 1, ECF No. 68-3.) The revised report concluded that approximately 6,326 COVID-19-positive residents were admitted to nursing homes and adult care facilities between March 25, 2020 and May 8, 2020, that there had been 6,432 COVID-19 fatalities in nursing homes as of June 26, 2020, and that the data did not support "[a] causal link between the admission policy and infections/fatalities." (*Id.* at 4–5, 7.) The report instead attributed these infections and fatalities to COVID-19 transmission from nursing home employees, with the rate of employee infections corresponding to the spread of COVID-19 throughout the most impacted regions in the state. (*Id.* at 3.) Some state officials and media outlets reported that Cuomo, DeRosa, and the NYSDOH made a concerted effort to downplay the number of COVID-19 deaths in nursing homes and adult care facilities and failed to report "at least 4,100" additional fatalities from April 2020 to February 2021. (SAC ¶¶ 130–39.)

3    Plaintiffs fail to specify the "state commission" of which Raske is alleged to be a member.

4    "[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability [and] it is effectively lost if a case is erroneously permitted to go to trial.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). As such, the availability of qualified immunity should be decided by a court "[a]t the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *see also Pearson*, 555 U.S. at 231–32 ("[T]he driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." (internal citations and quotations omitted)).

5    Courts routinely find that readily distinguishable cases cannot serve as a basis to find that a right was clearly established in a separate context. For example, in *Radwan v. Manuel*, a student who played soccer for the University of Connecticut brought claims against the school for violating her First Amendment rights when they terminated her scholarship in response to her raising her middle finger to a television camera after the team won a tournament. 55 F.4th 101, 118 (2d Cir. 2022). The student argued that it was clearly established that showing the middle finger, even if offensive, expresses a viewpoint and that punishing her for expressing a viewpoint violated her First Amendment rights. *Id.* To support her argument, the student relied on a case, *Papish v. Board of Curators of the Univ. of Mo.*, 410 U.S. 667 (1973), where the Supreme Court held that a university violated a student's First Amendment right to free speech when it expelled the student after she published "indecent" content in her independent newspaper. *Id.* The Second Circuit in *Radwan* rejected the plaintiff's argument, holding that "[e]xpelling a university student because of a disagreement with the content

of an article in an independent student newspaper ... is not the constitutional equivalent of disciplining a university student for displaying a vulgar or offensive gesture while playing for a university's sports team." *Id.* The court found that, because the plaintiff's situation differed from the context of the previous case, the plaintiff failed to plead that her free speech rights, in the context of her involvement in a school-sponsored event, were clearly established at the time. *Id.* at 118–20.

6    In full, Plaintiffs allege that under the FNHRA, Decedents had clearly established rights to "be cared for in such a manner and in such an environment as will promote quality of life;" "receive nursing and related services and specialized rehabilitative services so as to attain and maintain the highest practicable physical, mental, and psychosocial well-being;" "be cared for in such a manner so as to attain and maintain the highest practicable physical, mental, and psychosocial wellbeing;" "reside in a safe, sanitary, and comfortable environment designed to prevent the development of disease and infection;" "reside in a facility designed, constructed, equipped, and maintained in a manner to protect the health and safety of residents, personnel, and the general public;" "be treated with dignity and care in a manner and in an environment that promotes maintenance or enhancement of their quality of life, recognizing their individuality, and with their rights protected and promoted;" "be treated with respect and dignity;" "make choices about aspects of their life that are/were significant to them;" "receive the necessary care and services in such a manner so as to attain and maintain the highest practicable physical, mental, and psychosocial well-being;" and "reside in a safe, sanitary, and comfortable environment designed to prevent the development of diseases and infections." (SAC ¶ 56.)

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 965131
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

JOSEPH **FERRARI**, as Administrator of the Estate
of CHRISTINE **FERRARI**; LEOVA JENKINS, as
Administrator of the Estate of ELOISE BROOKS;
IRASEMA RIVERA, as Administrator of the Estate of
PAUL RIVERA; JOSE MONGE, as Administrator of the
estate of BLANCA NIEVES; STACIE DRUCKMAN, as
Administrator of the Estate of ARTHUR DRUCKMAN;
DELORIS PEOPLES, as Proposed Administrator of
the Estate of ALEX PEOPLES; SANDRA THOMAS-
WATSON, as Administrator of the Estate of BELINDA
THOMAS; and PATRICIA BIONDI, as Executor
of the Estate of MICHAEL BIONDI, on behalf of
themselves and all others similarly situated, Plaintiffs,

v.

ANDREW M. **CUOMO**, HOWARD A.
ZUCKER, M.D., MELISSA DEROSA, JOHN
DOES and JANE DOES 1-30, Defendants.

23 Civ. 7715 (KPF)
|
Filed 03/31/2025

**OPINION AND ORDER**

KATHERINE POLK FAILLA United States District Judge

**\*1** On March 25, 2020, in the early days of the COVID-19
pandemic, the New York State Department of Health (the
"DOH") issued an advisory that directed nursing homes to
readmit residents who had been discharged from hospitals
after being treated for COVID-19, regardless of whether
those residents continued to test positive for the virus. That
advisory, and its alleged impact on Christine Ferrari, Eloise
Brooks, Paul Rivera, Blanca Nieves, Arthur Druckman, Alex
Peoples, Belinda Thomas, and Michael Biondi — all of whom
resided in nursing homes, contracted COVID-19 while in
those nursing homes, and ultimately died from the virus —
are at the heart of this case. These individuals are represented
in this action by the administrators of their respective
estates ("Plaintiffs"), who allege that Defendants Andrew
M. Cuomo ("Cuomo"), Howard A. Zucker ("Zucker"), and
Melissa DeRosa ("DeRosa," and collectively, "Defendants")

are civilly liable for the effects of that advisory on nursing
home facilities. Plaintiffs also allege that Defendants are
liable for their failure to accurately report the number of
nursing home deaths in New York State that resulted from the
COVID-19 pandemic.

Plaintiffs have brought federal claims pursuant to 42 U.S.C.
§ 1983, and state-law claims for violations of the New York
Civil Rights Act and the New York State Constitution, as well
as for conscious pain and suffering, wrongful death, gross
negligence, and intentional infliction of emotional distress.
Before the Court now are Defendants' motions to dismiss
the Amended Complaint in its entirety. As explained herein,
and despite the Court's deepest sympathy for Plaintiffs and
their families, the fact remains that their proffered claims are
not legally viable. Accordingly, the Court grants Defendants'
motions to dismiss; the Court dismisses the federal Section
1983 claim with prejudice, and the state-law claims without
prejudice.

**BACKGROUND** [1]

**A. Factual Background**

**1. The Parties**

**\*2** As mentioned, Plaintiffs in this action are the
administrators of the estates of their family members, all
of whom were residents of nursing homes and adult care
facilities in New York State who died during the COVID-19
pandemic (collectively, "Decedents"). (AC ¶ 1). Plaintiffs
include the following:

- Joseph Ferrari is the Administrator of the Estate of
his deceased spouse, Christine Ferrari. (AC ¶ 5). Ms.
Ferrari was admitted to the Yonkers Center for Nursing
and Rehabilitation in or around January 2020 for short-
term rehabilitation services. (Id. ¶ 6). Ms. Ferrari died
on April 27, 2020, due to "septic shock caused by
COVID-19." (Id. ¶ 10).

- Leova Jenkins is the Administrator of the Estate of
her mother, Eloise Brooks. (AC ¶ 13). Ms. Brooks
was admitted to the Upper East Side Rehabilitation
and Nursing Center in or around November 2019, for
rehabilitation services following hip surgery. (Id. ¶ 14).
Ms. Brooks was transferred to a hospital on April 9,
2020, after experiencing "difficulty breathing." (Id. ¶
18). She died five days later, on April 14, 2020, after
being diagnosed with COVID-19. (Id.).

■ Irasema Rivera is the Administrator of the Estate of her father, Paul Rivera. (AC ¶ 21). Mr. Rivera was a long-term care resident of the Workmen's Circle Multicare Center in the Bronx, New York, from in or around 2012, until on or about May 4, 2020. (*Id.* ¶ 22). On May 4, 2020, Mr. Rivera was brought to the hospital because he was having seizures and had contracted COVID-19. (*Id.* ¶ 26). He died on May 12, 2020. (*Id.*).

■ Jose Monge is the Administrator of the Estate of his mother, Blanca Nieves. (AC ¶ 29). Ms. Nieves was a long-term care resident at the Bronx Center for Nursing and Rehabilitation from in or around 2016, until on or about April 18, 2020. (*Id.* ¶ 30). Ms. Nieves, who suffered from dementia, died on May 13, 2020, after she was hospitalized and placed on hospice due to COVID-19-related complications. (*Id.* ¶ 31).

■ Stacie Druckman is the Administrator of the Estate of her father, Arthur Druckman. (AC ¶ 33). Mr. Druckman was a resident at the Morningside Nursing and Rehabilitation Center in the Bronx, New York, from in or around 2017, until on or about April 5, 2020. (*Id.* ¶ 34). Mr. Druckman died from COVID-19-related complications on April 17, 2020. (*Id.* ¶ 35).

■ Deloris Peoples is the Proposed Administrator of the Estate of her brother, Alex Peoples. (AC ¶ 38). Mr. Peoples was a resident of Triboro Center for Rehabilitation and Nursing in the Bronx, New York, from in or around January 2017, until on or about April 10, 2020. (*Id.* ¶ 39). Mr. Peoples died from COVID-19-related complications on April 13, 2020. (*Id.* ¶ 42).

■ Sandra Thomas-Watson is the Administrator of the Estate of her mother, Belinda Thomas. (AC ¶ 44). Ms. Thomas was a resident at the Clove Lakes Health Care and Rehabilitation Center Inc. in Staten Island, New York, where she received rehabilitation services following a stroke. (*Id.* ¶ 45). She was a resident of the facility from 2018 until April 21, 2020. (*Id.*). Ms. Thomas died on May 1, 2020, after being hospitalized and put on a ventilator after contracting COVID-19. (*Id.* ¶ 47).

■ Patricia Biondi is the Executor of the Estate of her deceased spouse, Michael Biondi. (AC ¶ 50). Mr. Biondi was a resident at the North Westchester Restorative Theory and Nursing Center in Mohegan Lake, New York, from October 16, 2020, until on or about November 19, 2020. (*Id.* ¶ 51). Mr. Biondi was admitted

to a hospital in November 2020 because of COVID-19-related complications, and he died on November 24, 2020. (*Id.* ¶ 52).

**\*3** Plaintiffs also seek to bring claims on behalf of two proposed classes of similarly situated individuals, which classes "represent[ ] the estates of elder, mentally, and/or physically disabled nursing home residents across the State of New York, who were under lockdown and confined to their nursing homes during the COVID-19 pandemic." (*Id.* ¶ 57).[2]

Defendants are all former New York State government officials. Andrew M. Cuomo served as Governor of New York from 2011 until 2021. (AC ¶ 61). Howard A. Zucker served as Commissioner of the DOH from approximately May 2015 until November 2021. (*Id.* ¶ 62). Melissa DeRosa served as the Governor's Secretary of Staff from 2017 to 2021. (*Id.* ¶ 63). Plaintiffs also bring claims against John and Jane Does 1-30, who "are individuals whose identities and involvement can only be ascertained through the discovery process," but who, "upon information and belief, acted under color of state law to deprive plaintiffs-decedents of their federally protected constitutional and statutory rights." (*Id.* ¶ 66).

### 2. COVID-19 and Nursing Home Facilities

The COVID-19 pandemic, and the devastation it wrought, need no introduction. The Amended Complaint details the early months of the COVID-19 outbreak in the United States, as politicians, health organizations, and the public gained awareness of the growing threat the virus posed. As alleged in the Amended Complaint, Defendants were first "made aware" of COVID-19 in January 2020. (AC ¶ 69). The first case of COVID-19 in New York was reported shortly thereafter, on March 1, 2020. (*Id.* ¶ 85). On March 7, 2020, then-Governor Cuomo declared a state of emergency. (*Id.* ¶ 91). Less than a week later, the World Health Organization declared COVID-19 a global pandemic (*id.* ¶ 94), and President Donald J. Trump declared a national emergency (*id.* ¶ 97).

According to Plaintiffs, even in the early days of the pandemic, there was an awareness of the acute risk that COVID-19 posed to older adults — particularly those housed in long-term care facilities such as nursing homes. (AC ¶ 82). Reports had spread of an incident in King County, Washington, where a resident of a nursing home died on March 2, 2020, three days after contracting COVID-19. (*Id.* ¶¶ 81-82). And as of March 9, 2020, at least eight other King County skilled nursing and assisted living facilities had reported one or more confirmed COVID-19 cases. (*Id.* ¶

81). Recognizing the urgency of the situation, several public health organizations began issuing guidance directly targeted at adult care facilities, such as nursing homes.

**\*4** For example, on February 29, 2020, the Centers for Disease Control and Prevention (the "CDC") issued a report to nursing homes, which report instructed facilities to, among other things, "[t]ake steps to prevent known or suspected COVID-19 patients from exposing other patients." (AC ¶ 84). On March 4, 2020, the Center for Medicare and Medicaid Services (the "CMS") issued its *Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes*, which recommended the suspension of standard nursing home activities and the screening of visitors and staff for signs of infections. (*Id.* ¶ 88). The DOH followed suit, and issued guidance on March 6, 2020, detailing precautions and procedures that nursing homes should take to protect the health of their residents and staff. (*Id.* ¶ 90).

The CDC, the CMS, and the DOH continued to issue updated versions of their reports throughout March 2020, and each report provided additional guidance on how to limit the transmission of COVID-19 in nursing homes. (AC ¶¶ 92-93, 95-96, 98-100). On March 18, 2020, the CDC published a report analyzing what occurred in King County, Washington, titled *COVID-19 in a Long-Term Facility — King County, Washington, February 27-March 9, 2020.* This CDC report highlighted that COVID-19 (i) can cause "severe illness and death, particularly among older adults with chronic health conditions," and (ii) "can spread rapidly in long-term residential care facilities." (*Id.* ¶ 102). The report also emphasized that "[a]s the pandemic expands, continued implementation of public health measures targeting vulnerable populations such as residents of a long-term care facilities ... will be critical." (*Id.* ¶ 103).

Ultimately, the predictions outlined by the CDC, the CMS, and the DOH proved only too accurate. (AC ¶ 131). As of May 22, 2020, for example, 43% of all COVID-19 deaths in the United States were residents of long-term care facilities, even though that cohort comprised only 0.62% of the nation's population. (*Id.*).

**3. The March 25th Directive**

In March 2020, COVID-19 was spreading rapidly throughout New York State. In response, on March 23, 2020, Defendants issued a mandate addressed to hospitals, ambulatory surgery centers, office-based surgery practices, and diagnostic and treatment centers, requiring an increase in the availability of beds by a minimum of 50 percent. (AC ¶ 105). Two days later, on March 25, 2020, Defendants issued another advisory (the "March 25th Directive")[3] — this one directed at nursing homes — that mandated that "no resident shall be denied re-admission or admission to the [nursing home] solely based on a confirmed or suspected diagnosis of COVID-19." (*Id.* ¶ 106). The March 25th Directive also "prohibited [nursing homes] from requiring a hospitalized resident who is determined medically stable to be tested for COVID-19 prior to admission or re-admission." (*Id.*).

Immediately after its issuance, the March 25th Directive allegedly provoked the ire of patient care support groups and public health organizations, who criticized the directive as "over-reaching" and "not consistent with science." (AC ¶¶ 107-112). These organizations included the Society for Post-Acute and Long-Term Care Medicine of the American Medical Directors Association (the "AMDA"), the American Health Care Association (the "AHCA"), and the National Center for Assisted Living (the "NCAL"). (*Id.*). For example, in a joint statement, the three organizations warned that "requiring all New York nursing homes state-wide to accept all patients regardless of their COVID-19 status, even from hospitals that are not at capacity, will likely cause many more hospitalizations." (*Id.* ¶ 111). However, despite the criticism of the March 25th Directive, another directive was issued on April 7, 2020, which similarly required that "[n]o resident shall be denied re-admission or admission to [an adult care facility] solely based on a confirmed or suspected diagnosis of COVID-19." (*Id.* ¶ 123).

**\*5** The March 25th Directive continued to remain in effect, even though by April 25, 2020, Defendants allegedly "knew of widespread reports that the coronavirus had killed nearly 11,000 people in nursing homes in 36 states, with more than one third of them occurring in New York." (AC ¶ 127). During this time, individuals such as the head of a Brooklyn-based nursing home, Cobble Hill Health Center, allegedly "pleaded" with health officials, to no avail, to take alternate measures, such as sending residents suspected of having COVID-19 to the Javits Convention Center or to the U.S. Navy hospital ship USNS *Comfort*. (*Id.* ¶ 148). The Amended Complaint suggests that in creating and maintaining the March 25th Directive, Defendants were swayed by the influence of "outside private actors" in the hospital industry, such as the Greater New York Hospital Association ("GNYHA"), who were allegedly "generous donors" to Governor Cuomo's political campaigns. (*Id.* ¶ 156). These organizations were, in

turn, allegedly motivated by a desire to ease the burden of the pandemic on their association's members. (*Id.* ¶ 157).

On May 10, 2020, the March 25th Directive was partially rescinded via Executive Order No. 202.30. (AC ¶ 130). Under this new directive, hospitals were not permitted to "discharge a patient to a nursing home, unless the nursing home operator or administrator has first certified that it is able to properly care for such patient." (*Id.*). Moreover, a hospital was not to discharge a patient to a nursing home "without first performing a diagnostic test for COVID-19 and obtaining a negative result." (*Id.*).

### 4. The DOH Report

In a report released on July 6, 2020 (the "DOH Report"), the DOH concluded that the March 25th Directive was not responsible for the further spreading of COVID-19 among nursing home populations. (AC ¶ 133). Indeed, the DOH Report concluded that "[a]dmission policies were not a significant factor in nursing home fatalities," and that the "March 25 guidance was not the driving force in nursing home deaths." (*Id.*). The report also claimed that New York State followed the CMS's guidance when forming its nursing-home-related policies. (*Id.* ¶ 136). Plaintiffs challenge the validity of this report, and assert that the CMS had always emphasized that nursing homes should admit residents with COVID-19 *only* if able to "follow CDC guidance for transmission-based precautions." (*Id.*).

After its issuance, the DOH Report was heavily criticized by members of the public health community and the press. One article published by *ProPublica* noted that while the report was done with "the aid of the consulting company McKinsey & Co," the report failed list a "single author by name." (AC ¶ 135). And perhaps most damningly, on January 28, 2021, a different report issued by the New York State Office of the Attorney General (the "OAG") concluded that "over 4,000 nursing home deaths occurred after issuance of the March 25 guidance," and that "these admissions may have contributed to increased risk of nursing home resident infection, and subsequent fatalities." (*Id.* ¶ 137).

The OAG also found that the State of New York and the DOH had undercounted COVID-19-related nursing home resident deaths by as much as 50 percent, or close to 4,000 underreported deaths. (AC ¶ 137). While Governor Cuomo allegedly dismissed the criticisms of the DOH Report (*id.* ¶ 138), in February 2021, the DOH Report was revised (*id.* ¶ 136). The updated report provided that, as of January 19,

2021, the total reported nursing home deaths stood at 12,743. (*Id.* ¶ 139). This was a significant uptick from one day earlier, when the total "pushed by the Defendants, in a concerted manner," had been 8,711. (*Id.*). On February 10, 2021, Zucker sent a letter to lawmakers stating that the total number of nursing home residents who had died from COVID-19 was now 13,297. (*Id.* ¶ 141).

On March 15, 2022, the Office of the New York State Comptroller (the "Comptroller") published the findings of an audit that covered the period from January 2017 through November 2021. (AC ¶ 143). This audit found that "New York significantly trailed other states in surveying nursing homes and developing strategies to stop infections from spreading in facilities." (*Id.* ¶ 144). The Comptroller opined that "[t]he public was misled by those at the highest level of state government through distortion and suppression of facts when New Yorkers deserved the truth." (*Id.* ¶ 145). Moreover, the Comptroller found that the DOH had "failed to meet its 'ethical' and 'moral' imperatives to act transparently in counting nursing home deaths between April 2020 and February 2021." (*Id.* ¶ 147). Per the Comptroller's report, an estimated 13,919 residents in New York nursing homes died from COVID-19 between March 4, 2020, and May 23, 2021. (*Id.* ¶ 151).

### B. Procedural Background

**\*6** This case was initiated on August 30, 2023, with the filing of a complaint. (Dkt. #1). Plaintiffs brought a federal claim for deprivation of civil rights under Section 1983, as well as numerous state-law claims. On November 17, 2023, the Court received pre-motion letters from Defendants Zucker (Dkt. #18), Cuomo (Dkt. #22), and DeRosa (Dkt. #23), each requesting a pre-motion conference regarding Defendants' anticipated motions to dismiss. On November 29, 2023, the Court received an additional pre-motion letter from then-Defendant Sally Dreslin. (Dkt. #26). Plaintiffs opposed each of these requests. (Dkt. #27, 30).

The Court held a pre-motion conference on January 18, 2024, during which the Court set a briefing schedule for Defendants' motions to dismiss, which schedule included a period for Plaintiffs to file an Amended Complaint. (January 18, 2024 Minute Entry). In accordance with the Court's schedule, Plaintiffs filed the Amended Complaint, the operative pleading in this action, on February 22, 2024. (Dkt. #39). The Amended Complaint dismissed Plaintiffs' claims against Sally Dreslin, who was then terminated from this action. (*Id.*). On March 29, 2024, the remaining

SPA-42

Defendants filed their individual motions to dismiss the Amended Complaint. (Dkt. #42, 45, 47). Plaintiffs filed their consolidated opposition to the motions to dismiss on June 3, 2024. (Dkt. #53). On June 28, 2024, Defendants filed their replies in further support of their motions to dismiss the Amended Complaint. (Dkt. #54, 55, 56).

## DISCUSSION

### A. Applicable Law

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in [p]laintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)). A plaintiff is entitled to relief if she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotations marks omitted) (citing *Twombly*, 550 U.S. at 570)).

That said, a court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (citation and internal quotation marks omitted); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)). Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

On a motion to dismiss, "the Court may consider any written instrument attached to the [c]omplaint as an exhibit, any

statements or documents incorporated by reference in the [c]omplaint, documents that are 'integral' to the [c]omplaint even if they are not incorporated by reference, and matters of which judicial notice may be taken." *Donoghue* v. *Gad*, No. 21 Civ. 7182 (KPF), 2022 WL 3156181, at *2 (S.D.N.Y. Aug. 8, 2022) (citing *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)).

### B. Analysis

**\*7** Against the dispiriting factual backdrop outlined above, the Court considers the adequacy of Plaintiffs' pleadings.[4] It begins with Plaintiffs' federal claim in Count I, which comprises substantive and conspiracy claims under 42 U.S.C. § 1983 predicated on violations of Decedents' rights under the U.S. Constitution and the Federal Nursing Home Reform Act of 1987 (the "FNHRA"). In their motions to dismiss, Defendants argue that Count I should be dismissed because: (i) Plaintiffs fail to allege a violation of federal rights; and (ii) even if Plaintiffs' federal rights were violated, Defendants acted in their individual capacities and are shielded by the doctrine of qualified immunity. The Court addresses each argument in turn, and ultimately agrees that Plaintiffs have failed to plead a viable Section 1983 claim. Moreover, because the Court dismisses Plaintiffs' sole federal claim, it declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims.

#### 1. Plaintiffs' Section 1983 Claim Is Dismissed for Failure to State a Claim

Section 1983 provides a cause of action against any

> person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

42 U.S.C. § 1983. "To state a claim under [Section 1983], a plaintiff must allege both that: [i] a right secured by

the Constitution or laws of the United States was violated, and [ii] the right was violated by a person acting under the color of state law." *Golian* v. *N.Y.C. Admin. for Child. Servs.*, 282 F. Supp. 3d 718, 727 (S.D.N.Y. 2017) (citing *West* v. *Atkins*, 487 U.S. 42, 48 (1988)). Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker* v. *McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Thomas* v. *Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Here, as previously noted, Plaintiffs assert that Defendants violated their substantive due process rights under the Fourteenth Amendment, as well as their statutory rights under the FNHRA. The Court, however, finds that Plaintiffs have failed to assert a violation under either theory.

### a. Plaintiffs Have Failed to Allege a Constitutional Violation

The Court begins by addressing Plaintiffs' constitutional claim, whereby Plaintiffs allege that Defendants' actions deprived their loved ones of their "fundamental rights to life, bodily integrity, and the right to personal security." (Pl. Opp. 18, 22-24). Plaintiffs' claim is based in the Due Process Clause of the Fourteenth Amendment (AC ¶ 160), which, as the Supreme Court explained in *DeShaney* v. *Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989), "was to intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression[.]' " As such, the Due Process Clause "protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." *Cunney* v. *Bd. of Trs. of Vill. of Grand View, N.Y.*, 660 F.3d 612, 626 (2d Cir. 2011) (quoting *Kaluczky* v. *City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)); *accord Ferran* v. *Town of Nassau*, 11 F.3d 363, 369-70 (2d Cir. 2006). Nor does the Due Process Clause "require[ ] the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney*, 489 U.S. at 195. [5]

**\*8** The Second Circuit nevertheless has recognized " 'two separate and distinct theories' under which a state actor's failure to protect against private violence can violate substantive due process.' " *Golian*, 282 F. Supp. 3d at 728 (quoting *Benzman* v. *Whitman*, 523 F.3d 119, 127 (2d Cir. 2008) (internal quotation marks omitted)). These "two exceptions to th[e] general principle, rooted in the Supreme Court's analysis in *Deshaney*," are (i) the "special relationship

exception" and (ii) the "state-created danger exception." *Matican* v. *City of New York*, 524 F.3d 151, 155-57 (2d Cir. 2008). Even if a plaintiff's claims fall within one of these two exceptions, however, a defendant's behavior only constitutes a constitutional violation if the behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento* v. *Lewis*, 523 U.S. 833, 848 n.8 (1998). Here, because Plaintiffs argue that both exceptions apply, the Court considers (i) whether Defendants' substantive Section 1983 claim falls within either of the two *DeShaney* exceptions and (ii) whether Defendants' behavior can be said to shock the contemporary conscience.

### i. The Special Relationship Exception

"The special relationship exception grows from the *DeShaney* Court's observation that 'in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals.' " *Matican*, 524 F.3d at 155 (quoting *DeShaney*, 489 U.S. at 198). The "linchpin of any special relationship exception" is "involuntary custody," *id.* at 156 (citing *Lombardi* v. *Whitman*, 485 F.3d 73, 79 n.3 (2d Cir. 2007)), such as when someone is incarcerated, *id.* at 155-56 (citing *DeShaney*, 489 U.S. at 199-200; *Lombardi*, 485 F.3d at 79 n.3); involuntarily committed to an institution for mental health reasons, *id.* (citing *DeShaney*, 489 U.S. at 199-200); or placed in foster care, *id.* at 156 (citing *Doe* v. *N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir. 1981)). *See also Ying Jin Gan* v. *City of New York*, 996 F.2d 522, 533 (2d Cir. 1993) (collecting cases). Although "[i]nvoluntary custody for purposes of substantive due process does not require the plaintiff to be in the physical custody of the State, ... some form of functional state control over the person is required." *Golian*, 282 F. Supp. 3d at 728.

Plaintiffs assert that a "special relationship" arose because: [i] the State ordered a "lockdown which confined these nursing home residents, many cognitively impaired and physically disabled, to their respective facilities; [ii] granted nursing homes with broad immunity from liability, via the Emergency Disaster Treatment Protection Act ('EDTPA'), PHL §§ 3080-3082, and [iii] issued a Must-Admit Order that directly impacted their quality of life." (Pl. Opp. 36). However, Plaintiffs fail to allege how this confluence of factors equates to the narrow circumstances where this Circuit has previously found "involuntary custody" over plaintiffs. *Matican*, 524 F.3d at 156. Even in the limited situations where the Second Circuit has recognized that physical custody is not required to assert that a special relationship exists, it has

nonetheless required some functional state control over the person. For example, in *Jacob* v. *Ramirez*, the Court found that a parolee, though not in the state's physical custody, was "nonetheless in its legal custody" such that a special relationship existed. 400 F.3d 105, 106 (2d Cir. 2005) (*per curiam*). Critical to the *Jacob* Court's reasoning was the fact that the state "curtail[s]" a parolee's "freedom of movement" beyond that of the average citizen. *Id.*

Here, Decedents were voluntarily placed into nursing home facilities and were free at all times to seek alternative methods of treatment. *Cf. George* v. *Rockland State Psychiatric Ctr.*, No. 10 Civ. 8091 (NSR), 2014 WL 5410059, at *8 (S.D.N.Y. Oct. 23, 2014) (concluding that special relationship did not exist between parolee and state when parolee was "free to find his own medical treatment" at a specific hospital); *Bascom* v. *City of New York*, No. 23 Civ. 10898 (VEC), 2025 WL 692082, at *4 (S.D.N.Y. Mar. 4, 2025) (finding no special relationship existed between the state and children who were "voluntarily enrolled" in an after-school program). What is more, the mere fact that these nursing homes were subject to state regulations — as many institutions are — does not render all those housed within them a "special relationship" with the state. Using similar logic, courts in this District have routinely refused to apply the special relationship exception in cases involving schools, despite the prevalence of state regulations and compulsory attendance requirements. *See, e.g.*, *H.B.* v. *Monroe Woodbury Cent. Sch. Dist.*, No. 11 Civ. 5881 (CS), 2012 WL 4477552, at *10 (S.D.N.Y. Sept. 27, 2012) ("[C]ourts in this Circuit and elsewhere have generally held that '[e]ven in light of compulsory [education] attendance laws, no special relationship is created between students and school districts such that school districts take on any such duty to protect students from the private actions of others.' " (quoting *Santucci* v. *Newark Valley Sch. Dist.*, No. 05 Civ. 971 (TJM), 2005 WL 2739104, at *3 (N.D.N.Y. Oct. 24, 2005)); *see also F.H. by Pichardo* v. *City of Yonkers*, No. 19 Civ. 4722 (PED), 2022 WL 16722214, at *5 (S.D.N.Y. Nov. 4, 2022) ("[W]hile schools impose certain rules and restrictions on students, they do not limit an individual's freedom to act in the same manner as involuntary confinement by the state in a state prison or mental institution." (quoting *P.W.* v. *Fairport Cent. Sch. Dist.*, 927 F. Supp. 2d 76, 82 (W.D.N.Y. 2013)). This difference in treatment makes sense, because courts are instructed to apply the special relationship exception only in "exceptional circumstances," *Ying Jang Gan*, 996 F.2d at 533, where "liability arises from the relationship between the state and a particular victim," *Pena* v. *DePrisco*, 432 F.3d 98, 109 (2d Cir. 2005). Comparable

circumstances are not present here, and the Court therefore declines to expand the definition of involuntary custody beyond the limits previously recognized in this Circuit. Accordingly, Plaintiffs cannot rely on the special relationship exception as the basis for their substantive due process claim.

### ii. The State-Created Danger Exception

**\*9** "Like the special relationship exception, the state-created danger exception arises from the Court's analysis in *DeShaney*." *Matican*, 524 F.3d at 157. "After explaining that no special relationship existed between the state and petitioner, the [*DeShaney*] Court further noted that, '[w]hile the State may have been aware of the dangers that [petitioner] faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.*' " *Id.* (alterations in original) (emphasis added) (quoting *DeShaney*, 489 U.S. at 201). Following this reasoning, the Second Circuit has "conclude[d] that, by negative implication, the state does infringe a victim's due process rights when its officers assist in creating or increasing the danger that the victim faced at the hands of a third party." *Id.* (citing *Dwares* v. *City of New York*, 985 F.2d 94, 99 (2d Cir. 1993)). In other words, "the state may be liable for failing to protect against private violence when a state actor '*affirmatively* create[s] or enhance[s] the danger of private violence.' " *Eubanks* v. *Hansell*, No. 24-1165, 2024 WL 4662983, at *2 (2d Cir. Nov. 4, 2024) (summary order) (alterations in original) (emphasis added) (quoting *Okin* v. *Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009)). By contrast, the state cannot be liable where the victim of private violence alleges merely that "state functionaries ... stood by and did nothing when suspicious circumstances dictated a more active role for them." *DeShaney*, 489 U.S. at 203. Likewise, it is insufficient to allege only "that the state agent's actions contributed to or increased the likelihood that the victim would be unsafe." *Golian*, 282 F. Supp. 3d at 730 (citing *Hemphill* v. *Schott*, 141 F.3d 412, 418 (2d Cir. 1998); *Matican*, 524 F.3d at 158 n.7; *Okin*, 577 F.3d at 430).

Plaintiffs allege that the March 25th Directive falls within the state-created danger exception because it "undoubtedly increased the foreseeable danger and direct harm to which nursing home residents were already exposed to and led to the deaths of many nursing home residents." (Pl. Opp. 37). They reason that not only did Defendants respond to the COVID-19 pandemic in an imprudent manner, but they in fact affirmatively created a danger by issuing the March 25th Directive. (*Id.*). As Defendants point out, however,

JOSEPH FERRARI, as Administrator of the Estate of CHRISTINE..., Slip Copy (2025)

the "Second Circuit has never found a state-created danger established in the absence of third-party, particularized violence." (Zucker Br. 19). As such, for Plaintiffs' claims to survive, they must allege facts showing that "Defendants officially sanctioned or encouraged [the] perpetrators to commit the private acts of violence." *Brown* v. *City of New York*, 786 F. App'x 289, 292 (2d Cir. 2019) (summary order) (rejecting an application of the state-created danger exception when defendants allegedly placed plaintiff in a dangerous shelter room with individuals who threatened her). But the Amended Complaint contains no allegations that the nursing homes, as the alleged perpetrators of "private violence," committed a state-sanctioned violent act that caused Decedents harm. *Id.* at 292-93. (*See* DeRosa Br. 14). Instead, the Amended Complaint merely pleads action that "increased the likelihood" that Decedents would be unsafe — action that categorically falls outside the state-created danger exception. *Golian*, 282 F. Supp. 3d at 730.

While Plaintiffs raise credible doubts about the efficacy of the March 25th Directive, a policy that may have raised the likelihood of individuals contracting COVID-19 is entirely "dissimilar from the state created dangers recognized in [Second Circuit] precedents." *Lombardi*, 485 F.3d at 80. "[I]n each of those cases, a third party's criminal behavior harmed the plaintiff after a government actor — always a law enforcement officer — enhanced or created the opportunity for the criminal act through some interactions or relationship with the wrongdoer." *Id.* Such is not the case here. And the Second Circuit, "[m]indful of the Supreme Court's admonition not to permit the Due Process Clause to 'transform every tort committed by a state actor into a constitutional violation,' " has instructed courts that the state-created danger doctrine should impose liability "with considerable stringency." *Benzman*, 523 F.3d at 127 (quoting *DeShaney*, 489 U.S. at 202). Accordingly, this Court heeds the Second Circuit's instructions and finds that Plaintiffs cannot rely on the state-created danger exception as the basis for their substantive due process claim.

### iii. Shocking the Conscience

**\*10** Even were Plaintiffs to have pleaded conduct falling within one of these two exceptions, they would still need to allege that Defendants' "behavior was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Matican*, 524 F.3d at 155 (quoting *Lewis*, 523 U.S. at 848 n.8). The conscience-shocking standard "screens out all but the most significant constitutional violations, 'lest the Constitution be demoted

to ... a font of tort law.' " *Id.* (quoting *Lewis*, 523 U.S. at 848 n.8) (citing *Paul* v. *Davis*, 424 U.S. 693, 701 (1976)); *see also Daniels* v. *Williams*, 474 U.S. 327, 333 (1986) ("[I]njuries inflicted by governmental negligence are not addressed by the [U.S.] Constitution[.]"). "[C]onduct exhibiting 'deliberate indifference' to harm can support a substantive due process claim," though " '[d]eliberate indifference that shocks in one environment may not be so patently egregious in another.' " *Lombardi*, 485 F.3d at 82 (quoting *Lewis*, 523 U.S. at 850). "Negligent conduct does not qualify as conscious-shocking behavior," *Golian*, 282 F. Supp. 3d at 732 (citing *Matican*, 524 F.3d at 158), while "reckless conduct is evaluated on a case-by-case basis," *id.*

As is particularly important to the case at hand, reckless conduct "does not qualify as conscious-shocking when the state actors 'were subjected to the pull of competing obligations.' " *Golian*, 282 F. Supp. 3d at 732 (quoting *Matican*, 524 F.3d at 159 (quoting *Lombardi*, 485 F.3d at 83)). In an analogous factual context, the Second Circuit in *Lombardi* found that officials' misstatements about the dangers of environmental contaminants near Ground Zero following the September 11, 2001 terrorist attacks did not shock the conscience. The Court reasoned that public officials in the aftermath of the attacks were "required to make decisions using rapidly changing information about the ramifications of unprecedented events in coordination with multiple federal agencies and local agencies and governments." 485 F.3d at 82. The *Lombardi* Court was wary of deterring decisive action in a public emergency, believing instead that the threat of liability might lead officials to "default to silence in the face of the public's urgent need for information." *Id.* at 84. Accordingly, it concluded that "a poor choice made by an executive official between or among the harms risked by the available options is not conscience-shocking merely because for some persons it resulted in grave consequences than a correct decision could have avoided." *Id.* at 85. Put somewhat differently, the *Lombardi* Court found that an executive may choose "the least of evils" without shocking the conscience. *Id.* at 82. Such a decision is within the province of the executive, unhindered by the Due Process Clause.

For similar reasons to those outlined in *Lombardi*, this Court finds that Defendants' actions here fail to shock the conscience. This is not to minimize the grief and hardship that Plaintiffs have experienced. As in *DeShaney* itself, "[t]he facts of this case are undeniably tragic." 489 U.S. at 191. But the law is clear that "when agency officials

decide how to reconcile competing governmental obligations in the face of disaster, only an intent to cause harm arbitrarily can shock the conscience in a way that justifies constitutional liability." *Lombardi*, 485 F.3d at 74-75; *see also Corr. Officers' Benevolent Ass'n, Inc. v. City of New York*, No. 17 Civ. 2899 (LTS), 2018 WL 2435178, at *4 (S.D.N.Y. May 30, 2018) ("The Second Circuit, recognizing a government's need to make [ ] difficult decisions, has held that deliberately indifferent policy actions of government actors cannot shock the conscience in a constitutional sense where they seek to accommodate competing governmental interests even if the decision-making official, aware of the risks to a particular group, makes a poor choice resulting in grave consequences.").

Plaintiffs' attempts to distinguish this action from *Lombardi* are unavailing. Plaintiffs argue, for example, that this action is distinct because they are not arguing that Defendants had an affirmative duty to prevent Decedents from being infected with COVID-19, but rather, that Defendants "increased the danger and harm to these residents." (Pl. Opp. 37). However, as in *Lombardi*, Defendants in this action "were required to make decisions using rapidly changing information about the ramifications of unprecedented events in coordination" with various other government agencies. 485 F.3d at 82. (*See* DeRosa Br. 16; Cuomo Reply 4-5). In the wake of a developing public health crisis, Defendants were "subject to the pull of competing obligations," such as the safety of nursing home residents and the countervailing safety concerns related to overcrowding hospitals. *Lombardi*, 485 F.3d at 83. Such a situation is the exact kind envisioned by the Second Circuit in *Lombardi*. The law is intentionally designed to ensure that due process liability to does not "inhibit or control policy decisions of government agencies [in circumstances such as these], even if some decisions could be made to seem gravely erroneous in retrospect." *Id.* at 84.

 *11  Moreover, while Plaintiffs focus in their opposition brief on arguing that the March 25th Directive violated substantive due process, and do not address at length how the DOH Report may also have done so (*see* Pl. Opp. 24-32), the Court briefly notes that Plaintiffs have failed to plead a constitutional violation relating to the DOH Report. Plaintiffs assert that the DOH Report failed to provide "accurate and reliable information during a public health emergency." (*Id.* at 31). However, for many of the same reasons already discussed, Plaintiffs have failed to show how this conduct, even when read in the light most favorable to them, constitutes action that "shock[s] the contemporary conscience" — especially in the

context of an unfolding public health emergency. *Lombardi*, 485 F.3d at 84. For this reason as well, Plaintiffs have failed to plead a substantive due process violation. [6]

**b. Plaintiffs Have Failed to Allege a Violation of the FNHRA**

In the Amended Complaint, Plaintiffs summarily state that Defendants "through their shocking actions and omissions, interfered with the rights guaranteed by federal statutes and regulations, like the Federal Nursing Home Reform Act, 42 U.S.C[. §] 1396r, 42 U.S.C. [§] 1395i-3, and 42 [C.F.R. §] 483." (AC ¶ 174). Defendants argue that this threadbare reference to the statute is insufficient to plead a violation of the FNHRA. (*See* Zucker Br. 8 n.5 ("Plaintiffs fail to allege any specific rights under" FNHRA); DeRosa Br. 17 (arguing that Plaintiffs "do not even identify any FNHRA-protected rights that were allegedly violated"); Cuomo Br. 18 n.25 (arguing that a general reference to FNHRA "is insufficient to state a claim")). The Court agrees that this conclusory statement does not withstand a motion to dismiss, and Plaintiffs cannot correct this pleading deficiency in their opposition briefing. *See, e.g., Goode v. Westchester County*, No. 18 Civ. 2963 (NSR), 2019 WL 2250278, at *2 (S.D.N.Y. May 24, 2019) ("[T]he court can only consider facts raised in the pleading and not those introduced in the opposition papers."); *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 308 (S.D.N.Y. 2010) (confirming that "a party cannot amend its pleading through its opposition brief" (collecting cases)).

 *12  However, even if Plaintiffs had provided sufficient facts to support this allegation, the Court would still find that Plaintiffs failed to state a Section 1983 claim based on a violation of the FNHRA. While the Supreme Court ruled in *Health and Hospital Corporation of Marion County v. Talevski*, 599 U.S. 166, 184-86 (2023), that Congress unambiguously created a private right of action for certain FHNRA provisions, enforceable through Section 1983, against nursing homes that receive Medicaid funds, the decision does *not* mean that the FNHRA provides a basis for plaintiffs to pursue claims against Defendants. Plaintiff fails to show that the FNHRA can be enforced against Defendants, who, unlike federally-funded nursing homes, are not the recipients of federal funds, as defendants must be when plaintiffs seek to enforce Spending Clause legislation against them. *See Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 641 (1999) ("The Government's enforcement power may only be exercised against the funding

recipient[.]"); *Washington* v. *Gonyea*, 731 F.3d 143, 145-46 (2d Cir. 2013) ("Congress'[s] spending power ... allows the imposition of conditions, such as individual liability, only on those parties actually receiving the state funds." (internal citation omitted)).

In decisions issued after *Talevski*, courts have limited the FNHRA's reach, finding, for instance, that the FNHRA does not provide "a private right of action against private parties," including private nursing homes. *Zietek* v. *Pinnacle Nursing & Rehab Ctr.*, No. 21 Civ. 5488 (AT) (JLC), 2024 WL 243436, at *5 (S.D.N.Y. Jan. 23, 2024) ("[T]he Nursing Home Reform Act's provisions do not confer a right of action on [the plaintiff] that can be enforced against a private nursing home[.]" (citing *Prince* v. *Dicker*, 29 F. App'x 52, 54 (2d Cir. 2002) (summary order))); *see also Arbeeny* v. *Cuomo*, No. 22 Civ. 2336 (LDH) (LB), 2025 WL 71729, at *8 (E.D.N.Y. Jan. 10, 2025) ("Plaintiffs bring claims against state officials for the issuance of public health regulations governing the admission of residents to nursing homes and adult care facilities in the midst of an unprecedented global pandemic. *Talevski* does not contemplate the circumstances presented by the instant case."). Accordingly, because Plaintiffs have failed to specify their FNHRA claim, or to demonstrate the basis by which the statute allows for claims against Defendants, Plaintiffs' allegations related to FNHRA are insufficient to support a claim under Section 1983.

### c. Plaintiffs Have Failed to Allege Personal Involvement by Defendant DeRosa

While the above pleading deficiencies are sufficient bases to dismiss Plaintiffs' Section 1983 claim, the claim arguably also fails as to one or more Defendants for lack of personal involvement. To review, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section 1983]." *Shomo* v. *City of New York*, 579 F.3d 176, 184 (2d Cir. 2009) (quoting *Colon* v. *Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (internal quotation marks omitted)). "[A] plaintiff must directly plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti* v. *Bachmann*, 983 F.3d 609, 612 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). Plaintiffs "cannot rely on a separate test of liability specific to supervisors." *Id.* at 619. As such, it is insufficient to allege "merely" that the defendant "held a high position of authority," *Black* v. *Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996), or was "in the chain of command," *Thomas*

v. *Jacobs*, No. 19 Civ. 6554 (CS), 2025 WL 662899, at *20 (S.D.N.Y. Feb. 28, 2025).

Among the three Defendants, DeRosa's arguments regarding her lack of personal involvement in Plaintiffs' claims are particularly strong. (*See* DeRosa Br. 11-12). Indeed, Plaintiffs conceded during the Court's pre-motion conference that DeRosa's name does not appear "at the top" of the March 25th Directive. (*Id.* at 11). The Court believed this to be the last word on the issue. However, in the Amended Complaint filed after the conference, Plaintiffs continue to allege that "Defendants Cuomo, Zucker, and DeRosa were at the top of the deadly March 25th Directive." (AC ¶ 64). In their opposition brief, Plaintiffs attempt to argue that this was inartful pleading, and that Plaintiffs intended to convey that "Defendants were active and principal participants in the creation of" the March 25th Directive. (Pl. Opp. 33 n.8). The Court finds this explanation unconvincing, and urges Plaintiffs to exercise greater care when alleging facts before this Court. Moreover, in light of the concession that DeRosa's name does not appear at the top of the March 25th Directive, the Amended Complaint lacks specific factual allegations tying DeRosa to the March 25th Directive or the development of its underlying policy. Plaintiffs must do more than rely upon DeRosa's former position of authority in New York State government to plausibly allege personal involvement sufficient to sustain a Section 1983 claim. *See Tangreti*, 983 F.3d at 618 ("[T]here is no special rule for supervisory liability[.]"); *Back* v. *Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) ("An individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority,' but can be held liable if he was personally involved in the alleged deprivation." (internal quotation marks omitted)). Accordingly, lack of personal involvement provides an alternative basis for the dismissal of Count I against DeRosa.

**\*13** Defendants Cuomo and Zucker similarly allege that Plaintiffs' claims should be dismissed against them because Plaintiffs merely rely on (i) their titles and (ii) the placement of their names at the top of the March 25th Directive to demonstrate personal involvement in the March 25th Directive and the DOH Report. (Cuomo Br. 14-15; Zucker Br. 14-16). In doing so, Cuomo places particular weight on Judge Hector Gonzalez's analysis in *Mauro* v. *Cuomo*, wherein the court found no personal involvement of then-Governor Cuomo in the issuance of a health advisory that recommended nursing homes prohibit visitations during COVID, except when medically necessary. No. 21 Civ. 1165

JOSEPH FERRARI, as Administrator of the Estate of CHRISTINE..., Slip Copy (2025)

(HG) (ARL), 2023 WL 2403482 (E.D.N.Y. Mar. 8, 2023). In that case, Judge Gonzalez reasoned that "[w]hile it is true that Defendant Cuomo participated in issuing executive orders and guidance regarding the COVID-19 pandemic, [the nursing home] was responsible for enforcing those mandates and had discretion in determining whether Plaintiffs qualified for an exception under said guidance." *Id.* at \*5. However, here, the Amended Complaint does more than allege that Cuomo's and Zucker's names were on top of the advisory and, instead, alleges that the two Defendants were involved with the policy's actual administration. *See Stone #1* v. *Annucci*, No. 20 Civ. 1326 (RA), 2021 WL 4463033, at \*9 (S.D.N.Y. Sept. 28, 2021) (discussing how policymakers can still be held liable post-*Tangreti* for their role in the "promulgation of an unconstitutional policy"). For example, Zucker is alleged to have spoken about the policy and to have been involved in defending the DOH Report. (AC ¶¶ 125, 133). As such, the Court cannot say that Cuomo and Zucker lacked personal involvement in the March 25th Directive or the DOH Report. Even so, however, this does not change the Court's ultimate decision regarding dismissal of Count I, because Plaintiffs are still unable to plead a violation of Section 1983 under any purported theory of liability.

### d. Plaintiffs Have Failed to Allege a Conspiracy to Violate Section 1983

In addition to bringing a substantive claim for violation of Section 1983, Plaintiffs allege in Count I that Defendants "took part [i]n a conspiracy that resulted in the deprivation of nursing home residents' civil rights." (AC ¶ 175). A plaintiff bringing a Section 1983 conspiracy claim "must allege [i] an agreement between a state actor and a private party; [ii] to act in concert to inflict an unconstitutional injury; and [iii] an overt act done in furtherance of that goal causing damages." *Ciambriello* v. *County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002) (citing *Pangburn* v. *Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). "In addition, 'complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct.'" *Id.* at 325 (quoting *Dwares* v. *City of New York*, 985 F.2d 94, 100 (2d Cir. 1993) (internal quotation marks omitted and alteration adopted)). Rather, "[t]he facts alleged must constitute 'a meeting of the minds' between defendants to show a conspiracy." *Marquez* v. *Hoffman*, No. 18 Civ. 7315 (ALC), 2021 WL 1226981, at \*23 (S.D.N.Y. Mar. 31, 2021) (quoting *Webb* v. *Goord*, 340 F.3d 105, 10-11 (2d Cir. 2003)). And of course, "[w]here

[the] [p]laintiff has failed to plead a claim for a violation of her constitutional rights, her conspiracy claim fails as well." *Id.* (citing *Dowd* v. *DeMarco*, 314 F. Supp. 3d 576, 587 (S.D.N.Y. 2018)); *see also Singer* v. *Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("[A]lthough the pleading of a [Section 1983] conspiracy will enable a plaintiff to bring suit against purely private individuals, the lawsuit will stand only insofar as the plaintiff can prove the *sine qua non* of a [Section] 1983 action: the violation of a federal right."). Here, Plaintiffs' conspiracy claim necessarily fails because Plaintiffs have not adequately pleaded a violation of their constitutional or statutory rights. *See, e.g.*, *Curley* v. *Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). Moreover, Plaintiffs fail to allege in a non-conclusory manner the overt acts and the agreement that allegedly comprised this conspiracy. *See Lee* v. *Law Office of Kim & Bae, PC*, 530 F. App'x 9, 10 (2d Cir. 2013) (summary order) ("Absent from [the plaintiff's] second amended complaint are allegations, made in a non-conclusory way, setting out the overt acts, and the agreement, that allegedly comprised the conspiracy."). Accordingly, insofar as it is construed as a claim for conspiracy to violate Section 1983, Count I must also be dismissed.

### e. Plaintiffs' Claims Are Barred by Qualified Immunity

\*14 Even if Plaintiffs had asserted a viable claim under Section 1983 (which they have not), the claim would be barred by qualified immunity. "Qualified immunity shields government officials performing discretionary functions from suits for money damages unless their conduct violates clearly established law of which a reasonable official would have known." *Nat'l Rifle Ass'n of Am.* v. *Vullo*, 49 F.4th 700, 714 (2d Cir. 2022), *vacated and remanded on other grounds*, 602 U.S. 175 (2024). The doctrine is intended to "give[ ] government officials the breathing room to make reasonable even if mistaken, judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)).

"The Supreme Court has instructed that '[q]ualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Vega* v. *Semple*, 963 F.3d 259, 272 (2d Cir. 2020) (quoting *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009)). The defense will shield federal and state officials from money damages unless a plaintiff sufficiently pleads "[i] that the official violated a statutory or constitutional right, and [ii] that the right was

'clearly established' at the time of the challenged conduct." *Id.* at 273 (quoting *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 735 (2011)). A defendant has the burden of proving the affirmative defense of qualified immunity. *See Gomez* v. *Toledo*, 446 U.S. 635, 640-41 (1980).

As discussed previously, *see supra* in section B.1.a, the Court finds that Plaintiffs have not sufficiently pleaded a qualifying violation of their rights. Therefore, Plaintiffs clearly fail to meet their burden under the first prong of the two-part test to defeat a qualified immunity defense. In the interests of completeness, however, the Court concludes that neither Plaintiffs' claimed constitutional rights nor their statutory rights under the FNHRA were clearly established when the March 25th Directive was issued. Thus, Plaintiffs' Section 1983 claim is also barred by qualified immunity.

#### i. Constitutional Rights

Under the second prong of the qualified immunity analysis, "a case directly on point" is not required "for a right to be clearly established." *White* v. *Pauly*, 580 U.S. 73, 78-79 (2017) (*per curiam*) (internal quotation marks omitted). That being said, "existing precedent must have placed the statutory or constitutional question *beyond debate.*" *Id.* (emphasis added) (quoting *Mullenix* v. *Luna*, 577 U.S. 7, 12 (2015)); *see also Douglas* v. *City of New York*, No. 18 Civ. 9327 (KPF), 2022 WL 294075, at *8 (S.D.N.Y. Feb. 1, 2022) ("The Supreme Court has 'repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.' " (quoting *D.C.* v. *Wesby*, 583 U.S. 48, 63-64 (2018))). "A right is 'clearly established' when '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Vincent* v. *Yelich*, 718 F.3d 157, 166 (2d Cir. 2013) (alterations in original) (quoting *Jackler* v. *Byrne*, 658 F.3d 225, 242 (2d Cir. 2011)). Put differently, "an official is immune from liability unless, under the particular circumstances the official faced, any 'reasonable offic[ial]' would 'have known for certain that the conduct was unlawful' under then-existing precedent." *Liberian Cmty. Ass'n of Conn.* v. *Lamont*, 970 F.3d 174, 187 (2d Cir. 2020) (alterations in original) (quoting *Ziglar* v. *Abbasi*, 582 U.S. 120, 152 (2017)). Here, Plaintiffs' alleged constitutional violations fail to meet this standard because "other infectious disease cases had [not] clearly articulated the substantive due process standard" that Plaintiffs argue should govern Defendants' actions. *Id.* at 191.

**\*15** This precise conclusion was reached by Judge LaShann DeArcy Hall in an analogous case in the Eastern District of New York, which case also involved constitutional claims against Defendants for their issuance of the March 25th Directive. *See Arbeeny* v. *Cuomo*, 2025 WL 71729, at *1. In that case, Judge DeArcy Hall determined that qualified immunity barred the plaintiffs' claims because the plaintiffs "fail[ed] to cite to any case similar in fact to the one at hand that would demonstrate, beyond debate, that these due process rights were clearly established in the context of public health policy decisions at the time of the issuance of the [March 25th Directive]." *Id.* at *10. Moreover, Judge DeArcy Hall emphasized that qualified immunity is intended to "protect officials when their jobs require them to make difficult on-the-job decisions," which is especially prevalent in the "context of a public health emergency." *Id.* (quoting *DiBlasio* v. *Novello*, 413 F. App'x 352, 356 (2d Cir. 2011) (summary order)).

The Court agrees with this analysis. As various courts have held, "it is implausible that 'every reasonable official' would have understood issuing or enforcing public health policies [during the COVID-19 pandemic] violated the plaintiffs' rights." *Bastian* v. *Lamont*, No. 21 Civ. 1249 (JCH), 2022 WL 2477863, at *7 (D. Conn. July 6, 2022) (quoting *Jacobson* v. *Massachusetts*, 197 U.S. 11, 31 (1905)); *see also Estate of DeRosa* v. *Murphy*, No. 22 Civ. 2301 (ESK) (AMD), 2025 WL 249169, at *3 (D.N.J. Jan. 21, 2025) (dismissing similar claims premised on a nearly identical directive issued by the State of New Jersey because, in part, plaintiff failed to plead a clearly established right at the time of the challenged conduct); *cf. Liner* v. *Hochul*, No. 21 Civ. 11116 (ER), 2023 WL 358826, at *5 (S.D.N.Y. Jan. 23, 2023) (dismissing COVID-19-related claims based on qualified immunity). And even if Defendants had violated federal law, qualified immunity "shields government officials from liability when they make reasonable mistakes about the legality of their actions." *Sudler* v. *City of New York*, 689 F.3d 159, 174 (2d Cir. 2012) (internal quotation marks omitted). Accordingly, qualified immunity independently bars Plaintiffs' constitutional claims.

#### ii. The FNHRA

The Court likewise finds that Plaintiffs have failed to demonstrate that the law around the FNHRA was clearly established at the time the March 25th Directive was issued. As Plaintiffs acknowledge, it was only the "[o]n the heels of" the Supreme Court's decision in *Talevski* that there was "no longer any doubt that FNHRA 'can create 1983-enforceable rights.' " (Pl. Opp. 18 (quoting *Talevski*, 599 U.S. at 180)).

JOSEPH FERRARI, as Administrator of the Estate of CHRISTINE..., Slip Copy (2025)

Because that decision was issued three years after the March 25th Directive went into effect, the law could not have been "clearly established" during the relevant time period.

This conclusion was also reached by Judge DeArcy Hall in *Arbeeny*. When considering a Rule 12(b)(6) argument that the plaintiffs' claims under the FHNRA were barred by qualified immunity, Judge DeArcy Hall noted that "[p]rior to the Supreme Court's ruling in *Talevski*, courts around the country, and within the Second Circuit, were split as to whether the FNHRA conferred a private right of action enforceable under Section 1983." *Arbeeny*, 2025 WL 71729, at *8. "This disagreement at the time of the issuance of the [March 25th Directive] forecloses a finding that a reasonable officer would have known that the issuance of the advisories would violate residents' rights under the FNHRA." *Id.* This Court agrees with Judge DeArcy Hall's thoughtful analysis, which observes that "[i]t is axiomatic that for a case to provide the basis to claim that the law articulated therein was clearly established to defeat a claim of qualified immunity, the case must predate the conduct at issue." *Id.*; *see also Reichle* v. *Howard*, 566 U.S. 658, 669-70 (2012) (noting that "[i]f judges [ ] disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy" (internal quotation marks omitted)).

 **\*16** Moreover, as discussed *supra* in section B.1.b, while the *Talevski* decision confirmed that the FNHRA confers a private right of action that can be enforced against state-run nursing home facilities under Section 1983, "[t]his broad proposition is insufficient to support a finding that the Decedents' rights under the FNHRA were clearly established with respect to public health regulations imposed by the state." *Arbeeny*, 2025 WL 71729, at *8; *see also Estate of DeRosa*, 2025 WL 249169, at *3 ("Here, plaintiffs bring claims against state officials for the issuance of promulgations governing the admission of residents to nursing homes during the unprecedented COVID-19 pandemic. *Talevski* neither 'contemplate[s] the circumstances presented by the instant case' nor 'place[s] the statutory or constitutional questions raised in this case beyond debate." (alterations in original) (quoting *Arbeeny*, 2025 WL 71729, at *8)). Accordingly, because the law was not settled at the time of the March 25th Directive, and even now *Talevski* does not put the statutory questions beyond debate, Plaintiffs' FNHRA claims are precluded by qualified immunity.

Recognizing the insurmountable hurdle of qualified immunity, Plaintiffs urge the Court to defer its judgment

on this question because "[t]here are issues of fact and credibility that will need to be determined by the jury, including the extent of each Defendants' personal involvement in the design and implementation of the [March 25th Directive]." (Pl. Opp. 41). However, "federal courts around the country have granted state officials qualified immunity at the motion to dismiss stage for restrictions implemented during the COVID-19 pandemic." *Mauro*, 2023 WL 2403482, at *6 (collecting cases); *see also Whitfield* v. *City of New York*, No. 20 Civ. 674 (JMF), 2025 WL 327312, at *2 (S.D.N.Y. Jan. 29, 2025) ("[T]he Second Circuit explained ... that it saw 'no reason why even a traditional qualified immunity defense may not be asserted on a Rule 12(b)(6) motion as long as the defense is based on facts appearing on the face of the complaint[.]" (quoting *McKenna* v. *Wright*, 386 F.3d 432, 436 (2d Cir. 2004))). The Court takes the same approach here and concludes that it is clear at the pleading stage that Defendants are entitled to qualified immunity. For all of these reasons, the Court dismisses Count I with prejudice.

### 2. The Court Declines to Exercise Supplemental Jurisdiction over Plaintiffs' State-Law Claims

A district court may decline to exercise supplemental jurisdiction over state and city law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Indeed, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Benefit Guar. Corp. ex rel. Saint Vincent Cath. Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003)); *see also Klein & Co. Futures, Inc.* v. *Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

Having dismissed Plaintiffs' federal claim over which the Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims. At this stage in the litigation, judicial economy will not be served by the Court retaining the state-law claims, particularly because discovery has not begun and Plaintiffs' federal claim has been eliminated "prior to the

investment of significant judicial resources." *Kolari* v. *N.Y.-Presbyterian Hospital*, 455 F.3d 118, 123 (2d Cir. 2006). Accordingly, Plaintiffs' state-law claims for New York civil-rights violations (Count II), conscious pain and suffering (Count III), wrongful death (Count IV), gross negligence (Count V), and intentional infliction of emotional distress (Count VI) are dismissed without prejudice to their refiling in state court.

### 3. The Court Will Not Grant Leave to Amend

**\*17** The remaining issue concerns further amendment of Plaintiffs' pleadings. On December 10, 2024, Plaintiffs requested leave to file a second amended complaint. (Dkt. #57). Defendants opposed this request, arguing that the flaws in Plaintiffs pleadings were incurable. (Dkt. #60 at 2). The Court ultimately denied Plaintiffs' request, without prejudice to its renewal after resolution of the instant motions. (Dkt. #61).

"Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court 'should freely give leave [to amend] when justice so requires.' " *Gorman* v. *Covidien Sales, LLC*, No. 13 Civ. 6486 (KPF), 2014 WL 7404071, at *2 (S.D.N.Y. Dec. 31, 2014) (alterations in original) (quoting Fed. R. Civ. P. 15(a)(2)). Consistent with this liberal amendment policy, "[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Id.* (alterations in original) (quoting *Block* v. *First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). That being said, "it remains 'proper to deny leave to replead where ... amendment would be futile.' " *Gorman*, 2014 WL 7404071, at *2 (quoting *Hunt* v. *All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998)). Given the analysis above, the Court does not believe that

further amendment would remedy the pleading deficiencies outlined in this Opinion. *See Baines* v. *Nature's Bounty (NY), Inc.*, No. 23-710-cv, 2023 WL 8538172, at *3 (2d Cir. Dec. 11, 2023) (summary order) (finding no abuse of discretion in denying leave to amend where plaintiffs had "already amended their complaint once in the face of a pre-motion letter from Defendants," and then "requested leave to amend again in a single, boilerplate sentence without specifying what allegations they could add or how amendment would cure any deficiencies"); *Binn* v. *Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) ("To grant Plaintiffs leave to amend would be allowing them a 'third bite at the apple,' which courts in this district routinely deny." (collecting cases)), *report and recommendation adopted*, No. 19 Civ. 6122 (GHW), 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020). Accordingly, the Court declines to grant Plaintiffs leave to amend.

### CONCLUSION

Based upon the foregoing analysis, the Court hereby GRANTS Defendants' motions to dismiss the Amended Complaint. The Court's sympathy for Plaintiffs and their loved ones simply cannot supplant governing law. The Court dismisses Count I with prejudice, and Counts II through VI without prejudice. The Clerk of Court is directed to terminate all pending motions, terminate all remaining dates, and close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 965131

---

**Footnotes**

1    This Opinion draws its facts from the Amended Complaint ("AC" (Dkt. #39)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Nelson A. Boxer ("Boxer Decl., Ex. [ ]" (Dkt. #43)), the Declaration of Rita M. Glavin ("Glavin Decl., Ex. [ ]" (Dkt. #48)), and the Declaration of Joseph L. Ciaccio ("Ciaccio Decl., Ex. [ ]" (Dkt. #52)). *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

JOSEPH FERRARI, as Administrator of the Estate of CHRISTINE..., Slip Copy (2025)

For ease of reference, the Court refers to Zucker's memorandum of law in support of his motion to dismiss as "Zucker Br." (Dkt. #44); to DeRosa's memorandum of law in support of her motion to dismiss as "DeRosa Br." (Dkt. #46); to Cuomo's memorandum of law in support of his motion to dismiss as "Cuomo Br." (Dkt. #49); to Plaintiffs' consolidated memorandum of law in opposition to Defendants' motions as "Pl. Opp." (Dkt. #53); to Zucker's reply memorandum of law as "Zucker Reply" (Dkt. #56); to DeRosa's reply memorandum of law as "DeRosa Reply" (Dkt. #55); and to Cuomo's reply memorandum of law as "Cuomo Reply" (Dkt. #54).

2       Specifically, Plaintiffs propose the following two classes:

> **Class 1:** Comprised of individuals who were nursing home residents who were under lockdown orders at any time during the effectiveness of the March 25th Directive, and were exposed to, contracted the COVID-19 viral infection, and died after the March 25th Directive came into effect compelling nursing homes to admit and readmit patients discharged from hospitals even if they were positive for COVID-19 ("Class 1"). [Plaintiffs] estimate Class 1 is potentially comprised of more than 7,000.

> **Class 2:** Comprised of individuals who were nursing home residents at any time during the period the Defendants were actively conspiring, suppressing, distorting, and manipulating public health information about death count of the COVID-19 infection in nursing home settings ("Class 2"). [Plaintiffs] estimate Class 2 is potentially comprised of more than 8,000.

(AC ¶ 57).

3       Plaintiffs refer to the pronouncement as the "March 25th Directive," while Defendants refer to it as the "March 25th Advisory." (*Compare* AC ¶ 1, *with* Zucker Br. 3, DeRosa Br. 2, *and* Cuomo Br. 4). Both terms appear in the text of the document. (*See* Boxer Decl., Ex. A). The Court adopts Plaintiffs' nomenclature, recognizing that this semantic difference has no impact on the Court's analysis.

4       For clarity, the Court refers generally to "Plaintiffs' " claims, even as it is aware that the conduct underlying the claims was directed at, and the consequences felt most acutely by, Decedents.

5       *See generally Cullen* v. *Mello*, No. 23-413, 2024 WL 1904571, at *2 (2d Cir. May 1, 2024) (summary order):

> "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Kaluczky* v. *City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995) (cleaned up). Nor does "substantive due process ... entitle federal courts to examine every alleged violation of state law, especially ones that, while perhaps vexatious, are more routine than egregious." *Kuck* v. *Danaher*, 600 F.3d 159, 167 (2d Cir. 2010). Rather, "[s]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale* v. *Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).

6       In their opposition brief, Plaintiffs argue for the first time that the March 25th Directive should be analyzed under a strict scrutiny standard. In doing so, Plaintiffs aver that strict scrutiny applies because the March 25th Directive was "not of general applicability, [and] it imposed greater strain on a specific group, i.e., vulnerable, elderly, and frail nursing home residents." (Pl. Opp. 14). However, Plaintiffs misapprehend the law. To begin, age is not a suspect classification and thus rational basis review would govern the Court's analysis. *See We The Patriots USA, Inc.* v. *Conn. Off. of Early Childhood Dev.*, 76 F.4th 130, 158 (2d Cir. 2023) ("Under the Equal Protection Clause, claims that the government has discriminated based on age are typically subject to rational basis review because age is not a suspect classification."), *cert. denied*, 144 S. Ct. 2682 (2024). What is more, even if the Court were to apply the scrutiny-based standard to Plaintiffs' claims, it would apply rational basis scrutiny and evaluate Plaintiffs' claims under the deferential standard articulated in *Jacobson*

SPA-53

v. *Massachusetts*, 197 U.S. 11 (1905), pursuant to which "state and local authorities are granted substantial deference in enacting measures 'to prevent the spread of contagious disease' during public health crisis.' " *Jones* v. *Cuomo*, 542 F. Supp. 3d 207, 217 (S.D.N.Y. 2021) (quoting *Jacobson*, 197 U.S. at 35); *see also We The Patriots USA, Inc.* v. *Hochul*, 17 F.4th 266, 290 (2d Cir. 2021) (applying *Jacobson* to uphold decision to require healthcare facility employees to be vaccinated against COVID-19). Under such a standard, Plaintiffs' claims also fail because Plaintiffs have not shown that the March 25th Directive had no "real or substantial relation" to the public health crisis. *See, e.g.*, *Clementine Co., LLC* v. *Adams*, 74 F.4th 77, 84 (2d Cir. 2023) (upholding vaccination requirements that "plainly had a real and substantial relation to the City's public health goal of combatting the COVID-19 pandemic").

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.